**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

COMPONENT HARDWARE GROUP, INC., :
                                 : CIVIL ACTION NO: 05-891 (MLC)
        Plaintiff,               :
                                 :     **MEMORANDUM OPINION**
        v.                       :
                                 :
TRINE ROLLED MOULDING CORP.,     :
                                 :
        Defendant.               :
_____:

**COOPER, District Judge**

     Plaintiff, Component Hardware Group, Inc. ("Component"),

moves for a preliminary injunction enjoining defendant, Trine

Rolled Moulding Corp. ("Trine"), from, <u>inter alia</u>, manufacturing,

marketing, or selling grease filters imprinted with Component's

name, Underwriters Laboratories ("UL") numbers R10173 and R7283,

or name designations F-30, F-35, F-50, or F-60.  (Component Prop.

Ord.)[1]  Trine cross-moves for a preliminary injunction enjoining

Component from, <u>inter alia</u>: selling grease filters to any

customers Trine has sold to since 1982; selling the Grease Guard,

a competing filter; selling filters imprinted with UL numbers

R10173 and R7283; disparaging Trine or its products; and

representing to Trine's customers that Trine has no right to sell

its grease filters.  (Trine Prop. Ord.)

---

     [1] Underwriters Laboratories, Inc. is a testing and
certification organization that tests products for safety.  (Rego
Decl., Ex. A, Glossary of UL Terms, Introduction.)  A UL file
number ("UL number") is a designation assigned by UL that
"identifies a file for an Applicant within a specific product
category."  (<u>Id.</u>, Glossary of UL Terms, "File Number" Definition.)

Component brought this action on January 24, 2005 against
Trine in New Jersey Superior Court, Ocean County.  (Compl.)
Component generally contends that it designed a series of grease
baffle filters in 1982 and entered into a contract with Trine
whereby Trine agreed to manufacture the filters.  (Component Br.
at 3.)  Component alleges that in the Fall of 2004 it advised
Trine that it no longer desired Trine to manufacture or
distribute filters.  (Burns Cert. at ¶ 12.)  Component asserts
that Trine's refusal to refrain from manufacturing and selling
the filters constitutes the "stealing" of Component's "goodwill,
reputation, . . . customers, and grease filter design."
(Component Br. at 1.)  The complaint specifically asserts causes
of action for: breach of contract, misappropriation of trade
secrets, tortious interference with contract and with prospective
economic advantage, breach of implied covenants of good faith and
fair dealing, breach of fiduciary duties, conversion, unfair
competition under N.J.S.A § 56:4-1 et seq. and 15 U.S.C. §
1125(a)(1)(A), and unjust enrichment.  (Compl.)

Trine removed the action on the basis of diversity and
subject matter jurisdiction on February 14, 2005.  (Not. Remov.)
Trine then filed a third-party complaint against defendants
Richard Bohacik alleging unenforceability of the Grease Guard
patent, and Thomas Carr, alleging slander and trade libel. (Ans.,
Ctrclm., & 3d Party Compl. ("Ctrclm."), at 30-31, 34-35.)  Trine
also filed a counterclaim against Component alleging, inter alia,

2

breach of contract, breach of fiduciary duties, breach of implied covenant of good faith and fair dealing, intentional interference with prospective economic advantage, unfair competition, and unjust enrichment.  (Id. at 26-36.)  Trine generally asserts that: (a) Trine designed and owns the baffle filter series; (b) the parties had an exclusive agency contractual relationship, with Component acting as Trine's agent and Trine acting as the principal; and (c) Component breached the contract by substantially reducing its purchasing requirements and instead selling its own competing filter.  (Trine Br. at 4-12.)

The Court has considered the papers submitted by the parties and heard oral argument on March 9, 2005.  The Court conducted an evidentiary hearing on April 6-8, 11-13, and 27, May 23 and 31, and June 3, 2005.  The Court, at that hearing, heard from Component's witnesses: (a) Alfred Klein, a founder of Component (4-6-05 Tr. at 9-188); (b) Richard Bohacik, former shareholder of Component and named inventor of the patent for Component's Grease Guard (4-6-05 Tr. at 192-278, 4-7-05 Tr. at 3-46); (c) Martin Burns, Component's Vice-President of Operations (4-7-05 Tr. at 48-237); and (d) Thomas Carr, Component's President and CEO (5-31-05 Tr. at 220-241, 6-3-05 Test.).  The Court also heard from Trine's witnesses: (a) Lester Wykowski, Trine's Maintenance Supervisor (4-8-05 Tr. at 13-161, 4-11-05 Tr. at 5-35); (b) Stephen Bohacik, a former stockholder and former Vice-President of Component, (4-11-05 Tr. at 40-180, 4-12-05 Tr. at 3-130; (c)

3

James Lange, Trine's Director of Operations (4-12-05 Tr. at 160-235, 4-13-05 Tr. at 3-233, 4-27-04 Tr. at 3-296); (d) Michael Conte, Inventory Control Manager for Franklin Machine Products ("FMP"), a customer of both Component and Trine (5-23-05 Tr. at 50-139); and (e) Frank Rella, Jr., Trine's President and sole owner (5-23-05 Tr. at 157-201, 5-31-05 Tr. at 3-216).

The Court hereby issues its findings of fact and conclusions of law as required by Federal Rule of Civil Procedure ("Rule") 52. The Court, for the reasons stated herein, will deny Component's motion and also deny Trine's cross motion.

## CHRONOLOGY OF EVENTS — FACTUAL FINDINGS

Most of the historical facts are undisputed.  Such conflicts as arise in the evidence are noted and resolved based upon our evaluation of credibility.[2]  Although the issue of which assets or interests were transferred by Component to Trine in the sale of certain Standard-Keil assets ("the Component-Trine sale") is a factual issue, that ultimate factual determination is set forth below in Section I of the Conclusions of Law portion of this memorandum opinion; it is best explained within the legal framework discussed in that section.

This matter concerns four groups of filter product lines.

_____

[2]  Where a stated fact herein relies on our resolution of a conflict in the testimony we have generally made our credibility determination without discussion, but we have included references to both sides of the conflicting testimony.

Each has a particular name designation and UL number.  The Court
has created a table of these groups for the sake of clarity.

| | Group 1[3] | Group 2 | Group 3 | Group 4 |
|---|---|---|---|---|
| Name Designation | F-30 (aluminum)<br><br>F-35 (galvanized)<br><br>F-50 (stainless steel) | Fire Chief = F-30<br><br>Fire Marshall = F-35<br><br>Fire Guardian = F-50<br><br>Fire Fighter = F-60 | Grease Guard:<br>FA-30<br>FG-35<br>FS-50 | T-30<br>T-35<br>T-50<br>T-60<br>T-70 |
| UL Number | R10173,<br><br>Vols. I & II[4] | F-30,35,50 = R10173<br>F-60 = R7283[5] | R10173,<br><br>Vol. III[6] | R11714[7] |

I.   **Historical Facts**

---

[3] Group 1 refers to Trine-made filters from 1983 to 1998.
These filters were sold by Component per the parties' contractual
relationship.  F-30, F-35, and F-50 are hereby referred to as the
"F-series designations."

[4] Group 2 refers to Trine-made filters from 1998 to 2005.
The Fire Chief, Fire Guardian, Fire Marshall, and Fire Fighter
filters ("the Fire-series filters") were formerly manufactured
and sold by Standard-Keil Hardware Manufacturing Co. ("Standard-
Keil").  The F-series designations correspond to the Fire-series
filters because each is nearly identical in design and produced
of the same alloy.

Group 3 refers to filters manufactured by Shanghai New
Tree Metals Co., Ltd. ("Shanghai") and being sold by Component.

Group 4 refers to Trine-made filters now being sold by
Trine as of April 2005.

[4] Component is listed as applicant and Trine is listed as
manufacturer.

[5] Component is listed as applicant and Trine is listed as
manufacturer.

[6] Component is listed as applicant and Shanghai is listed
as manufacturer.

[7] Trine is listed as applicant and manufacturer.

5

Trine is an original equipment manufacturer ("OEM") of steel component parts for the commercial hardware food service industry, including baffle-type grease filters. (Lange Cert. at ¶ 2.)[8] Trine has two manufacturing divisions: a food service division manufacturing baffle-type grease filters, and a roll-form division manufacturing component parts including angles, channels, and moldings for various industries. (5-23-05 Tr., Rella Test., at 162.) Trine is a New York corporation with its principal place of business in Bronx, New York. (Ctrclm. at 9.)

Trine was founded in approximately 1942. (Rella Cert. at ¶ 2.) The Rella family purchased Trine in the 1950s and has owned it since that time. (Id.; 5-23-05 Tr., Rella Test., at 158.) Trine, and its sister company Inductoweld, were owned by Frank Rella, Sr. and Dave Wilson prior to 1993. (Id. at 158.) Wilson passed away in 1993, leaving Frank Rella, Sr. as the sole owner of Trine and Inductoweld. (Id. at 158-59.) Frank Rella, Jr., Trine's current President and sole owner, succeeded Wilson as president in 1993. (Id. at 160.) Frank Rella, Sr. was the CEO of Trine and Inductoweld for approximately 10-11 months after Wilson

---

[8] Component asserts that Trine is merely a "job shop" or "jobber." (Burns Cert. at ¶ 2.) Component alleges that it outsources the manufacturing of its product to Trine, which merely manufacturers the product. (Id.) Trine, in contrast, contends that a "job shop" merely manufacturers a component part of a finished product, uses the specifications provided by the OEM, and manufactures products using equipment owned by the OEM. (Lange Cert. at ¶ 5.) Trine contends that it is not a "job shop" because it manufacturers a finished product using its own equipment and ships products to customers. (Id. at 5-6.)

passed away, after which time Rella, Sr. retired, leaving Rella, Jr. as Trine's sole owner.  (Id. at 161.)

Component designs, manufactures, and sells kitchen, restaurant, and plumbing products for various industries, including the food service industry.  (Burns Cert. at ¶ 2; Compl. at ¶ 1.)  Among the products that Component sells and distributes to customers are baffle-type grease filters used in overhead commercial and residential kitchen stove exhaust fan systems.  (Burns Cert. at ¶ 3.)  Component is a Delaware corporation with its principal place of business located in Lakewood, New Jersey.  (Compl. at ¶ 1.)

Component was founded by former employees of Standard-Keil Hardware Manufacturing Co. ("Standard-Keil") in 1981.  Alfred Klein's family started the Standard-Keil business in the late 1930s.  (4-6-05 Tr., Klein Test., at 9.)  It became a manufacturer and distributor of speciality stainless steel fittings for the commercial food service industry.  (Id.)  Klein's father sold Standard-Keil to Instrument Systems Corporation ("ISC") in the late 1960s.  (Id. at 11.)  Klein stayed with the company and was promoted to President and General Sales Manager in or about 1968.  (Id. at 12.)  During Klein's tenure at Standard-Keil, from 1968 to 1981, the corporation evolved into a full service supplier to manufacturers of stainless steel commercial food service and laboratory equipment.  (Id. at 13.)  Grease filters were among

7

the products that Standard-Keil provided to suppliers during Klein's tenure as President and General Manager.  (Id. at 16, 21.)  The corporation initially manufactured wire mesh grease filters based on a commonly known design.  (Id. at 18-19.)  These filters, however, were discontinued because the mesh filters were a fire hazard.  (Id.)

In response to safety parameters set by UL and the National Fire Prevention Association, Standard-Keil, with the help of a consultant, designed the baffle-type grease filter ("baffle filter"), which it began manufacturing in the mid-1970s.  (Id. at 19, 21.)  By 1981 the baffle filter was the only type of grease filter that Standard-Keil sold.  (Id. at 34.)  As of 1981 Standard-Keil sold four types of baffle filters (the "Fire-series filters") in various sizes with the following name designations: (1) the Fire Fighter, which was an expensive, heavy-duty stainless steel filter that came in both an adjustable and non-adjustable model; (2) the Fire Chief, which was made out of aluminum; (3) the Fire Marshall, which was made out of galvanized steel; and (4) the Fire Guardian, which was made out of stainless steel.  (Id. at 35-39.)

Klein was informed by a business associate in 1981 that ISC was looking to sell Standard-Keil.  (Id. at 41-42.)  He approached the chairman of ISC to ask that he, along with Fred Weinmann and Eric Klein, be given the opportunity to buy Standard-Keil.  (Id.

8

at 43.)  Klein was told ISC was not looking to sell Standard-Keil. (Id.)  Klein later confirmed that ISC was in fact attempting to sell Standard-Keil and again, along with Weinmann, confronted ISC.  (Id.)  Klein, Weinmann, and Eric Klein were then fired from Standard-Keil.  (Id. at 43-44.)  These former Standard-Keil employees formed and incorporated Component a few days after being fired.  (Id. at 44, 48.)  Bill Matthaei and Irv Brown joined Component six months thereafter.  (Id. at 44.)  Steven Bohacik joined Component in the late Spring of 1982.  (Id. at 51.)

Component, a few weeks after its formation in 1981, began negotiating with a company named Standex to distribute castors, stainless steel fittings, legs, and adjustable inserts.  (Id. at 47-48.)  In April or May 1982, Component began selling grease filters manufactured by Rutzler.  (Id. at 52-53.)  Rutzler produced filters for Component from 1982 to 1983.  (4-6-05 Tr., Klein Test., at 159-60.)  Component "wean[ed]" itself off of Rutzler in 1983.  (Id.)  Trine then assumed the position of exclusive manufacturer of baffle filters sold by Component from 1983 to 2005.  (Id. at 159-61.)

## II.  **The General Design of a Baffle Filter**

The general purpose of the baffle filter is to force grease-laden air rising from the cooking surface to rapidly shift direction several times so that the grease is trapped in the baffles. (4-6-05 Tr., Klein Test., at 19-20.)  The grease then

9

runs down the baffles into weep holes.  (Id.)  These weep holes
discharge the grease into a channel that directs the grease away
from the filtering surface into a grease collection cup.  (Id.)  A
baffle filter generally consists of about 18 parts: (1) a series
of baffles, between 12 and 15, depending on the filter's size;
(2) an inner and outer frame; and (3) two handles that are
fastened into place.  (Id., Richard Bohacik Test., at 198-99.)

     The Standard-Keil filters had baffles with tabs on the ends
that were fitted into slots in the inner frame and bent over the
inner frame to hold the baffles in place.  (Id. at 199.)  The
outer frame was then wrapped around the inner frame and the
corners of the outer frame were riveted.  (Id.; 4-8-05 Tr.,
Wykowski Test., at 73.)  Handles were then crimped onto the outer
frame.  (Id. at 76; 4-6-05 Tr., Richard Bohacik Test., at 228-29.)
The Standard-Keil filters were not patent protected.  (4-6-05
Tr., Klein Test., at 143; Id., at Richard Bohacik Test., at 281.)

     The Trine-made filters are nearly identical in construction,
except for the following product changes: (1) the baffles are
secured to the inner frame using pop rivets; (2) the handles are
fastened to the outer frame using pop rivets; (3) the corner of
the outer frame is smoother and less jagged than the Standard-
Keil product; and (4) the dimensions of the weep holes are
slightly larger, to facilitate the draining of grease.  (Id. at
227-29; 4-8-05 Tr., Wykowski Test., at 73-78.)

## III.  **Trine's Manufacturing of Baffle Filters**

Trine and Component commenced discussions, in or about early 1982, about Trine producing baffle filters comparable to the Standard-Keil filter for Component to sell.  (Id. at 16-17; 4-6-05 Tr., Klein Test., at 54-60; Compl. at 2; Ctrclm. at 10.) Trine — in particular, Lester Wykowski, a machinist, John Lari, a plant engineer, and Nick Sielecki, a draftsman and engineer — then set out to produce a baffle grease filter.  (Id. at 21-22.) Trine had not manufactured baffle filters before, so Component provided Trine, in early 1982, with a Standard-Keil filter for Trine to use as a model so it could produce a comparable filter. (4-6-05 Tr., Klein Test., at 62-63; 4-8-05 Tr., Wykowski Test., at 17-18, 88.)  Trine employees then disassembled that Standard-Keil filter to see how the product was designed.  (4-8-05 Tr., Wykowski Test., at 28-29.)  Trine funded all the costs associated with "gearing up" the grease filter product line and did not ask Component to finance any portion of the start up costs.  (5-31-05 Tr., Rella Test., at 55.)

Trine designed equipment necessary to manufacture the baffle filter, at its own expense, including: tooling, dies, machines, and other equipment.  (4-6-05 Tr., Richard Bohacik Test., at 286; 4-8-05 Tr., Wykowski Test., 21, 29-36, 72-79.)[9]  Trine also made

---

[9]  Wykowski contends that it was Trine that designed the baffle filter, as the Trine-made filter has technical differences in its construction compared to the Standard-Keil baffle filter. (4-8-05 Tr., Wykowski Test., at 120-27.)

slight construction changes to the Standard-Keil baffle filter design. (4-6-05 Tr., Richard Bohacik Test., at 227-29; 4-8-05 Tr., Wykowski Test., at 73-78.) Trine, in effect, produced a baffle filter using the Standard-Keil filter as a model, thereby utilizing a process of reverse engineering. (Id.; 4-6-05 Tr., Richard Bohacik Test., at 236.)

Trine's Sielecki, to produce a baffle filter, first created design drawings for tooling to produce each component of the filter. (4-8-05 Tr., Wykowski Test., at 21.) Wykowksi used Sielecki's drawings to create the tooling. (Id.) Lari then laid out the machinery necessary to assemble the filter. (Id.) Trine produced a sample filter that it provided to Component to be used for UL safety testing in September 1982. (4-8-05 Tr., Wykowski Test., at 82.)

Component applied for a UL number, and paid the initial application fee to apply for UL registration, for the Trine-made baffle filter in 1982. (4-11-05 Tr., Stephen Bohacik Test., at 73; 4-6-05 Tr., Klein Test., at 161; Lange Cert. at 12.) The Trine-made filter was approved by UL on October 29, 1982 and assigned UL number R10173. (Ex. P-3, 12-20-82 UL Letter.)[10]

---

[10] Component's Stephen Bohacik testified that Trine-made baffle filters made out of aluminum and stainless steel were granted National Sanitary Foundation ("NSF") approval in the 1990s. (4-11-05 Tr., Stephen Bohacik Test., at 75-77.) Bohacik testified that Component paid for the fees associated with the NSF approval of those filters. (Id. at 75.) Component advertises the Trine-made filters as being NSF approved. (Id. at 78; Ex. P-20, § D, CHG Catalog.) Trine contends that the baffle filters,

Component was listed as the applicant and Trine was listed as the manufacturer. (Id.)[11]

Trine, however, was having difficulty mass producing baffle filters. (4-6-05 Tr., Richard Bohacik Test., at 205.) Richard Bohacik, a former plant manager at Standard-Keil, approached Klein about employment opportunities at Component. (Id. at 204-05.) Klein told Richard Bohacik to contact Trine since Trine was working on producing a baffle filter and Bohacik had experience with that product at Standard-Keil. (Id.) Richard Bohacik was hired by Trine as a consultant in December 1982. (Id. at 208-09.) Richard Bohacik worked as a consultant for Trine, on Trine's payroll, for approximately one year. (Id. at 212.) While at Trine Richard Bohacik worked with Lari, Wykowski, Sielecki, and other Trine employees to modify the manufacturing equipment and

---

F-30, F-35, and F-50, are not NSF approved, as those filters are not stamped NSF certified, while the Fire Fighter/F-60 is stamped. (4-12-05 Tr., Lange Test., at 210.) Component disputes that contention, citing the NSF website as listing the F-30, F-35, and F-50 as certified. (6-3-05 Carr Test.)

[11] A UL number is permitted to be stamped on a product and signifies that the particular product has successfully passed UL's safety tests and an initial production inspection of the manufacturer's facility. (Rego Decl. at 3.) "UL has exclusive rights and possession to the contents of its files." (Id.) A UL number does not "connote[] ownership of [a] product or [a] product's intellectual property." (Id.) An "applicant" is a company that applies to UL for the certification of a particular product. (Id.) A "manufacturer" is a company "that maintains and operates the factory facilities where a UL certified product is manufactured or assembled, and where conformity assessment audits are conducted as a part of UL's Follow-up Service." (Id.)

manufacturing process for the baffle filter.  (<u>Id.</u>)  Trine worked
out the kinks in its manufacturing process and was able to
produce small quantities of baffle filters by the Spring of 1983.
(<u>Id.</u> at 218-19.)  A Trine-made baffle filter was first sold in
early 1983.  (<u>Id.</u> at 287.)  By late 1983 Trine was manufacturing
filters at "full speed."  (<u>Id.</u> at 219.)

**IV.  <u>The Parties' Contractual Relationship</u>**

This matter concerns a 22-year contractual relationship
between Component and Trine.  Trine began manufacturing and
Component began selling baffle filters made of three different
kinds of alloys in various sizes in 1983.  These Trine-made
filters were designated by the alloys the filters were made of:
F-30 for aluminum, F-35 for galvanized steel, and F-50 for
stainless steel.  (4-6-05 Tr., Klein Test. 65-66.)  The
designations F-30, F-35, and F-50 ("the F-series designations")
are derived from Standard-Keil part numbers, which were adopted
by Component's Fred Weinmann, a former Standard-Keil employee,
who initially used the F-series designations to designate baffle
filters manufactured by Rutzler.  (<u>See</u> <u>Id.</u>; <u>Id.</u>, Richard Bohacik
Test., at 200-202, 235-36; 4-7-05 Tr., Burns Test., at 51; Exs.
P-18, 19, Standard-Keil catalogs.)[12]  The F-series designations
were then later applied to Trine-made filters.  (<u>Id.</u>)  Component
used the F-series designations on Trine-made filters ("F-series

_____

[12] Trine asserts that Lari invented the F-series designations.
(Def. Br. at 5; 4-8-05 Tr., Wykowski Test., at 85-86.)

14

filters") while Standard-Keil was still using the same
designation system.  (See 4-6-05 Tr., Klein Test., at 65-66.)
The F-series filters were stamped with Component's name and UL
number R10173 and were packaged in boxes labeled with Component's
name.  (4-6-05 Tr., Klein Test., at 72, 97-98.)

Component's sale of F-series filters grew quickly and by
mid-1983 all of the baffle filters sold by Component were made by
Trine.  (Id. at 80.)  The parties' contractual relationship
initially began with Component buying F-series filters from Trine
for a set price and Component then selling those filters in the
marketplace.  (Id. at 72.)  That arrangement changed within six
to eight months after the parties' relationship began, in order
to compete with Standard-Keil.  (Id. at 72-73.)

The parties developed a system involving three methods by
which F-series filters were sold to customers ("the parties'
sales arrangement").  (Id. at 155.)  The first method involved
direct sales from Trine to customers: a customer would place an
order with Trine directly, Trine would fill that order from its
inventory, and ship the product and bill the customer directly
("direct ships").  (Id. at 155-56.)  When this method was used,
Trine would receive the purchase price from customers and then pay
Component a "commission," which represented a percentage of the
purchase price.  (Id. at 156.)  Trine was the final decision
maker on the price for direct ships.  (4-11-05 Tr., Stephen
Bohacik Test., at 115; 4-13-05 Tr., Lange Test., at 46.)

The second method involved direct purchases of F-series filters from Trine: Component would buy directly from Trine and pay Trine a set purchase price ("direct purchases"). (4-6-05 Tr., Klein Test., at 155.) Trine and Component both agreed on optimal inventory levels for each F-series product line, to be maintained at Component's facilities, from which Component would buy filters using the direct purchase method. (4-6-05 Tr., Klein Test., at 156-57.) Component would send Trine a "weekly manifest" each Monday indicating how much in-stock inventory had dropped below the optimal pre-set inventory levels. (Id.) Trine was then obligated to manufacture and deliver to Component enough F-series filters to replenish Component's inventory up to the pre-set inventory levels. (Id.) On direct purchase sales Trine would deliver F-series filters to Component as dictated by the weekly manifest. (4-13-05 Tr., Lange Test., at 47-50.) Component would warehouse these direct purchase filters until Component itself bought the product. (Id. at 48-49, 52.) Component would then pay Trine a set purchase price, and then Component would resell the product in the marketplace for a price of its choosing. (Id. at 47, 53.) The purchase price paid by Component to Trine was set by Trine. (Id. at 53; 4-6-05 Tr., Klein Test., at 155.) Trine did not pay Component a commission for direct purchase sales. (4-13-05 Tr., Lange Test., at 50.)

16

The third method was called "commission sales."[13]  Trine
would deliver F-series filters to Component to satisfy the weekly
manifest inventory requirements.  (Id. at 54-55.)  Component
would warehouse this inventory until it was purchased by a
customer.  (4-13-05 Tr., Lange Test., at 47-48.)  This inventory
was held on a consignment basis, in that it belonged to Trine.
(4-7-05 Tr., Burns Test., at 69.)  Upon the purchase of the filter
by a customer, Component would ship the product and bill the
customer directly.  (4-6-05 Tr., Klein Test., at 157-58.)  When
Component sold a commission sales filter directly from inventory,
Component would remit the purchase price to Trine.  (Id.; 4-13-05
Tr., Lange Test., at 54-55.)  Trine set the price it received for
commission sales.  (4-11-05 Tr., Stephen Bohacik Test., at 116.)
Component would remit payment for commission sales to Trine sixty
days after the week the sale was made.  (4-13-05 Tr., Lange
Test., at 76.)  Trine would then pay Component a commission for
the sale of the baffle filter.  (Id.)  Trine would pay Component's
commission 15 days after it received money from Component.  (Id.)
Component earned its commission by "going out and generating
sales for Trine."  (4-11-05 Tr., Stephen Bohacik Test., at 49.)

A fourth method of sales concerned the Fire Fighter, also
designated as F-60.  Trine began manufacturing the Fire Fighter

---

[13]  The first method described above, called "direct ship,"
also resulted in a commission paid by Trine to Component.

in 1998.  (4-13-05 Tr., Lange Test, at 82, 84; 4-27-05 Tr., Lange
Test., at 65.)  Trine kept an inventory of Fire Fighters at its
facility.  (4-13-05 Tr., Lange Test., at 67.)  When a customer
bought a Fire Fighter through Component, Component would send
Trine a purchase order and Trine would then ship the product to
Component.  (Id.)  Component would remit the purchase price to
Trine.  (Id.)  Trine set the price for the Fire Fighter.  (Id.)
There also were times when Trine would sell a Fire Fighter filter
directly to a customer.  (Id. at 68.)  Trine did not pay a
commission to Component for sales of the Fire Fighter.  (Id. at
67.)  The Fire Fighter filters were treated differently than the
other F-series filters, even though it was a relatively low
volume product, as these filters were priced high and had a high
profitability.  (Id. at 67-68; 5-23-05 Tr., Rella Test., at 169.)

    This arrangement continued from 1983 to 2004.  (4-6-05 Tr.,
Klein Test., at 158-59; 4-13-05 Tr., Lange Test., at 174.)  The
parties continued to send and receive the weekly manifests until
January 2005.  (Lange Cert. at 17.)  Component, as of 1984,
exclusively purchased F-series filters from Trine and Trine, as
of 1983, exclusively sold F-series filters to Component.  (4-6-05
Tr., Klein Test., at 159-60.)  The parties did not have a written
agreement detailing the rights and responsibilities associated
with the relationship.  (4-7-05 Tr., Burns Test., at 196-97; 4-12-
05 Tr., Lange Test., at 211; 5-31-05 Tr., Rella Test., at 47-48.)

18

The relationship, rather, was a "handshake agreement." (4-12-05 Tr., Lange Test., at 211.)

Michael Conte, Vice President of FMP, a long-time customer of Trine and Component, testified that his understanding of the relationship between Component and Trine, and the common knowledge of his company, was that "Component was acting as what I would call a representative of Trine, some sort of rep type agreement, or agent type agreement." (5-23-05 Tr., Conte Test., at 9, 55.) Conte testified that the relationship between Trine and Component, where Trine would sell a filter and Component would receive commissions for that sale made directly by Trine to customers, was a very common type of relationship in the food service industry. (Id. at 55.) Conte also testified that his understanding was that the parties had an exclusive relationship. (Id. at 34.) Conte testified that during his 16 year tenure at FMP, he, and others in his company, referred to the F-series filters as Trine's filters. (Id. at 86.)

FMP has sent payments directly to Trine since the 1990s. (Id. at 9.) Conte testified he did not question why Trine did not have its own name on the F-series filters because it is customary in his industry for companies to engage in "private labeling." (Id. at 87.) Private labeling is a practice where FMP, for example, would put another entity's name on a product that it manufactures. (Id. at 87-88.) Conte described the

19

practice of private labeling, stating: "[I]n essence, we [FMP] own the product, we manufacture it, we own the rights to it, but the end user may not see our name on it.  They may see a distributor from whom [they are] purchasing it." (<u>Id.</u> at 88.)

The sale of Trine-made baffle filters grew steadily through the 1980s and 1990s. (4-6-05 Tr., Klein Test., at 81.)  Component lost the business of Captive Air, a large manufacturer of commercial range hoods, which represented a significant portion of Component's grease filter business, in the mid-1990s. (<u>Id.</u> at 86-87.)  At that time, Captive Air complained that the Trine-made F-series filters were not durable enough. (<u>Id.</u>)[14]  Component's sale of baffle filters grew from $0 in 1983 to approximately $35 million in the mid-1990s, despite this loss. (<u>Id.</u> at 88-89.)

The number of baffle filters that Trine shipped to Component on a weekly basis increased from 1995 to 2001. (4-13-05 Tr., Lange Test., at 59.)  The numbers leveled off in 2002 or 2003. (<u>Id.</u>)  Trine sold 245,000 F-series filters under the arrangement with Component in 2002. (<u>Id.</u>)  Trine geared up to produce 24,000 F-series filters per month in 1999 and that production goal

_____

[14]  Component's Martin Burns testified that Component lost eight other customers besides Captive Air. (4-11-05 Tr., Burns Test., at 195.)  Carr testified he was unaware of written complaints relating to the F-series Trine-made filters, other than Captive Air's 1995 letter to Component. (6-3-05 Tr., Carr Test., at 70-71.)  Trine contends that the loss of the Captive Air business in the mid-1990s was due to deficient customer relations by Component. (5-31-05 Tr., Rella Test., at 42-44. <u>See also</u> note 57, <u>infra</u>.)  We need not resolve that issue here.

remained substantially the same until October, 2004.  (Id. at 60-
62.)[15]  The Trine-made aluminum baffle filters, designated as F-
30, were the biggest selling filters, compared to the other
Trine-made filters, and represented the largest portion of F-
series filter sales as of 2004.  (4-7-05 Tr., Burns Test., at
167.)  Component's gross annual sales for all of its product
lines were approximately $47 million, as of July 2001, and the
Trine-made baffle filters represented approximately 5% of
Component's gross sales.  (4-6-05 Tr., Klein Test., at 125-26.)
The grease filter business represented approximately 3% of
Component's total business in 2003.  (6-3-05 Carr Test.)

Component paid the UL maintenance fees associated with the
F-series filters, under UL number R10173, from 1984 to 1997.
(Lange Cert. at ¶ 14; 4-13-05 Tr., Lange Test., at 86.)[16]  Trine
paid the UL quarterly inspection fees during that time for UL
number R10173.  (Id.)[17]  As part of the parties' arrangement

_____

[15]  Component's Martin Burns testified that Component ships
between 18,000 to 20,000 F-series filters per month for a total
of approximately 240,000 F-series filters per year.  (4-7-05 Tr.,
Burns Test., at 195.)

[16]  Maintenance fees consist of an annual one-time fee,
billed in December of the previous year, associated with a
particular UL number and are charged according to how many files
exist under that number.  (4-12-05 Tr., Lange Test., at 207; 4-
13-05 Tr., Lange Test., at 85.)

[17]  Inspection fees are service fees paid to UL for quarterly
inspections performed by UL inspectors at the manufacturer's
premises to ensure that the UL registered product is being
manufactured in keeping with the construction details contained
in the Follow-up Service Procedure.  (4-12-05 Tr., Lange Test.,

Trine relied on Component to sell the baffle filters that it manufactured. (4-6-05 Tr., Klein Test., at 103.) Component, acting as Trine's commission sales agent: advertised Trine-made filters in its catalogs, sales literature, and mailings to customers; employed an internal and outside sales force; participated in a buying consortium, known as Prime Advantage; and attended trade shows to promote, among other products, Trine-made filters. (Id.; Ex. P-20; 4-11-05 Tr., Stephen Bohacik Test., at 52, 93, 117-21, 136-37, 223; 5-23-05 Tr., Rella Test., at 170-71; 6-3-05 Carr Test.)[18]  Component did so at Component's own expense. (6-3-05 Carr Test.)  Trine, though, did contribute some funds toward participation in the buying group in the form of higher commissions for those Trine-made filters sold by Component as a consequence of the buying group. (4-27-05 Tr., Lange Test., at 278; 6-3-05 Carr Test.)

---

at 207-08; 4-13-05 Tr., Lange Test., at 85; Exs., D-49—54, Follow-up Serv. Agmts. for UL U.S. & Canada.)  The UL inspector, after inspecting the product and manufacturing process, notes that such an inspection was performed in a UL Follow-up Service Procedure, which is kept on the manufacturer's premises. (Id.) These inspection fees are typically paid by the manufacturer of the UL registered product. (4-7-05 Tr., Burns Test., at 206; 5-31-05 Tr., Rella Test., at 64-65; 6-3-05 Carr Test.)

[18]  Prime Advantage is a buying group formed by customers for the purpose of buying products at a cheaper price from suppliers who are members of the organization. (6-3-05 Carr Test.) Suppliers who join the group are given preference over non-group suppliers. (Id.)  Component is a supplier member of this group and as a consequence attends two meetings per year, where it meets with customers. (Id.)  Component paid $110,000 in administrative fees and another $125,000 in rebates to customers in 2005 to belong to this group. (Id.)

Component's Stephen Bohacik had the primary responsibility for dealing with Trine as to the daily operations of the parties' relationship from 1983 to 2001, when Bohacik retired.  (4-6-05 Tr., Klein Test., at 154; 4-11-05 Tr., Stephen Bohacik Test., at 62.)  Klein, however, had regular meetings with Dave Wilson of Trine during that period.  (Id.)  The prices of baffle filters were set by Klein of Component and Dave Wilson or Frank Rella, Jr. of Trine until approximately 2001.  (4-11-05 Tr., Stephen Bohacik Test., at 116.)  Jim Lange of Trine was directly involved in the sale of baffle filters to Component from 1995 to 2004. (4-13-05 Tr., Lange Test., at 56.)  Trine's correspondence, as of 2003, was with Component's purchasing agent(s).  (Id. at 169.) Trine did not have a "designated" contact person at Component by September 2004.  (Id. at 168.)

Trine did not question the ownership or control of the F-series filters or UL's listing of Component as the applicant for UL number R10173 from 1983 to 2004.[19]  (Id. at 182-85.)  Klein testified that Component viewed its relationship with Trine to be a "collective business" in which both parties had a vested interest.  (4-11-05 Tr., Stephen Bohacik Test., at 134.)  Rella testified that Trine had a similar view: "[I]t was a combination

---

[19] But Trine did question the ownership of the Fire Fighter/F-60 and Component's listing as the applicant for UL number R7283.  (4-6-05 Tr., Klein Test., at 185-86.)  See infra.

of both companies that developed the customers" for the baffle
filters.  (5-31-05 Tr., Rella Test., at 205.)

**V.   Sale of Standard-Keil Assets**

Standard-Keil approached Component in 1997 and proposed that
it could buy Standard-Keil for a small sum if it agreed to have
Standard-Keil manufacture all of its products.  (4-6-05 Tr.,
Klein Test., at 105.)  Component declined the offer because it
had outstanding contractual relationships with other
manufacturers, including Trine.  (Id. at 105-06.)  Standard-Keil
and Component instead negotiated a contract, in 1997, whereby
Component purchased, in effect, all of Standard-Keil's assets for
more than $6 million ("the Standard-Keil—Component sale").  (Id.)
Component bought all of Standard-Keil's net assets for all of
Standard-Keil's product lines including the Fire Chief, Fire
Marshall, Fire Guardian, and Fire Fighter.  (Id. at 167-68.)
Component specifically purchased: tooling, dies, machinery and
equipment, inventory, customer lists, work-in-progress, raw
materials, finished goods, all permits, licenses, and
registrations issued to and associated with Standard-Keil's
products, and intellectual property.  (Id. at 105-10; 4-11-05
Tr., Stephen Bohacik Test., at 118-22.)  The intellectual property
acquired by Component included all valid patents and trademarks
of Standard-Keil.  (4-6-05 Tr., Klein Test., at 106-08.)  The
purchase price paid by Component to Standard-Keil was determined

24

by allocating particular values to machinery, equipment, work-in-progress, raw material, and finished goods.  (4-11-05 Tr., Stephen Bohacik Test., at 119-20.)  Specific prices were not allocated to product lines, intellectual property, customer lists, engineering drawings, or vendor files.  (Id. at 119-21.)

Component approached Trine in late-1997 and offered Trine the opportunity to purchase certain assets Component acquired in the Standard-Keil—Component sale, specifically those assets associated with the former Standard-Keil baffle filter product lines, including machinery, equipment, and tooling.  (4-6-05 Tr., Klein Test., at 111; 4-13-05 Tr., Lange Test., at 9.)[20]  Component indicated that if Trine declined the offer, Component itself could use the assets to manufacture its own filter products or could sell the assets to another manufacturer at auction, thereby exposing Trine to potential competition.  (Id.; 4-6-05 Tr., Klein Test., at 113.)  Lange and Rella of Trine and Stephen Bohacik of Component engaged in oral negotiations regarding the sale of the former Standard-Keil assets in November 1997.  (4-12-05 Tr., Stephen Bohacik Test., at 96; 4-13-05 Tr., Lange Test., at 18.)

---

[20]  Trine asserts that it did not need nor did it use the machinery and equipment used to produce the Fire Chief, Fire Marshall, or Fire Guardian, because it already had machinery, which it had just replaced in 1996, to make the nearly identical F-series filters.  (4-13-05 Tr. Lange Test., at 6, 11; 4-27-05 Tr., Lange Test., at 89.)

The parties orally agreed on a purchase price of $192,247.56 by December 1997 ("Component-Trine sale").  (Id. at 21-22.)[21]

The parties' negotiations were memorialized in two documents, both drafted by Component: (1) a Component invoice, detailing, inter alia, specific equipment and machinery being sold as part of the sale, and (2) a letter written by Stephen Bohacik to Jim Lange, dated February 4, 1998.  (Id. at 80; Ex. P-7, Component-Trine sale Inv.; Ex. D-10, 2-4-98 Component-Trine sale Letter.)  The Component invoice specifically listed machinery and equipment by machine number and liquidation value. (Ex. P-7.) It also assigned a value to finished goods, located in both New Jersey and California, raw materials, and work-in-progress.  (Id.)

The letter written by Stephen Bohacik to Jim Lange states in pertinent part:

> Attached is a list of tooling that has been transferred to Trine as part of your portion of the Acquisition of product lines formerly belonging to [Standard-Keil] in Allenwood, New Jersey.
>
> Tooling was used in the manufacture of the Fire Chief, Fire Marshall, Fire Guardian and Fire Fighter baffle filters which are the same products as you had been manufacturing for us for many years. . . .
>
> The delivery of this tooling completes the transaction of your purchase of these items.

---

[21]  Component charged Trine the same purchase price that it paid to Standard-Keil as to raw material, work-in-progress, and finished goods.  (4-6-05 Tr., Klein Test., at 109.)  Component charged Trine a percentage less than what Component paid Standard-Keil for the machinery.  (Id.)

(Ex. D-10.)  Attached to this letter was a specific and detailed list of tooling, dies, and straighteners by machine number.  (Id.)

As part of the transaction, Component gave Trine business transaction records belonging to Standard-Keil, including a sales analysis of former Standard-Keil customers and vendor files.  (4-11-05 Tr., Stephen Bohacik Test., at 127-133; 4-13-05 Tr., Lange Test., at 29-30.)[22]  Component also gave Trine engineering drawings for the Fire Fighter and other Fire-series filters.  (Id. at 142, 144-47.)[23]  Neither the business transaction records nor engineering drawings were listed specifically as part of the Component-Trine sale.  (Id. at 141-42.)

Component contends it did not transfer to Trine ownership interest in the Fire-series filters.  (4-6-05 Tr., Klein Test., at 111, 116; 4-11-05 Tr., Stephen Bohacik Test., at 155-58, 190-200.)

---

[22]  Component contends that it gave Trine a list of former Standard-Keil customers as a sales tool, to help Trine understand how much its business would increase due to the dissolution of Standard-Keil and in an effort to induce Trine to participate in the Component-Trine sale.  (4-11-05 Tr., Stephen Bohacik Test., at 232-33; 4-12-05 Tr., Stephen Bohacik Test., at 137.)
Trine contends that Stephen Bohacik gave Lange the list of former Standard-Keil customers, and indicated that the customers on the list that were not prior customers of either Trine or Component were considered to be Trine's new customers.  (4-13-05 Tr., Lange Test., at 24-25.)  Lange denies that Bohacik told him that the list of former Standard-Keil customers was to be used merely as a reference or sales tool.  (Id. at 24.)

[23]  Lange asserts that Trine did not need the engineering drawings for the Fire Chief, Fire Marshall, or Fire Guardian because Trine was already making nearly identical baffle filters, designated as the F-series.  (4-13-05 Tr., Lange Test., at 27.)  Lange asserts that Trine only needed drawings for the Fire Fighter.  (Id.)

Rather, Component asserts it retained the intellectual property rights to these former Standard-Keil baffle filters and merely sold Trine the manufacturing equipment and inventory associated with the former Standard-Keil filter product lines.  (Id.) Stephen Bohacik testified that while he did not explicitly tell Trine that Component was retaining the intellectual property to the Fire-series filters, it was understood that Component was "retaining the rights to the UL's, to the intellectual property, to the drawings."  (4-11-05 Tr., Stephen Bohacik Test., at 158.)

Trine asserts that it acquired "everything" that Component bought from Standard-Keil relating to the filter product lines for the Fire Chief, Fire Marshall, Fire Guardian, and Fire Fighter, including proprietary rights to the Fire-series filters. (4-13-05 Tr., Lange Test., at 36-37; 5-23-05 Tr., Rella Test., at 175.)  Trine contends that Component did not explicitly tell it that Component was retaining the intellectual property and proprietary interest in the former Standard-Kiel baffle filter product lines.  (Id.; 4-27-05 Tr., Lange Test., at 61-62.)

Trine, as part of the sale, acquired finished products stamped with Standard-Keil's name and UL number R7283.  (4-11-05 Tr., Stephen Bohacik Test., at 151; 4-13-05 Tr., Lange Test., at 84.)  These finished Standard-Keil filters, designated the Fire Chief, Fire Marshall, and Fire Guardian, were nearly identical to the Trine-made F-30, F-35, and F-50, respectively.  (4-11-05 Tr., Stephen Bohacik Test., at 152-54.)  The finished former Standard-

Keil Fire-series filters were sold by Trine to Component under
the same sales methods used for Trine-made filters. (4-13-05 Tr.,
Lange Test., at 146-50.) The former Standard-Keil Fire-series
filters were sold interchangeably with Trine-made filters until
the supply of finished Standard-Keil filters was exhausted. (Id.)

     Once the Standard-Keil filters were sold off, the parties'
relationship resumed and Trine manufactured baffle filters and
Component sold those filters as the parties had before the
Component-Trine sale. (4-6-05 Tr., Klein Test., at 121-23.)
Trine began producing the Fire Fighter, after setting up the
former Standard-Keil machinery and equipment used to produce the
Fire Fighter, in 1998. (4-27-05 Tr., Lange Test., at 85, 88.)
The Fire Fighter, also designated by Trine as F-60, was treated
differently by the parties than the other F-series filters in
that it was considered to be Trine's proprietary product. (4-6-
05 Tr., Klein Test., at 127-29.) Trine, therefore, beginning in
1998, did not pay commissions to Component for sales of the Fire
Fighter and Trine was free to sell the Fire Fighter to whomever
it wanted. (Id.) The Fire Fighter was stamped with Component's
name and UL number 7283, Standard-Keil's former UL designation.
(4-13-05 Tr., Lange Test., at 84.) The Fire Fighter filter is a
very small percentage of total baffle filter sales. (See 5-23-05
Tr., Conte Test., at 143 (single digit percentages); 4-27-05 Tr.,
Lange Test., at 19 (Trine has sold approximately 16 F-60 filters
since October 2004).)

Component's Klein wrote Trine's Frank Rella, Jr. on January 29, 2001, in response to Rella's inquiry as to Trine's proprietary interest in the Fire Fighter.  (Ex. D-11, 1-29-01 Klein Letter.)  Klein, in that letter, wrote in pertinent part:

> After our recent telephone conversation, I tracked Steve [Bohacik] down, and reviewed your comments with him.  In the broad sense, he essentially confirmed your understanding.
>
> In retrospect, I wish matters had been handled a little more formally by Steve and yourself, as I am uncertain how to transfer what you require, after the fact.  What I am asking from Trine and yourself is for time to talk to our attorney, to see exactly what it is that you do not yet have, that can be conveyed to you to further formalize your agreement with Steve.
>
> I will be meeting with our attorney on a variety of matters within the next two weeks. I will contact you immediately thereafter, to work out details, so that you are comfortable that the Fire Fighter is a proprietary product of Trine. . . .

(Id.)  Klein, during cross-examination, testified that this letter confirmed that Trine acquired the Fire Fighter as part of the Component-Trine sale.  (4-6-05 Tr., Klein Test., at 171-73, 187.) Klein and Bohacik acknowledged that the Fire Fighter was not treated differently, in any respect, in the sales documents memorializing the Component-Trine sale.  (Id. at 187; 4-11-05 Tr., Stephen Bohacik Test., at 169-70; see Exs. P-7, D-10.)[24] Stephen Bohacik confirmed the Fire Fighter was not the subject of a separate sale after the Component-Trine sale.  (Id. at 176.)

_____

[24]  Klein testified that Component allowed Trine to assume proprietary rights to the Fire Fighter because it was part of the Component-Trine sale and Component did not contest Rella's claim to the Fire Fighter.  (4-6-05 Tr., Klein Test., at 189-90.)

Trine began paying the UL inspection and maintenance fees
for UL numbers R10173, Volumes I and II (the UL number associated
with the Trine-made F-series filters) and 7283 (the UL number
associated with the former Standard-Keil Fire Fighter) in 1998.
(4-13-05 Tr., Lange Test., at 85-89, 97-107; 5-31-05 Tr., Rella
Test., at 4-5; Exs. D-60—62, Documents relating to payment of UL
fees.)[25]  Trine has (1) paid those UL fees from 1998-2005 (id.),
(2) been listed as the manufacturer, and Component as the
applicant, for UL number R10173, Volumes I and II, from 1982 to
2005 (Exs. D-49, 50), and (3) been listed as the manufacturer, and
Component as the applicant, for UL number R7283 from 1998 to 2005.
(Exs. D-51, 51a, Follow-up Serv. Procedures for UL number R7283.)
Component is still listed as the applicant for UL numbers R10173
and R7283 to this date.  (6-3-05 Carr Test.)  Trine was not
listed as the applicant of UL number R7283, assigned to the Fire
Fighter, even though Trine after purchasing the Fire Fighter
product line had Component's permission to do so.  (4-6-05 Tr.,
Klein Test., at 129, 186; 4-13-05 Tr., Lange Test., at 117-119.)[26]

---

[25]  See infra VII and n.37 for a discussion of the payment of
UL fees for UL file number R10173, Vol. III.

[26]  Jim Lange contends that he requested that Stephen
Bohacik contact UL to change Trine to the listed applicant and
manufacturer for UL number R7283 and relied on Bohacik to ensure
that those changes were communicated to UL.  (4-13-05 Tr., Lange
Test., at 118-119.)
    Klein claims that while Trine had Component's permission to
list Trine as the applicant and manufacturer for UL R7283, that
change was not made because Trine "never followed through with
it."  (4-6-05 Tr., Klein Test., at 129.)

## VI.  **Development of Trine's T-70**

Trine began developing a new type of grease filter in the
early to mid-1990s.  (4-13-05 Tr., Lange Test., at 127; 5-31-05
Tr., Rella Test., at 6.)  Trine did so after encouragement from
Component to design a new type of filter.  (Id.; 4-6-05 Tr.,
Klein Test., at 89-90, 242; 4-12-05 Tr., Stephen Bohacik Test.,
at 79-80.)[27]  Trine invested approximately $150,000 and
significant time into developing a new filter.  (5-31-05 Tr.,
Rella Test., at 7.)  Those costs began to mount considerably in
approximately 2000.  (Id.)  This new filter was designated the T-
70.  (Id.)  Component offered to help finance the development of
the T-70 but Trine rejected the offer.  (4-13-05 Tr., Lange
Test., at 152; 4-6-05 Tr., Klein Test., at 90.)  Trine alone
incurred all the expense in producing the T-70.  (4-13-05 Tr.,
Lange Test., at 151-52.)

Trine showed Stephen Bohacik prototypes of the T-70 on
multiple occasions and Bohacik took those prototypes back to
Component.  (4-12-05 Tr., Stephen Bohacik Test., at 81-83.)
Trine showed Stephen Bohacik and Bill Matthaei a prototype of the

---

[27]  Trine contends that Component encouraged it to create a
cheaper filter than the F-series filters, for the "replacement
market."  (4-13-05 Tr, Lange Test., at 131-32; 5-31-05 Tr., Rella
Test., at 6.)  Rella denies that Component encouraged Trine to
develop a stronger, more durable grease filter.  (Id. at 6.)
    Component claims that it encouraged Trine to create a
better, more robust filter at less cost than the F-series
filters.  (5-31-05 Tr., Carr Test., at 235-36; 6-3-05 Carr Test.)
    Component's Burns denies that he encouraged Trine to develop
the T-70.  (4-7-05 Tr., Burns Test., at 158.)

T-70 in May of 2000.  (Id.; 4-12-05 Tr., Stephen Bohacik Test.,

at 79-81.)[28]  Matthaei, after seeing the prototype, wrote Rella

and Lange a letter, dated June 2, 2002, stating:

> All of us at Component Hardware are extremely
> pleased and enthused over the sample filter design you
> shared with us and we are anxious to develop additional
> avenues of marketing this product for you.
>
> A point we should consider before finalizing the
> designs is the total sizes that would be required by
> our trade.  As I indicated, our largest potential
> customer for this new design is Captive Air . . . [W]e
> find they utilize approximately 400 aluminum 16x16
> filters per month in addition to their other size
> requirements.  We know that tooling is costly but
> Captive Air's requirements would have an immediate
> impact on our sales efforts and this size should be
> considered in helping us to penetrate the marketplace.
> Our wish list continues to include a stainless
> steel version down the road . . .
>
> As suggested during our visit, perhaps when the
> initial samples are ready you can schedule a visit to
> us here in Lakewood, New Jersey to meet the rest of our
> crew and explore other areas in which to grow our
> relationship.

(Ex. D-12, 6-2-02 Matthaei Letter.)[29]  Trine's Rella and Lange

understood this letter and the conversation at the meeting to

---

[28]  Component took a sample of the T-70, provided to it by
Trine, to legal counsel to obtain a legal opinion on whether it
infringed on a patent for the Kason-Trapper, a filter designed
and sold by Component's competitor Kason Industries, Inc.
("Kason").  (4-6-05 Tr., Richard Bohacik Test., at 270-71; 4-12-
05 Tr., Stephen Bohacik Test., at 93-94.)  Legal counsel found
that the T-70 did not infringe on outstanding patents held by
Kason.  (Id. at 308-09; Ex. D-13, 9-19-00 Patent Counsel Letter.)

[29] Richard Bohacik and Stephen Bohacik both testified that
Component did not think very highly of the T-70 because it had
what Component perceived as design flaws.  (4-6-05 Tr., Richard
Bohacik Test., at 264-70; 4-11-05 Tr., Stephen Bohacik Test., at
204-05.)  Richard Bohacik testified that Component would never
have sold the T-70 because of its design flaws.  (Id. at 266.)

mean that Component would be Trine's sales agent for the T-70 if the product were later manufactured.  (4-13-05 Tr., Lange Test., at 153-54; 5-31-05 Tr., Rella Test., at 10-11.)[30]

Trine also showed the T-70 prototype to Component's Martin Burns in 2002, at which time Trine informed Burns that the tooling for the T-70 was still in development.  (4-7-05 Tr., Burns Test., at 152.)  Burns took a sample of the T-70 with him back to Component after the 2002 meeting with Trine.  (Id. at 156.)  Trine did not execute a confidentiality agreement with regard to its disclosing the T-70 to Component.  (4-7-05 Tr., Burns Test., at 197.)

The T-70 filter is a "clam-shell" design consisting of two pieces, a front and back, stamped together.  (Lange Cert. at ¶ 43.)  It has a hollow box-like appearance.  (Ex. D-13.)  Each of the two pieces of the T-70 is flat and smooth and the two plates consist of a number of elongated parallel air passages.  (Id.; Lange Cert. at ¶ 43.)  The T-70 does not utilize a "roll can-seam" design.  (Burns Reply Cert. at ¶ 4.)

Trine signed a UL Service Agreement and applied to UL, after paying an initial product investigation fee, for approval of the T-70 on September 23, 2002.  (Ex. P-16, 9-23-02 UL Services Agreement; 5-31-05 Tr., Rella Test., at 99-100.)  Trine, over the

---

[30]  Burns testified that if the T-70 met with Component's approval there was a possibility that Component would have sold the T-70 through the commission sales relationship existing between it and Trine.  (4-7-05 Tr., Burns Test., at 157.)

course of three years, paid approximately $20,000 in UL initial
application and testing fees in relation to the T-70. (Id. at
207.)  Trine did not forward a copy of its agreement with UL to
Component. (Id. at 100-02; 4-27-05 Tr., Lange Test., at 229.)[31]
UL denied approval because the T-70 failed UL's safety tests.
(5-31-05 Tr., Rella Test., at 110.)  UL admitted that it made a
mistake in its initial testing and retested the T-70, but the T-
70 failed again. (Id.)  Trine again applied for UL approval of
the T-70 on November 24, 2003. (5-31-05 Tr., Rella Test., at
110-11; Ex. P-36, 11-24-03 UL Services Agreement.)  Component's
Carr was aware that Trine had submitted the T-70 to UL for safety
testing and that it had failed. (6-3-05 Carr Test.)  Trine,
however, did not send a copy of its second request for approval
of the T-70 to Component. (5-31-05 Tr., Rella Test., at 116.)
The T-70 failed UL testing three times before it passed. (4-27-
05 Tr., Lange Test., at 226-27.)

Trine received a notice that UL approved the T-70 and
authorization to apply for a UL mark on March 3, 2004. (5-31-05
Tr., Rella Test., at 118; Ex. P-22, 3-3-04 UL Letter.)  Trine did
not send a copy of this notice of approval or inform Component
that the T-70 was approved by UL. (4-27-05 Tr., Lange Test., at

---

[31] Rella contends that he did not forward Component a copy of
the agreement because Component already knew that Trine had
developed the T-70. (5-31-05 Tr., Rella Test., at 101-02.)

35

233-39; 5-31-05 Tr., Rella Test., at 118-120.)[32]  The T-70 was initially approved by UL under UL number 20516.  (4-13-05 Tr., Lange Test., at 157; Ex. P-22.)[33]  The T-70 is currently registered under UL number 17114.  (Exs. D-52, 52a.)[34]  Trine is listed as the applicant and manufacturer for UL number R17114. (Id.)  Component learned that the T-70 had been approved by UL in March of 2004 when it inadvertently received paperwork from UL. (4-7-05 Tr., Burns Test, at 215; 6-3-05 Carr Test.)  Carr testified that no one at Trine ever spoke to him about Trine's manufacturing the T-70.  (Id.)

Trine was working with an independent company, Special T, to develop the tooling dies necessary to make the T-70 when it received UL approval in March 2004.  (5-31-05 Tr., Rella Test., at 150.)  Trine sent a $65,000 deposit to Special T in March of 2004.  (Id. at 152.)  Trine was poised to submit a purchase order and make a down payment for the dies in October of 2004.  (Id.)

---

[32]  Lange testified that he kept Component apprised of Trine's efforts to develop the T-70, including UL's initial testing and re-testing of the T-70 via telephone conversations. (4-13-05 Tr., Lange Test., at 152-53.)

[33]  Trine never received a Follow-up Service Procedure for UL R20516 because UL mistakenly gave UL file number R20516 to Component.  (Lange Cert. at ¶ 64.)  Lange contacted UL on October 20, 2004 via e-mail to ask that the error be rectified.  (Id. at ¶ 66.)  UL, after receiving approval from Component's counsel, Stuart Pachman, reissued its approval for the T-70 under UL number R17114.  (Id. at ¶ 67, Ex. L, 11-4-04 Pachman Letter.)

[34]  UL number R17114 replaced UL number R20516 as the file number for the T-70.  (4-13-05 Tr., Lange Test., at 160.)

Trine anticipated beginning production for the T-70 in April or
May of 2005.  (4-13-05 Tr., Lange Test., at 164.)  Trine, because
of the present litigation, has yet to order the dies because it
can no longer afford the substantial cost of the dies.  (5-31-05
Tr., Rella Test., at 151-52.)  Nor is Trine now manufacturing the
T-70.  (Id. at 159.)  Trine did not inform Component that it
intended to order the tooling dies needed to produce the T-70.
(Id. at 150-52.)  Nor did Trine, prior to March 2004, ask
Component to participate or contribute to the manufacturing of
the tooling dies necessary to produce the T-70.  (Id. at 154.)
Trine has not patented the T-70.  (Id. at  149; 4-27-05 Tr.,
Lange Test., at 269-70.)

## VII. **Development of Component's Grease Guard**

Component's Richard Bohacik began developing a new grease
filter, the Grease Guard, in the 1990s.  (4-6-05 Tr., Richard
Bohacik Test., at 255.)  Richard Bohacik personally participated
in creating the Grease Guard and developing the roll can seam
until he retired in 2003, at which time Burns assumed Bohacik's
duties as to the Grease Guard's development.  (Id. at 272.)

The Grease Guard was developed over a long period of time
and required the use of experimental tooling.  (Id. at 259-60.)
Component had to have new tooling designed and built to make the
new filter.  (Id. at 275-76.)  The new tooling was built in China
by Shanghai New Tree Metals Co., Ltd. ("Shanghai"), the current
manufacturer of the Grease Guard.  (Id.)  Component spent about $1

million to develop the Grease Guard.  (Id. at 276.)  Component,
however, did not incur these costs alone.  (Id.)  Shanghai and
Component, rather, entered into a mutual agreement where the
parties shared the costs.  (Id.)  Component and Shanghai do not
have a written contract.  (6-3-05 Carr Test.)  Shanghai, unlike
Component, does not pay commissions to Component for Grease
Guards sold by Component nor does Shanghai have permission to
ship Grease Guards directly to customers.  (Id.)

Component investigated the possibility of domestic
manufacturers making the Grease Guard.  (4-7-05 Tr., Burns Test.,
at 277; 6-3-05 Carr Test.)  It did not ask Trine to manufacture
the Grease Guard.  (Id.; 4-7-05 Tr., Burns Test., at 153, 161-
62.)[35]  When Burns met with Trine in 2002 and saw Trine's T-70
prototype he did not tell Trine that Component was in the process
of developing the Grease Guard.  (Id. at 158-59.)  Component
ultimately decided to have the Grease Guard manufactured overseas
because it believed that it was losing considerable market share
of the filter industry and it was unsure if and when Trine would
produce a new filter.  (4-6-05 Tr., Richard Bohacik Test., at
277.)  Richard Bohacik testified that the Grease Guard will

---

[35]  Burns testified that Component did not afford Trine the
opportunity to manufacture the Grease Guard because it did not
have confidence in Trine.  (4-7-05 Tr., Burns Test., at 162.)
        Lange testified that in July 2002 Dave Wilson approached
him about manufacturing a filter with a "roll lock seam" design
and Lange told Wilson that he had not done it before and was not
sure if it could be done.  (4-13-05 Tr., Lange Test., at 185-86;
4-27-05 Tr., Lange Test., at 142-69.)

afford Component the opportunity to assume a greater portion of
the market for grease filters because the Grease Guard is a
revolutionary, stronger product.  (Id.)

     The Grease Guard is a three-piece design with front, back,
and center pieces of material that are held together by a "rolled
can seam," similar to a soup can edge.  (Id. at 257-58.)[36]  The
baffles, rather than being separate components of the filter as
in the F-series filters, are stamped into the front and back
pieces of material.  (Id.)  The center piece of material gives
the filter a rectangular or square frame that gives the filter
dimension or width.  (Id.; Ex. P-13, Ex. R, Grease Guard Patent.)
Richard Bohacik filed for a utility patent for the Grease Guard
on March 14, 2003.  (Id., 4-6-05 Tr., Richard Bohacik Test., at

---

     [36]  Richard Bohacik asserts that he personally conceived of
the idea to use a "can seam roll lock" design on a new filter
while he was looking at a can of cookies in 1992.  (4-6-05 Tr.,
Richard Bohacik Test., at 258; 4-7-05 Tr., Richard Bohacik Test.,
at 34-35.)  Bohacik claims that he alone conceived of the design
for the Grease Guard without input from Trine.  (4-6-05 Tr.,
Richard Bohacik Test.,  at 314-15.)
     Trine contends that Trine's Dave Wilson conceived of the
idea of using a "can seam roll lock" design on a new filter and
communicated that concept to Richard Bohacik at a meeting held in
July of 1992.  (4-6-05 Tr., Richard Bohacik Test., at 313-19; 4-
13-05 Tr., Lange Test., at 185-204; 4-27-05 Tr., Lange Test., at
12-13, 142-169.)  Trine further argues that the Grease Guard is a
copy of the T-70 and that Component unfairly appropriated the T-
70 design and incorporated it into the Grease Guard.  (Trine Br.
at 13-14; Ctrclm. at 24-25.)  Component disputes this allegation.
(Component Reply Br. at 2-5; 5-31-05 Carr Test., at 238; 6-3-05
Carr Test.)
     This issue is beyond the scope of this preliminary
injunction memorandum opinion per stipulation of the parties.
The Court expressly reserves judgment on this issue.

255-56.)[37]  The patent on the Grease Guard was issued on January
11, 2005 and was assigned by Richard Bohacik to Component.  (Id.
at 257; Ex. P-13, Ex. R.)

    Component applied for, and paid the initial application fee
for, UL approval of the Grease Guard in early 2003 under UL
number R10173, Volume III.  (6-3-05 Carr Test.)  UL approved the
Grease Guard and issued a Follow-up Service Procedure for the
filter on August 22, 2003.  (4-6-05 Tr., Richard Bohacik Test.,
at 272-73; Ex. P-14, Follow-Up Service Procedure for R10173, Vol.
III.)  Component is listed as the applicant and Shanghai is
listed as the manufacturer.  (Id.)  Component has paid for the
fees associated with UL R10173, Volume III, including the initial
application fee, the maintenance fees, and the inspection fees
from 2003 to 2005.  (6-3-05 Carr Test; 6-14-05 Carr Cert.)[38]

---

    [37]  A utility patent relates to the way a particular product
is manufactured.  (4-6-05 Tr., Richard Bohacik Test., at 261.)

    [38]  Lange stated in his certification that "[f]rom at least
1999 to the present, Trine has paid for all annual maintenance
fees and inspection fees relating to both UL numbers R7283 and
R10173."  (Lange Cert. at ¶ 38.)  Lange also testified during the
preliminary injunction hearing that Trine paid the maintenance
fee for R10173 for 2005, but that he was unsure if that payment
related to maintenance fees associated with the Grease Guard,
R10173, Volume III.  (4-13-05 Tr., Lange Test., at 185-204; 4-27-
05 Tr., Lange Test., at 208-209; Ex. D-62, Backup Documents
Related to Payment of Invoices.)  Lange also testified during the
hearing, in the context of the payment of maintenance fees, that
he was unaware that Trine had "paid anything" for R10173, Volume
III.  (4-27-05 Tr., Lange Test., at 217-18.)  Rella testified
that he had not seen any bills sent from UL to Trine relating to

Component paid $15,118.39 to UL for registration, testing, and approval of the Grease Guard. (Id.)  Component's Grease Guard is designated, similar to the F-series filters, by the type of alloy the filter is made of: FA-30, for aluminum, FG-35, for galvanized steel, and FS-50, for stainless steel ("FG Series"). (Ex. P-20.)

Component openly displayed the Grease Guard at the North American Food Equipment Manufacturers Association ("NAFEM") in September 2003. (5-23-05 Tr., Conte Test., at 13; 6-3-05 Carr Test.)[39]  NAFEM is a trade show that Component attends to promote and display products and interface with customers, particularly OEMs. (6-3-05 Carr Test.)  The F-series Trine-made filters had been among the products displayed at NAFEM trade shows.  (Id.)

---

a grease filter manufactured in China. (5-31-05 Tr., Rella Test., at 67-69.)
       Trine contends that Carr's certification for entry of marked exhibits, dated June 9, 2005, should not be considered because it does not prove that Component paid the maintenance fees for R10173, Volumes I and II, for 2003 and 2004. (6-14-05 Judge Letter.)  Trine, rather, contends that the exhibits attached to the certification merely support the conclusion that Component paid the annual maintenance fee for R10173, Volume III in 2005. (Id.)  See infra Conclusions of Law, I.A.2., for a discussion relating to the relevance of the payment of UL fees.

[39]  Conte of FMP, a customer of Component and Trine, testified that he first heard about the Grease Guard from Component sales manager, Ron Braham, at the September 2003 NAFEM trade show. (5-23-05 Tr., Conte Test., at 14-16.)  Braham, according to Conte, told him that the Grease Guard was more durable, stronger and a different, better design than the F-series filters. (Id.)  Conte said that Braham did not discuss the F-series filters with him. (Id.)  Conte stated that his impression, after the trade show, was that the Grease Guard "was going to be sold in lieu of the Trine filter moving forward." (Id. at 17.)

Trine contends that Component attended NAFEM in September 2003 on Trine's behalf.  (Id.)  Trine, in support of this contention, cites to a May 8, 2000 letter written by Component's Matthaei stating that Component attends Prime Advantage on Trine's behalf. (Id.; Ex. D-5, 5-8-00 Matthaei Letter.)  Carr testified that Component did not attend NAFEM on Trine's behalf; rather, it attended the trade show in order to promote its own interests. (6-3-05 Carr Test.)[40]

Shanghai first manufactured the Grease Guard approximately in August 2004.  (Id.)  Component began selling the Grease Guard in the summer of 2004.  (Id.)  Although the full product line had not been developed by that date, Shanghai was running an assembly line and producing some sizes of Grease Guards by October 2004. (6-3-05 Carr Test.)  Component did not give Trine advance notice that it was going to market or sell the Grease Guard prior to the Grease Guard first being manufactured, marketed, or sold to customers.  (Id.; 4-7-05 Tr., Burns Test., at 159-60, 163-65.) Component had sold several thousand Grease Guards by October 11, 2004.  (Id.; 4-7-05 Tr., Burns Test., at 163.)

Component first advertised the Grease Guard in its catalogs in late 2004 or early 2005.  (6-3-05 Carr Test.)  Component's

---

[40]  Carr also testified that Component did not attend Prime Advantage meetings to merely promote Trine's products; rather, it attended the meetings to promote all of its products.  (6-3-05 Carr Test.)

current catalogs advertise both the Trine-made F-series filters
and the F-60, along with the Grease Guard series of filters.
(Id.; Ex. P-20.) Component's upcoming catalog, however, does not
advertise the Trine-made filters.  (6-3-05 Carr Test.)  Component
now will sell and ship a customer an F-series or F-60 filter if
the customer requests it.  (4-7-05 Tr., Burns Test., at 62-64,
72; 6-3-05 Carr Test.)

**VIII.** **Notification of a Change in the Parties' Relationship**

    A.   <u>Prior to the October 19, 2004 Meeting</u>

Component began requesting fewer F-30 filters from Trine on
the weekly manifest in the second week of September 2004.  (4-7-
05 Tr., Burns Test., at 63-64; 4-27-05 Tr., Lange Test., at 165-
66.)  Component began ordering fewer F-30 filters from Trine
because Component's FA-30 was beginning to sell.  (4-7-05 Tr.,
Burns Test., at 64.)  Component did not give Trine advance notice
of its intentions to order fewer F-30 filters prior to September
2004.  (Id. at 164-66; 4-13-05 Tr., Lange Test., at 14.)

Lange called A.J. Kraft, a salesman at Component, after he
initially saw that the number of F-30 orders had declined, and
was told that orders declined because Component lost the business
of a customer called Greenheck.  (4-13-05 Tr., Lange Test., at
166.)  Lange, questioning the validity of that answer, asked for
a sales manager but was told that no one was available with whom
he could speak.  (Id. at 166-67.)  Lange called Component one

week later again inquiring into the reason why filter orders had
declined and spoke to John Foran, a Component purchasing agent.
(Id. at 167.)  Lange was told that orders were down because
"business was off."  (Id.)  Lange again asked for a supervisor,
but was told that no one was available. (Id. at 168.)  Lange
received the weekly manifest on October 11, 2004 and again saw
that the inventory orders were much lower than usual — the orders
for F-30 20x20 filters went from 1,500 to 96.  (Id. at 171-72.)

F-30 filters were the biggest selling type of filter,
accounting for approximately 71% to 73% of Trine's overall filter
sales over the years.  (Id. at 173.)[41]  The filter product line
was over 56% of Trine's overall business as of October 2004.  (5-
31-05 Tr., Rella Test., at 21.)[42]  Trine's gross annual sales,
prior to September 2004, averaged approximately $2.5 to $3
million a year.  (Id. at 58-59.)  Trine was producing, on
average, approximately 200,000 filters per month.  (Id. at 58.)
The total reduction in F-30 filters was significant; it

---

[41] Burns testified that 73% sounds high but he acknowledged
that he had not reviewed Component's sales records.  (4-7-05 Tr.,
Burns Test., at 168-71.)  Burns confirmed that the aluminum F-30
filters were the biggest selling type of filter.  (Id. at 167.)
Carr testified that he could not dispute that aluminum filters
accounted for 73% of Trine's filter business.  (6-3-05 Carr Test.)

[42] Trine sold approximately 3.5 to 4 million baffle filters
and paid Component approximately $3.5 million in commissions over
the course of its 22-year relationship with Component.  (5-31-05
Tr., Rella Test., at 30.)

represented approximately an 84% reduction in F-30 orders.  (Id. at 17-18.)[43]

Burns called Lange on October 11, 2004 to discuss the decline in the weekly manifest orders for the F-30.  (4-7-05 Tr., Burns Test., at 64, 172-73; 4-27-05 Tr., Lange Test., at 174.) Burns testified that he told Lange that Trine "could see a significant reduction in the manifest numbers for the aluminum [filters] . . . because [Component] had a new filter that looked as if was starting to be accepted in the marketplace."  (4-7-05 Tr., Burns Test., at 64.)  Lange contends that the first words Burns said to him were: "We're not going to be -- Martin Burns calling from Component.  We're not going to be buying your filters anymore."  (4-13-05 Tr., Lange Test., at 174.)  Lange testified that he responded to Burns saying: "You're not going to buy the filter anymore?  What does that mean exactly?  You went someplace else, like China?"  (Id.)[44]  Burns, allegedly, responded: "Yes, we have.  We're going to China.  We decided to go in a different direction."  (Id.)

_____

[43] Burns testified that 84% sounded high but that he could not dispute it.  (4-7-005 Tr., Burns Test., at 167.) Carr testified that he could not dispute that figure.  (6-3-05 Carr Test.)

[44] Burns denies that he ever told Lange that Component was no longer going to buy Trine-made filters.  (4-7-05 Tr., Burns Test., at 173.)

B.   <u>October 19, 2004 Meeting</u>

Rella contacted Carr to ask about the situation and request that the parties meet.  (4-13-05 Tr., Lange Test., at 176; 5-31-05 Tr., Rella Test., at 19-20.)  Rella and Lange of Trine and Burns and Carr of Component met on October 19, 2004 (the "October meeting").  (4-7-05 Tr., Burns Test., at 65; 4-13-05 Tr., Lange Test., at 177.)  Burns and Carr ("Component's representatives") claim they showed Lange and Rella ("Trine's representatives") a sample of the Grease Guard and Trine complimented the design. (4-7-05 Tr., Burns Test., at 65-66; 6-3-05 Carr Test.)  Carr testified that Trine's representatives did not express an objection that Component was marketing and selling the Grease Guard at the October meeting.  (6-3-05 Carr Test.)  Component's representatives further testified that they informed Trine's representatives that since the Grease Guard was gaining market acceptance, Component's orders for filters would be declining. (<u>Id.</u> at 65; 6-3-05 Carr Test.)  Component's representatives did not give Trine, at the October meeting, a projection as to how much filter orders would be reduced.  (4-7-05 Tr., Burns Test., at 174.)  But Carr testified that he told Trine's representatives that he anticipated that Component would continue to buy Trine-made filters for approximately 1 to 2 years, but he was unsure how long that phase-out period would be because he did not know how the Grease Guard would be accepted in the market.  (6-3-05

46

Carr Test.)  Carr testified that he told Trine's representatives
that Component would sell both F-series and Grease Guard filters
simultaneously during the transition period, but that once the
Grease Guard was accepted in the marketplace, Component would
stop buying Trine-made filters.  (Id.)

Trine, to meet Component's weekly demands made pursuant to
the weekly manifest, had to keep a significant amount of
inventory and raw materials on hand.  (4-6-05 Tr., Richard
Bohacik Test., at 320; 4-7-05 Tr., Burns Test., at 176-77.)
Those requirements remained substantially the same for many
years. (4-7-05, Burns Test., at 176-77.)  Trine, as of September
2004, was ordering materials six months to one year in advance.
(5-31-05 Tr., Rella Test., at 35-36.)  Trine typically stocked
one to two months' worth of inventory, in the form of raw
material and work-in-progress, in advance of its anticipated use.
(Id. at 27.)  Also, Component was in possession of inventory held
on consignment per the parties' commission sales arrangement
around the time of the October 19, 2004 meeting, for which
Component had yet to pay Trine for and for which Trine bore the
risk that the inventory would not be sold.  (4-7-05 Tr., Burns
Test., at 69-70, 174-75; 5-31-05 Tr., Rella Test., at 24.)

Rella expressed concern about this inventory and about $1
million in inventory at the Trine plant at the October meeting.
(4-7-05 Tr., Burns Test., at 66; 4-13-05 Tr., Lange Test., at

47

182; 5-31-05 Tr., Rella Test., at 21-23; 6-3-05 Carr Test.)  Carr testified that he assured Trine that Component would honor the inventory.  (Id.)  Component's representatives contend they asked Trine's representatives to give them a breakdown of the inventory held at Trine listed by work-in-progress, raw material, and finished goods, and by value, model, size, and quantity ("inventory list").  (Id.; 4-7-05 Tr., Burns Test., at 66-68.) Trine's representatives, according to Component's representatives, agreed to provide them with a breakdown of Trine inventory and to contact them to arrange a second meeting after that inventory list was compiled.  (Id. at 67; 6-3-05 Carr Test.)  Burns and Carr testified that they left the meeting with the understanding that Component would help Trine pare down its inventory after Trine's representatives provided them with a detailed inventory list.  (Id.; 4-7-05 Tr., Burns Test., at 68.)  Component's representatives deny that they told Trine that Component was terminating the parties' relationship or that it was going to stop buying Trine-made filters.  (Id. at 173; 6-3-05 Carr Test.)

Component's representatives contend that Trine's representatives did not inform them that Trine was developing the T-70 at the October meeting.  (Id. at 72; 6-3-05 Carr Test.) Carr also testified that Trine did not tell Component that it intended to apply for a new UL number under its own name and to stamp that UL number on the F-series filters.  (Id.)  Carr

48

testified that he did not give Trine permission, at the October meeting, to take Component's name off of the F-series filters and to stamp Trine's name instead.  (6-3-05 Carr Test.)  Trine's representatives, according to Component's representatives, asked their permission to sell directly to customers but Component refused.  (4-7-05 Tr., Burns Test., at 194; 6-3-05 Carr Test.)[45]

Rella testified that Component's representatives told him and Lange that Component was terminating the parties' agreement because it was going to sell its own Chinese-made filter.  (5-31-05 Tr., Rella Test., at 21.)  Rella contends that in response he explained how devastating this would be to Trine's business. (Id.)  Burns, according to Rella, took this news lightly and said that the filter business was only 3% to 4% of Component's overall business.  (Id.; see also 4-13-05 Tr., Lange Test., at 182.) Trine's representatives acknowledge that the parties discussed paring down Trine's inventory but testified that Component's representatives did not commit to a particular time in which this would be done.  (Id. at 183; 5-31-05 Tr., Rella Test., 23-25.) Rella testified that Carr merely commented that he was going to talk to his transition team about it.  (Id. at 22.)  Rella testified that he agreed to compile an inventory list but that he did not agree to have a second meeting, nor was there discussion

---

[45]   Rella denies that he asked Component's permission to sell Trine-made filters.  (5-31-05 Tr., Rella Test., at 29.)

of a second meeting.  (Id. at 143.)  Lange testified that it was
his understanding upon leaving the October meeting that Trine was
to compile an inventory list broken down by total dollar value,
not an itemized list of raw materials, parts, and finished goods.
(4-27-05 Tr., Lange Test., at 92-94.)  Lange denies that
Component requested an itemized inventory list broken down by
goods.  (Id. at 95-96.)  Trine's representatives acknowledge that
Component showed them the Grease Guard and that it was stamped
with UL number R10173.  (5-21-0 Tr., Rella Test., at 24; 4-13-05
Tr., Lange Test., at 177, 185.)[46]

     Trine did not contact Component to arrange a second meeting
after the October meeting.  (4-7-05 Tr., Burns Test., at 71; 6-3-
05 Carr Test; 5-31-05 Tr., Rella Test., at 142.)  Nor did Trine
contact Component to discuss further arrangements for paring down
Trine's inventory.  (Id.)

     C.   October 28, 2004 Demand Letter

     Rella directed his attorney, Lee Goldberg, to send Component
a letter specifying how much money Component owed Trine as a
result of the alteration to the parties' relationship.  (Id. at
26.)  Goldberg sent Component a letter, dated October 28, 2004,
(the "demand letter") demanding, in pertinent part, that
"Component compensate Trine for the following":

_____

     [46]  Rella testified that he believed that the Grease Guard
that he saw was a copy of Trine's T-70.  (5-31-05 Tr., Rella
Test., at 24-25.)  This issue, however, is not before the Court.
See supra note 35.

a. $154,000, the sum of which "represents the value of the
[f]ilters which have been manufactured by Trine and shipped
to Component and its affiliates";

b. $757,000, the sum of which "represents the cost of inventory
which has been incurred by Trine in connection with the
[c]ontract";

c. $374,000, the sum of which "represents the amount of
receivables owed by Component and its affiliates to Trine
through September 2004.  Component shall also pay for any
receivables due Trine for receivables after September 2004";

d. $2,000,000, the sum of which "presents a one time
termination payment of the [c]ontract."

(Ex. D-25, 10-28-04 Goldberg Letter.)[47]  Lange and Rella believe

that this letter constituted a breakdown of the inventory, as

---

[47]  Lange testified that, at the time the dollar figure of
$757,000 was calculated, that total amount consisted of
approximately: (a) $135,000 to $150,000 in finished goods; (b)
$200,000 to $250,000 in raw materials; and (c) the balance was
parts, work-in-progress, boxes, staples, tape, etc.  (4-27-05
Tr., Lange Test., at 104.)
    Rella testified that the $154,000 demanded for the value of
filters that Trine had shipped to Component now equals $200,000
because Component is overdue, approximately 180 days, in paying
its outstanding balance.  (5-31-05 Tr., Rella Test., at 183-84.)
Rella testified that much of the $757,000 cited in the demand
letter represents not just inventory, but also the value of raw
materials and work-in-progress.  (Id. at 188-89.)  Rella
acknowledged that since the demand letter was written this value
has changed and that he would have to re-calculate the current
value of inventory, raw materials, and work-in-progress.  (Id. at
192.)  Rella testified that the $374,000 cited in the letter
refers to monies owed to Trine in the form of receivables on
purchase orders.  (Id. at 194.)  That sum now totals
approximately $140,000 because much of it has been paid by
Component.  (Id.)  Rella also testified that the $2 million cited
in the demand letter represents the value of Trine's filter
business that has been lost as a result of the alteration of the
parties' relationship.  (Id. at 195.)
    Component contends that it owes Trine $19,824.71 rather than
$140,000, the sum of money Lange requested Component remit to
Trine in an April 1, 2005 letter.  (Id. at 197.)

requested by Component at the October meeting.  (4-13-05 Tr.
Lange Test., at 184; 5-31-05 Tr., Rella Test., at 26-27.)  Burns
testified that this letter did not constitute a breakdown of the
inventory because it failed to specifically quantify raw materials,
work-in-progress, and finished goods. (4-7-05 Tr., Burns Test.,
at 179-80.)  Burns and Carr testified that Trine has yet to
provide Component with documentation to substantiate its demands
expressed in the demand letter.  (Id. at 220; 6-3-05 Carr Test.)

       Component's counsel, Stuart Pachman, responded to Goldberg's
letter on November 3, 2004.  (Ex. P-30, 11-3-04 Pachman Letter.)
That letter communicated Component's perception of the parties'
contractual relationship.  (Id.)  The letter also responded to
each of Trine's demands.  (Id.)  Component refused to notify UL
that Trine was the lawful owner of UL listings for the F-series
filters, stating that the grease filters manufactured by Trine
were Component's products and were never sold to Trine.  (Id.)
Component stated that it had the right to sell its own patented
product and have it manufactured by another manufacturer. (Id.)
Component also stated that it offered to "assist Trine to work
out the inventory held by Trine.  If, however, Trine persists in
the demands made in your letter, Component will withdraw this
offer."  (Id.)  Component stated that account receivables would
be paid in the "usual course, subject, of course, to Trine's
continuing to pay 'commissions' to Component when due."  (Id.)
Component refused to pay Trine $2,000,000.  (Id.)

Carr testified that prior to receiving the demand letter Component was selling Trine-made filters as it "normally would, as [it] went out and tried to qualify customers over to the Grease Guard, but after that letter, after [it] received that letter, you know, all bets were off. [It was] going after every customer to convert them over." (5-31-05 Tr., Carr Test., at 239.)

D.   Financial Transactions After the October Meeting

After the October meeting Component continued to transmit weekly manifests to Trine as per the parties' usual course of conduct, although F-30 orders were at a much lower level.  (4-7-05 Tr., Burns Test., at 70; 6-3-05 Carr Test.)  Component continued to order "odd sized" filters that were rarely sold to customers. (5-31-05 Tr., Rella Test., at 28.)  Component purchased "a lot" of filters in November 2004, and from that month to the present Component's purchase of filters has dropped.  (Id. at 29.)

Component also continued to pay Trine per the commissions sales arrangement after the October meeting.  (4-7-05 Tr., Burns Test., at 70.)  The payment arrangement between the parties changed in November or December of 2004 when Lange told Component that sales would be transacted only on a cash on delivery ("COD") basis.  (Id. at 71; 6-3-05 Carr Test.)  The parties' method of accounting for commission sales owed by Trine to Component also changed in December 2004.  (6-3-05 Carr Test.)  Trine, as per the usual method of billing for direct shipments to customers, typically included a summary sheet listing the customer Trine sold

to, the quantity, the part number of the filter, and the selling price of the filters along with its commission statement.  (Id.) This summary sheet allowed both parties to verify the commissions Trine owed Component.  (Id.)  Trine sent the summary sheets along with its commission statements to Component in October and November 2004.  (Id.)  But Trine stopped including a summary sheet with commission statements as of December 2004.  (Id.)[48]

Rella sent Carr invoices in January 2005 that reflected, Carr assumed, the inventory for finished goods and raw materials held by Trine.  (Ex. P-43, 1-24-05 Invoices; 6-3-05 Carr Test.) Those invoices totaled about $216,000.  (6-3-05 Carr Test.)  Carr questioned the $216,000 total because it was significantly less than the $757,000 referenced in the demand letter.  (Id.)  Rella contends that the amount of the invoices in January 2005 was considerably less than $757,000 because Trine's inventory had diminished substantially since the demand letter was written. (5-31-05 Tr., Rella Test., at 188-89.)[49]  Carr acknowledged that Trine sold off some of its inventory between October 28, 2004 and January 2005 because Component had purchased filters during that time.  (6-3-05 Carr Test.)

Carr assumed that Trine wanted Component to pay for the inventory listed in the invoices so he attempted to find a buyer

_____

[48] Rella denies that Trine has failed to send Component summary sheets.  (5-31-05 Tr., Rella Test., at 188.)

[49] See supra note 46 and accompanying text.

for the raw materials cited therein.  (6-3-05 Carr Test.)  Carr
posted advertisements on an internet cite and was contacted by a
buyer interested in aluminum coil.  (Id.)  The buyer, however,
requested specific information on the grade details and price for
the material.  (Id.; Ex. P-46, Carr Emails.)  Carr contacted
Lange by letter and telephone and requested details on the size,
weight, and thickness of the coil.  (Id.; 6-3-05 Carr Test.)
Lange, however, failed to respond to Carr's inquiries.  (Id.)
Carr, therefore, has been unable to resell the raw materials
referenced in the invoices sent by Rella in January 2005.  (Id.)

Component had difficulty resolving accounting discrepancies
between Component's accounting records and Trine's statements and
requests for payments relating to amounts owed to Trine by
Component.  (Id.)  In an effort to resolve these accounting
discrepancies William Del Pizzo, Component's Chief Financial
Officer, sent Trine a letter on March 17, 2005 for the purpose of
arranging a meeting between the parties to reconcile the
accounting systems.  (Id.; Ex. P-44, 3-17-05 Del Pizzo Letter.)
That letter stated in pertinent part:

> We have asked, several times, for the opportunity
> to discuss these reconciliations with your accounting
> personnel, but you have been unwilling to make them
> available to us . . . . In a March 2, 2005 conversation
> between our staff and yours, we were informed that a
> January 2005 commission report, along with the usual
> supporting invoices, would not be forthcoming from
> Trine.
>     It appears that you are assuming that our
> manifest/commission arrangement stopped in December
> 2004 . . . . It appears that you believe that the

> arrangement we had has changed, as a consequence of our
> being in litigation.  Our view is that we should
> maintain that arrangement, pending the outcome of the
> litigation . . . . I would welcome the opportunity for
> a reconciliation of any outstanding financial issues.

(Ex. P-44.)

Del Pizzo wrote Trine another letter on March 18, 2005

stating in pertinent part:

> In response to your recent inquires regarding payment
> of outstanding invoices, please be advised that we are
> more than willing to pay Trine what we believe we owe
> you (net of commissions owed to Component Hardware
> Group, Inc.) . . . . Your insistence on payments for
> all outstanding invoices regardless of normal 60 days
> terms and COD for any new parts ordered by CHG has hurt
> our ability to pare down your inventories there, as
> well as your consigned stock in our warehouses . . . .
> Component Hardware Group is willing to do business with
> Trine based on past practices and to pay any
> reconcilable invoices; however, we will do so only if
> Trine agrees to resume normal terms and to cooperate
> with us with respect to accounting questions.

(Ex. P-45, 3-18-05 Del Pizzo Letter.)  Carr testified that

Component is willing to wind Trine down but that Trine is

unwilling to negotiate. (6-3-05 Carr Test.)

     E.   Trine and UL

Lange contacted UL on October 20, 2004 and asked if Trine

could manufacture filters stamped with UL number R10173 but

without Component's name.  (4-13-05 Tr., Lange Test., at 211-13.)

UL informed Lange that the filters did not have to be stamped with

any entity's name; rather, the filter must merely be stamped with

its corresponding UL number.  (Id. at 212.)  Lange wrote UL, on

November 9, 2004, applying for new files for two grease filters,

which at the time were listed under UL numbers R7283 and R10173,
requesting that these filters be approved under R17114, with
Trine listed as the applicant.  (Ex. P-21, 11-9-04 Lange Letter.)
Trine did so without informing Component.  (4-7-05 Tr., Burns
Test., at 73-74; 6-3-05 Carr Test.)  Trine submitted the F-series
filters, the F-60, and the T-70 for UL testing in December 2004.
(4-13-05 Tr., Lange Test., at 229.)[50]  Those filters were
approved by UL on March 31, 2005 with Trine as applicant and
manufacturer under UL number R17114.  (Ex. D-53, 3-29-05 UL
Correspondence; Ex. D-54, Notice of UL Authorization under
R17114.)  The approved filters under UL number R17114 are
designated as T-30, T-35, T-50, T-60 and T-70.  (4-13-05 Tr.,
Lange Test., at 226; 5-31-05 Tr., Rella Test., at 211.)  The
numbers 30-60 are analogous to the former Standard-Keil and
Component designations in that 30 designates aluminum filters, 35
designates galvanized filters, 50 designates stainless steel
filters, and 60 designates the Fire Fighter.  (4-13-05 Tr., Lange
Test., at 226.)

    F.   Filters Stamped with UL Numbers R10173 and R7283

    Trine last stamped R7283 on newly manufactured F-60 filters
sometime prior to October 11, 2004.  (4-27-05 Tr., Lange Test.,
at 17-18.)  Trine has not made any new parts for the F-60 since
that date.  (Id. at 18-19.)  Trine, however, had finished goods

---

[50]   Trine spent approximately $20,000 in testing fees.  (5-
31-05 Tr., Rella Test., at 62.)

and work-in-progress inventory stamped with Component's name and
UL number R7283 when UL inspected Trine's facility on November 8,
2004 and the UL inspector did not express an objection.  (Id. at
17-18.)  Trine has sold approximately 16 F-60 filters since
October 11, 2004.  (Id. at 19.)  Trine has not paid Component a
commission for those filters stamped with Component's name and UL
number R7283, because, per the parties' agreement as of 1998, it
does not owe Component a commission on Fire Fighter sales.  (Id.)

Trine stopped stamping newly made parts with Component's
name in late December 2004 after Lange learned that Component
objected to the practice.  (4-27-05 Tr., Lange Test., at 23-24.)
Lange learned this fact upon receiving a letter, dated December
17, 2004, written by Component's counsel, Stuart Pachman and sent
to UL manager Glen Woo.  (4-13-05 Tr., Lange Test., at 216-17; 4-
27-05 Tr., Lange Test., at 24.) That letter advised UL that Trine
may attempt to apply to UL for certification of the F-series
filters and expressed Component's objection to Trine allegedly
engaging in unfair competition and wrongful use of Component's
proprietary interests.  (Ex. D-20, 12-17-04 Pachman Letter.)

Trine, after receiving Pachman's letter, stopped stamping
Component's name on newly made filter parts and merely continued
to stamp F-series filters with UL number R10173.  (4-13-05 Tr.,
Lange Test., at 218.)  The F-series filters made in January and
February of 2005, therefore, were not stamped with any company's
name; rather, those filters were only stamped with UL number

R10173.  (4-27-05 Tr., Lange Test., at 243.)  Trine paid
Component a commission for sales of filters stamped without any
company's name but stamped with UL number R10173.  (4-27-05 Tr.,
Lange Test., at 243.)  Trine, however, manufactured filters with
Component's name and UL number R10173 in January and February
2005 but only sent those filters directly to Component.  (4-27-05
Tr., Lange Test., at 176-77.)  Component has not sent Trine a
weekly manifest since January 4, 2005.  (6-3-05 Carr Test.)
Component stopped ordering filters from Trine in late February or
early March 2005.  (4-27-05 Tr., Lange Test., at 177; 5-31-05
Tr., Rella Test., at 140.)

       Component, in January 2005, discovered that Trine had sold
F-series filters, with Component's name and UL number R10173, to
FMP without Component's knowledge or consent.  (4-7-05 Tr., Burns
Test., at 83-88.)  Those filters were not ordered through
Component. (Id. at 84-86.)  Trine had shipped directly to FMP in
the past.  (Id. at 88-89.)[51]  But Component told Trine, prior to
January 2005, that it no longer had permission to ship filters
with Component's name and UL R10173 directly to FMP without
Component's permission. (Id. at 88.)  Carr sent Rella a letter on
January 18, 2005 stating, in pertinent part:

---

       [51] Conte of FMP testified that the boxes of filters shipped
to FMP by Trine in January 2005 were labeled FMP and that the
packaging was per FMP and Trine's usual course of dealing since
approximately 1999.  (5-23-05 Tr., Conte Test., at 11.)

>It is our understanding that Trine is attempting to
>sell directly to some of Component Hardware's customers
>directly, including, but not limited to, Integrated
>Support Systems and FMP.  We are disturbed to have
>heard about Trine's attempts to sell the grease filter
>that Component Hardware designed and for which it
>secured UL and NSF approval for our customers . . . .
>We must therefore demand that you cease doing so
>forthwith, or we will have no choice but to take
>appropriate legal action.

(Ex. D-18, Ex. C, 1-18-05 Carr Letter.)

Trine, however, has continued to sell F-series filters that remain in its inventory stamped with Component's name and UL number R10173 directly to customers.  (4-27-05 Tr., Lange Test., at 121.)[52]  Among the customers that Trine continues to sell to are FMP, Integrated Support Systems ("ISS"), and Ecolab.  (4-27-05 Tr., Lange Test., at 121.)[53]  ISS, Ecolab, and FMP represent about 20% of the business that Trine had prior to October 2004 and Trine continues to this day to sell to those customers.  (4-27-05 Tr.,

---

[52]   Trine, as of April 27, 2005, had approximately 8,000 to 9,000 filters in its inventory stamped with Component's name. (4-27-05 Tr., Lange Test., at 121.)

[53]   FMP, prior to October 11, 2004, was the largest single purchaser of baffle filters, representing approximately 20% of the grease filter customer base industry wide.  (4-7-05 Tr., Burns Test., at 201-02.)  Trine, prior to October 2004, shipped filters directly to FMP per Trine and Component's direct shipment arrangement.  (4-27-05 Tr., Lange Test., at 116-18.)  FMP represented approximately 12% to 15% of Trine's total filter business in 2003.  (Id. at 116-18.)  Trine also shipped directly to ISS per Trine and Component's direct shipment arrangement. (Id. at 118.)  Filter sales to ISS, in 2003, represented approximately 2% to 3% of Trine's total filter business.  (Id.) Trine similarly shipped filters directly to Ecolab and filter sales to it represented approximately 3% to 5% of Trine's total filter business in 2003.  (Id. at 122-23.)

Lange Test., at 120.)  Trine has paid Component a commission for filters that are sold with Component's name and UL number R10173, per the parties' standing agreement.  (4-27-05 Tr., Lange Test., at 186; 5-31-05 Tr., Rella Test., at 132-34.)  Trine last sent Component a check for commissions on May 15, 2005, although a summary sheet was not attached.  (5-31-05 Tr., Rella Test., at 132; 6-3-05 Carr Test; Ex. D-39, 3-15-05 Cancelled Check.)  Trine intends to continue to (1) sell filters stamped with Component's name until it exhausts its inventory, and (2) pay Component a commission for those filters.  (4-27-05 Tr., Lange Test., at 193.)

Trine began selling filters stamped with its name and UL number R10173 in March 2005 to customers, including FMP and ISS. (4-27-05 Tr., Lange Test., at 16-17; 5-31-05 Tr., Rella Test., at 130.)[54]  Those filters are designated F-30, F-35, and F-50.  (Id. at 185.)  Trine sold filters stamped with its name and UL number R10173 to customers already known to both Trine and Component, including Eagle Lab, FMP, ISS, and possibly Acme Fire.  (4-27-05 Tr., Lange Test., at 186.)  Trine did not apprise Component that it intended to manufacture grease filters stamped with UL number R10173.  (4-7-05 Tr., Burns Test., at 83-84; 6-3-05 Carr Test.) Trine has not been paying Component commissions on the sale of

---

[54]  UL inspected Trine's facility on March 10, 2005 and perceived Trine stamping filters with Trine's name and UL number R10173, and did not express an objection.  (4-27-05 Tr., Lange Test., at 16-17.)

filters stamped with Trine's name and UL Number R10173.  (5-31-05 Tr., Rella Test., at 132-34.)

G.   <u>Communications to Customers by Component and Trine</u>

Michael Conte of FMP testified that Component approached FMP about buying the Grease Guard sometime in 2004.  (5-23-05 Tr., Conte Test., at 19.)  Component told Conte in December 2004 that Component was selling the Grease Guard to 98% of the hood manufacturers and that it had sold approximately 100,000 filters by that date.  (<u>Id.</u> at 20-21.)  FMP placed a purchase order for the Grease Guard with Component in early 2005.  (<u>Id.</u> at 19.)[55]

FMP had been buying Trine-made filters before October 11, 2004 and continues to do so now.  (<u>Id.</u> at 30.)  FMP is a distributor of Trine-made filters; it purchases filters from Trine and then sells those filters to others.  (<u>Id.</u> at 120.)  FMP does not receive a commission from Trine.  (<u>Id.</u>)  Conte met with Rella and Lange on December 8, 2004.  (<u>Id.</u> at 31.)  Since Trine was already a vendor of FMP prior to October 2004, at the meeting the parties discussed "ways to enhance that relationship" whereby FMP would potentially sell the T-70.  (<u>Id.</u> at 31, 62.)

Conte met with Burns and Ron Braham, Component's manager for marketing and export sales, on December 20, 2004.  (<u>Id.</u> at 23.)  Component told Conte at that meeting that it owned the UL rights

---

[55]  FMP, however, has not sold any Grease Guard filters because it is awaiting the outcome of this litigation.  (5-23-05 Tr., Conte Test., at 21.)

to the F-series filters, Trine had no right to sell the F-series filters, and Trine was selling directly to Component's customers. (Id. at 25-27, 35.)  The parties also discussed "opportunities with the new [Grease Guard] filter." (Id. at 32.)  Conte testified that while "it was evident that if [FMP] did not go with the new filter [it] would be competing in the marketplace against [Component] if [it] continued to sell the Trine filter[,] . . . there were no threats." (Id.)  Conte testified that Component alluded to Trine's lack of stability going forward. (Id. at 35-36.)[56]

Braham wrote Conte a letter on December 9, 2004 for the purpose of making FMP more comfortable with purchasing the Grease Guard.  (Id. at 44.)  The letter stated in pertinent part:

> When I met with you on December 2, you mentioned that a representative of [Trine] was going to meet with you regarding grease filters.  In any discussion with Trine, you should be aware that grease filters made by Trine are manufactured by it as a job shop for [Component].  Prior to 1997, Trine had made grease filters designed by [Component]. When [Component] acquired assets and intellectual property rights from Standard-Keil, including those to the grease filters commonly known as Fire Chief, Fire Marshall, Fire Guardian, and Fire Fighter, Trine began to make those products as a job shop for [Component]. [Component] has retained all of the intellectual property rights to the former Standard-Keil products as well as the UL listing registrations for the grease filter designed by [Component] and those formerly made by Standard-Keil.

(Ex. D-68, 12-9-04 Braham Letter.)

---

[56]  Conte testified that FMP is concerned about Trine's stability because it currently purchases approximately 45,000 filters, worth $50,000 from Trine each year.  (5-23-05 Tr., Conte Test., at 36.)

Conte met with Rella and Lange on February 22, 2005 and the parties discussed Trine's ability to sell the F-series filters and continue to supply FMP with filters.  (Id. at 63-64.)  Lange faxed Conte, on January 12, 2005, a letter dated February 3, 1998 written by Stephen Bohacik concerning the sale of former Standard-Keil assets.  (Id. at 71; Ex. P-32, 2-3-98 Bohacik Letter.)  Lange sent the fax in order to demonstrate to FMP that Trine had purchased all of the former Standard-Keil filter product lines. (5-23-05 Tr., Conte Test., at 80-82.)  Lange, however, did not give Conte the bill of sale pertaining to the Component-Trine sale.  (Id. at 80.)  Conte met with Component again in March 2005 to address FMP's concerns about what the parties were contending in their litigation pleadings.  (Id. at 47, 51.)  Conte testified that Carr and Braham essentially confirmed what Braham told FMP in the December 9, 2004 letter.  (Id. at 48.)

Burns informed ISS, a customer that had been purchasing filters from Trine for a number of years, that if Trine was still stamping filters with Component's name and UL number R10173 that its conduct may possibly be illegal.  (4-7-05 Tr., Burns Test., at 183.)  Burns also advised FMP that Trine had no right to stamp UL Number R10173 on F-series filters without Component's permission.  (Id. at 184.)  Burns testified that in contacting ISS and FMP he was attempting to discourage those customers from buying from Trine so those entities would be in a position to buy from Component.  (Id. at 185.)

Carr, in an email to Marty Kelly of ISS, sent December 10, 2004, stated in pertinent part:

> I need to know what might be happening between ISS and [Component].  As you may be aware, Component Hardware has developed a new (and infinitely more robust) grease filter, Grease Guard.  The industry is rapidly flipping their filter away from our old design to this new one. We thought that ISS was switching over to this design; but I'm now hearing that you may not.
>
> Our old design will be obsoleted at some point next year; however we will retain the IP rights and UL listing for it.  We don't think, however, that many customers will want the old design once they have seen and tried the Grease Guard style.

(Ex. D-18, Ex. C.)[57]  Carr was referring to the Trine-made F-series filters when he wrote "our old design."  (6-3-05 Carr Test.)

Component, per Carr's authorization, sent a letter to each of its approximately 1,500 customers, on May 15, 2005 informing them of some of Component's new products.  (6-3-05 Carr Test.; Ex. D-69, 5-15-05 Carr Letter.)  That letter stated with regard to Component's new product the Grease Guard:

> This line of grease filters is exceeding our expectations in terms of market acceptance.  Much more robust than our old filter design, Grease Guard is proving to be a more durable and efficient filter.  We now have complete stock of all our standard sizes for your OEM or replacement business.  Although we have just been awarded a patent for the Grease Guard design, we are not sitting on our laurels.  We have initiated a program to improve the extraction rate of our filters in anticipation of inevitably higher industry requirements.  We'll keep you posted on our progress with this.

_____

[57]  Conte testified that FMP's impression is that the Trine-made filters are of good quality and dependable.  (5-23-05 Tr., Conte Test., at 37.)

65

(Ex. D-69, 5-15-05 Carr Letter.)  Carr testified that he authorized Component to send out other letters like this one. (6-3-05 Carr Test.)

    H.   <u>Trine-Made Filters Stamped R17114</u>

    Trine began manufacturing filters stamped with Trine's name and Trine's new UL number R17114 on April 6, 2005.  (4-27-05 Tr. Lange Test., at 191; 5-31-05 Tr., Rella Test., at 134, 141.) Trine did not give Component advance notice of this activity. (4-7-05 Tr., Burns Test., at 90.)  Filters stamped with Trine's name and UL number R17114 are designated as T-30, T-35, T-50, T-60 and T-70 ("T-series filters"). (4-13-05 Tr. Lange Test., at 230; 5-31-05 Tr., Rella Test., at 211.)  Trine has not paid, nor does it intend to pay, Component commissions for sales of those filters.  (<u>Id.</u> at 135.)  Trine's stated intention going forward is that it will only stamp filters with UL number R17114.  (4-27-05 Tr., Lange Test., at 206.)

    Trine is also currently selling to customers, including FMP and ISS, filters stamped with its name and UL number R17114.  (5-31-05 Tr., Rella Test., at 135.)  Rella maintains that Trine did not contact FMP or ISS, rather those companies contacted Trine. (<u>Id.</u> at 138.)[58]  Trine denies that it has initiated new sales with pre-existing customers to whom Component or Trine sold prior

---

[58]  Michael Conte of FMP testified that Trine approached FMP on December 8, 2004 regarding FMP buying Trine-made filters.  (5-23-05 Tr., Conte Test., at 111.)

to October 2004.  (Id. at 139.)  Trine is charging FMP and ISS
less money per filter, approximately 6-10% less, than those
entities were paying prior to October 2004 because Trine is no
longer paying Component commissions on each filter sale on
filters stamped with Trine's name.  (Id. at 166; 5-23-05 Tr.,
Conte Test., at 93, 101.)[59]  Sales to FMP and ISS are not
governed by a written contract; rather all sales are done via
direct purchase orders.  (5-23-05 Tr. Conte Test., at 167-68.)
Trine's Rella testified that he believes that Trine started
charging FMP and ISS less money per filter when Trine began
producing filters stamped with its own name.  (Id. at 180-81.)
Carr testified that prior to this litigation Component was
unaware that Trine had negotiated a sales agreement with FMP or
ISS at discounted prices.  (6-3-05 Carr Test.)

Trine, as of May 31, 2005, had approximately $40,000 worth
of F-60 filters in its inventory.  (5-31-05 Tr., Rella Test., at
136.)  It also had approximately $40,000-$50,000 worth of F-
series filters in its own inventory, not including inventory held
at Component's facilities, stamped with Component's name and UL
number R10173.  (Id.)  As of May 31, 2005, the remaining
inventory of F-series filters stamped with Component's name was
primarily comprised of "odd-sized" filters.  (Id. at 135.)  Trine

---

[59]  FMP purchased F-series filters from Trine on December 20,
2004 for approximately 9% less than it paid Trine prior to
October 11, 2004.  (5-23-05 Tr., Conte Test., at 101.)

is currently selling filters from its inventory stamped with Component's name and UL number R10173 to customers, including FMP and ISS. (Id.; 4-27-05 Tr., Lange Test., at 194.) Trine's stated intention is to sell off all of the odd-sized filters stamped with Component's name before it sells any similarly sized T-series filters, stamped with its own name and UL number R17114. (Id. at 194-95.) Trine sells T-series filters to those customers who request sizes that Trine no longer has in its Component-stamped inventory. (5-31-05 Tr., Rella Test., at 135.)

Trine has recovered approximately 15% of the business that it lost after October 2004. (Id. at 136.) Approximately 80% of Trine's current filter sales are to FMP and ISS. (Id. at 137.) Trine, as a result of the present dispute, has laid off 22 employees, many of whom had worked at Trine for years. (5-31-05 Tr., Rella Test., at 37-38.)[60]

### CONCLUSIONS OF LAW

Component moves to enjoin Trine from:

(1) using Component's "name on any grease filters Trine sells or manufactures";

(2) manufacturing or selling any baffle-type grease filter stamped with designations F-30, F-35, F-50, or F-60;

(3) manufacturing or selling any baffle-type grease filter derived from or based upon the Standard-Keil baffle-type grease filter design owned by Component;

---

[60] Trine employed 19 people in its filter division on October 11, 2004. (4-27-05 Tr., Lange Test., at 37.) As a result of this dispute, it has laid off 12 out of the 19 employees in that division. (Id.)

(4) using UL numbers R10173 and R7283 on any baffle-type grease filter it manufactures or sells;

(5) manufacturing filters under the trade names Fire Chief, Fire Marshall, Fire Guardian, or Fire Fighter;

(6) using the trademarks and designations F-30, F-35, F-50, and F-60 on any grease filter it sells or manufacturers;

(7) using the sales analysis printout provided to it by Component in early 1998 to directly or indirectly compete against Component;

(8) selling baffle-type grease filters to Component's customers without its express knowledge and consent;

(9) using any pricing information, business information, or customer information acquired through its relationship with Component and/or belonging to Component to directly or indirectly compete with Component in selling grease filters; and

(10) using the designations T-30, T-35, T-50, and T-60.

(Component Prop. Ord.)  Trine seeks a preliminary injunction

enjoining Component from:

(1) selling grease filters to any customer Trine has sold grease filters to since 1982 and all customers listed in the customer list Trine purchased from Component in 1997/1998;

(2) selling [the Grease Guard];

(3) selling any filter [stamped] with UL number[s] R10173 and R7283;

(4) using Trine's F-series trademarks or any variation thereof;

(5) representing to any customer or potential customer that Trine has no right to sell its filters or use UL numbers R10173 and R7283; and

(6) disparaging Trine or its products with any customer or potential customer.

(Trine Prop. Ord.)

The Court has jurisdiction over this controversy pursuant to

28 U.S.C. §§ 1331 and 1332.  The Court finds that Component has

69

not satisfied the elements of a preliminary injunction such that its requested relief is warranted.  We similarly find that Trine has failed to satisfy the elements of a preliminary injunction such that its requested relief is warranted.[61]  The findings and conclusions set forth in this opinion are preliminary only, based upon the state of the record at this stage in the litigation. See Fed.R.Civ.P. 65(a).  The parties have preserved all rights to present their disputes to a fact-finder for eventual adjudication on the merits.

## I.   **Preliminary Injunction**

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances."  <u>Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp</u>, 847 F.2d 100, 102 (3d Cir. 1988). Under well-established law governing the granting of preliminary injunctive relief, the Court must consider whether: (1) the party seeking a preliminary injunction has shown a reasonable probability of success on the merits; (2) the party will be irreparably injured by the denial of the relief; (3) granting

---

[61]   To the extent that the "Conclusions of Law" portion of this memorandum opinion contains findings of fact in addition to those expressly set out under the heading "Chronology of Events-Findings of Fact," they shall be deemed to be part of the findings of fact.

The "Conclusions of Law" subsections of this memorandum opinion generally do not contain citations to the evidence except after quoted language.  The record citations are set forth in the "Chronology of Events-Factual Findings" section of this memorandum opinion.

preliminary relief will result in even greater harm to the nonmoving party; and (4) granting the preliminary relief will be in the public interest.  See, e.g., ACLU v. Reno, 217 F.3d 162, 172 (3d Cir. 2000); ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc) (citations and quotation omitted).  "The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief."  AT&T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994) (citations omitted).

The injunctive relief analysis here centers on the first two essential factors listed above.  The Court will discuss each party's contentions in the motion and cross motion.

###    A.   Reasonable Probability of Success on the Merits

Under the standard for preliminary injunctive relief, the party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation." Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir. 1982).  In evaluating whether a moving party has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits."  Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975) (citations omitted).

1.  <u>Trine's Right to Make and Sell the F-Series Filters</u>

Component asserts that it "owns" the design of the F-series baffle filters, which is based on the former Standard-Keil baffle filter design, "as a result of [its] purchase of the Standard-Keil intellectual property assets in 1997." (Component Prop. Ord.; Component Br., at 8.)  Component also claims that in manufacturing and selling the T-series filters, which are identical in design to the F-series filters, Trine is violating 15 U.S.C. § 1125(a)(1)(A) by misappropriating Component's "grease filter product design." (<u>Id.</u> at 29.)  We find that Component has failed to demonstrate a reasonable likelihood of success on the merits of these claims.

Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), provides that:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such description or representation.

Section 43(a) protects not only trademarks, including words or symbol marks, it also protects trade dress, a term that refers to the design or packaging of a product which serves to identify the product's source. <u>Wal-Mart Servs., Inc. v. Samara Bros., Inc.</u>, 529 U.S. 205, 209-10 (2000); <u>Shire US, Inc. v. Barr Labs., Inc.</u>, 329 F.3d 348, 353 (3d Cir. 2003).

An essential principle of trademark law is that legal protection is not "available for products or features that [are] functional." Keene v. Paraflex Indus., Inc., 653 F.2d 822, 824 (3d Cir. 1981) (affirming district court's denial of preliminary injunction and lower court's finding that the design of a wall-mounted luminaire was functional and thus competitors were free to copy its design). The purpose of this rule "is to prevent the grant of a perpetual monopoly to features which cannot be patented." Id. The issue, therefore, is "whether prohibition of imitation by others will deprive the others of something which will substantially hinder them in competition." Id. at 827. Products or features, therefore, that are "not qualified for patent protection but which are functional are in the public domain, and are fair game for imitation and copying." Id. at 826 (citation omitted). Trade dress protection does not prevent against "reverse engineering" or "copying of innovative product design features." Shire, 329 F.3d at 353. See also Traffix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 29 (2001) ("In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying.").

To establish a violation of Section 43(a) for trade dress infringement or unprivileged imitation of a product design Component must show that: (1) the allegedly infringing, imitating feature is non-functional; (2) the feature is inherently

73

distinctive or has acquired secondary meaning; and (3) consumers
are likely to confuse the source of its product with that of
Trine's product.  <u>Shire</u>, 329 F.3d at 353.

A product feature is functional "if it is essential to the
use or purpose of the article or it affects the cost or quality
of the article."  <u>Traffix</u>, 532 U.S. at 32.  A functional feature
"is one the exclusive use of which would put competitors at a
significant non-reputation-related disadvantage."  <u>Id.</u>  "Proof of
nonfunctionality generally requires a showing that the element of
the product serves no purpose other than identification."  <u>Keene</u>,
653 F.2d at 826.

A product's design is not inherently distinctive for
purposes of an action under the Lanham Act for infringement of an
unregistered trade dress.  <u>Wal-Mart</u>, 529 U.S. at 212.  The Court,
therefore, in considering Component's assertion that it has a
protected interest in the design of F-series filters, need only
consider whether the filters' design has acquired a secondary
meaning.  Secondary meaning means that the "purchasing public
associates the design of the product with a particular source."
<u>Versa Prods. Co., Inc. v. Bifold Co., Ltd.</u>, 50 F.3d 189, 198 n.6
(3d Cir. 1995).  A design acquires secondary meaning when "in
the minds of the public, the primary significance of a product
feature or term [is] to identify the source of the product rather
than the product itself."  <u>Duraco Prods. Inc. v. Joy Plastic</u>

74

Indus., Ltd., 40 F.3d 1431, 1440 (3d Cir. 1994).  The relevant

factors to a finding of secondary meaning include:

> (1) plaintiff's advertising expenditures, measured
> primarily with regard to those advertisements which
> highlight the supposedly distinctive, identifying
> feature; (2) consumer surveys linking the distinctive
> product configuration to a particular, single source
> (although the identity of the source need not be
> known); and (3) length and exclusivity of use.

Id. at 1452.  "Consumer surveys and testimony are probably the

only direct evidence of secondary meaning; the other sources are

circumstantial, though the plaintiff may rely solely on them."  Id.

Component, to establish a likelihood of confusion, must show

that members of the consuming public are likely to confuse the

source of the product bearing the imitated feature.  Am.

Greetings Corp. v. Dan-Dee Imps., Inc., 807 F.2d 1136, 1141 (3d

Cir. 1986).  The Court in analyzing the likelihood of confusion

must evaluate a number of factors ("the Lapp factors") including:

> (1) the degree of similarity between the owner's mark
> and the alleged infringing mark; (2) the strength of
> [the] owner's mark; (3) the price of the goods and
> other factors indicative of the care and attention
> expected of consumers when making a purchase; (4) the
> length of time [the] defendant has used the mark
> without evidence of actual confusion arising; (5) the
> intent of the defendant in adopting the mark; (6) the
> evidence of actual confusion; (7) whether the goods,
> though not in competition, are marketed through the
> same channels of trade and advertised through the same
> media; (8) the extent to which the targets of the
> parties' sale efforts are the same; (9) the relationship
> of the goods in the minds of the public because of the
> similarity of function; (10) other facts suggesting
> that the consuming public might expect the prior owner
> to manufacture a product in the defendant's market.

Versa, 50 F.3d at 202.

> [E]xcept where consumers ordinarily exercise virtually
> no care in selecting a particular type of product (as
> may be the case with inexpensive disposable or
> consumable items . . .) clarity of labeling in
> packaging and advertising will suffice to preclude
> almost all possibility of consumer confusion as to
> source stemming from the product's configuration.

Id. at 203.

The Court, in considering Component's claim that it "owns" the design of the F-series filters because it acquired an interest in the filters as a consequence of the Standard-Keil—Component sale, must first consider what interest Standard-Keil had in the design of the Fire-series filters prior to the 1997 sale.  Component has presented no evidence that Standard-Keil had a patented interest in the Fire-series filters or that Component acquired a patent interest in the filters.[62]  The issue, therefore, is whether Component, as a result of the Standard-Keil—Component sale, acquired any other protected interest in the form of trade dress protection formerly held by Standard-Keil.  We find that Component did not acquire any such protected interest.

---

[62]   Klein and Bohacik both testified that the Standard-Keil filters were not patent protected.  (4-6-05 Tr., Klein Test., at 143; Id., at Richard Bohacik Test., at 281.)  The documents pertaining to the Standard-Keil—Component sale represent that Component acquired all intellectual property rights formerly belonging to Standard-Keil, including valid patents and state that such assets are listed in various schedules.  (Exs. P-4, 5, 6.)  Component has not produced those schedules or any other documents purporting to transfer patents associated with the former Standard-Keil Fire-series filters.

Component has not met its burden of proving the elements of trade dress infringement.  The design for the Fire-series filters is functional in that the design of the filter is essential to its overall functioning and use.  The design of the Standard-Keil filter has not acquired any secondary meaning because the design of the Fire-series filters does not identify Standard-Keil, Component, or Trine as being the source of the filters.

The purpose of the Lanham Act also favors finding against trade dress protection for the design of the Standard-Keil filters.  Richard Bohacik testified, in answer to the question of whether the Standard-Keil filter was patented, that "in our industry, everybody duplicated each other."  (4-6-05 Tr., Richard Bohacik Test., at 281.)  Component cannot now claim a protected trade dress interest in the design of the former Standard-Keil filters which it helped Trine reverse engineer and copy.[63]  We find that the design for the Standard-Keil Fire-series filters is

_____

[63]  Component cannot rely on the fact that its name appears on the F-series filters to prove its ownership interest in the filters.  Conte testified that private labeling is a common practice in the food service industry and that the name stamped on a product does not necessarily connote ownership.  (5-23-05 Tr., Conte Test., at 87-88.)  See N.J.S.A. § 12A:1-205 (pertaining to usage of trade and course of dealing).  The Uniform Commercial Code recognizes that the sale of a product under a particular entity's name is not dispositive of ownership of that product.  See N.J.S.A. § 12A:9-102(20) (defining consignment as a "transaction regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and . . . the merchant . . . deals in goods of that kind under a name other than the name of the person making delivery . . .").

not trade dress protected.  Component, therefore, did not acquire a protected interest in the design of the Standard-Keil Fire-series filters by purchasing Standard-Keil assets in 1997.

Trine contends it acquired all of the assets associated with the former Standard-Keil filter product lines as a result of the Component-Trine sale.  The Court agrees.  We find that despite the lack of formality in the contract papers and Component's assertions, Component sold to Trine all of the former Standard-Keil assets that it purchased from Standard-Keil.  All of the former Standard-Keil assets, including proprietary interest in the former Standard-Keil baffle filter product lines, therefore inure to the benefit of Trine.[64]  Trine, as a result of the sale, acquired an interest in the former Standard-Keil product names, Fire Chief, Fire Guardian, Fire Marshall, and Fire Fighter.

---

[64] Component admits that it encouraged Trine to purchase the former Standard-Keil assets associated with the product lines, including the tooling and dies, so that competitors would be foreclosed from competing against Trine and making the former Standard-Keil filters.  That purpose would be defeated if by buying the former Standard-Keil assets Trine had no right to exclude third parties from selling the former Standard-Keil Fire-series filters.  Component also admits that it sold Trine the rights to the Fire Fighter as part of the Component-Trine sale. It makes little sense why Component would sell the Fire Fighter but retain rights to the Fire Chief, Fire Guardian, and Fire Marshall but make no reference to such in the documentation relating to the sale.  It is also significant that the two contemporaneous writings reflecting the Component-Trine sale, both generated by Component, allocated all of the purchase price paid by Trine to only a portion of the Standard-Keil physical assets transferred to Trine in that sale.  (See 5-23-05 Rella Tr., at 172-77, 191-97 (comparing P-7 and D-10).)

Trine, however, for the same reasons stated supra, cannot now claim that it acquired a protected interest in the Standard-Keil Fire-series filter design that it reverse engineered and copied.  Neither Trine nor Component "owns" or has a protected interest in the design of the Standard-Keil Fire-series filters. Trine, because the design of T-series filters is not protected trade dress, however, has the right to manufacture and sell the T-series filters, the design of which is derived from and is nearly identical to the designs of the former Standard-Keil Fire-series filters and the F-series filters.  The Court, therefore, will not grant Component's or Trine's request for preliminary injunctive relief as to the design of the F-series or Standard-Keil filters, because neither party has proven a likelihood of success as to a trade dress claim.

Component asserts Trine should be enjoined from making and selling any baffle-type grease filter derived from the design of the former Standard-Keil Fire-series filters, which Component owns.  (Component Prop. Ord.)  Component, as discussed supra, has not demonstrated it owns the design of the former Standard-Keil Fire-series filters.  Nor has Component proven that Trine's manufacturing or selling the T-series filter, a filter design based on the former Standard-Keil design, will likely confuse customers.  The Court notes that the Grease Guard and T-series filters are not similar in design.  Component itself contends

79

that the Grease Guard allegedly is a better, more innovative
design compared to the T-series filters.  (Component Br. at 29;
4-6-05 Tr., Richard Bohacik Test., at 263, 265-67.)  We recognize
that the T-series filters and Grease Guard are marketed in the
same trade channels and to the same or substantially similar
types of customers.  But the buyers of these filters are
sophisticated customers, in many cases large OEM purchasers, who
can be expected to exercise a considerable degree of care in buying
a grease filter.  The T-series filters and the Grease Guard are
stamped with different company names and different product name
designations.  These filters are also packaged, shipped, and
marketed in such a way that makes clear the source of the
products.[65]  We, accordingly, find that Component has failed to

_____

[65] The Court recognizes that for a period of time, from
approximately December 2004 to March 2005, Trine was
manufacturing and selling F-series filters stamped without any
company's name and merely with UL numbers R7283 and R10173.  We
also recognize that Trine continues to this day to sell F-series
filters stamped with Component's name and UL numbers R7283 and
R10173.  For a discussion of Trine's right to continue to sell
those filters see infra I.A.5.  We first note that Trine is no
longer making such filters.  Trine presently is only
manufacturing filters stamped with its own name and UL number
R17114.  We, however, find that there still is no likelihood that
consumers will confuse the source of the filters Trine is
currently selling marked either with Component's name and UL
numbers R7283 and R10173 or merely with UL numbers R7283 and
R10173 because Trine's methods of labeling, shipping,
advertising, and marketing are sufficient to remedy potential
customer confusion.  See Versa, 50 F.3d at 204 (finding that
clear labeling and marketing should be generally legally
sufficient to remedy confusion).

prove the likelihood of customer confusion between its Grease Guard and Trine's T-series filters.

2.   Right to Use UL Numbers R10173 and R7283

Component moves to enjoin Trine's use of UL numbers R7283 and R10173 ("the UL numbers") on the basis that these marks of approval are Component's "own personal UL . . . trademarks" and it "has never transferred its intellectual property rights with respect to" the UL numbers to Trine.  (Component Br. at 29; Component Prop. Ord.)  Trine cross-moves seeking to enjoin Component from "[s]elling any filters with UL numbers R10173 and R7283."  (Trine Prop. Ord.)  We will not grant either party's request for injunctive relief because neither Trine nor Component has proven a likelihood of success as to a trademark claim pertaining to use of the UL numbers.

A trademark is "any word, name, symbol, or device, or any combination thereof," used "to identify and distinguish his or her goods." 15 U.S.C. § 1127 (2000).  To prove trademark infringement a plaintiff must show that (1) there is a valid and legally protectable mark; (2) the plaintiff owns the mark; and (3) the defendant's use of the mark is likely to cause confusion concerning the origin of the goods or services.  Fisons Hortic., Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994).

We need not address the first or third factors of this test because Component and Trine have failed to prove that either

81

entity owns the UL numbers.  The evidence before this Court
proves that UL, not Trine or Component, is the owner of the UL
numbers.  The standard UL Service Agreement clearly provides that
UL owns the UL marks.  See, e.g., Ex. P-16 at 3, ¶ 6.0.  Charles
Rego, Senior Corporate Counsel for UL, stated in his declaration
submitted to the Court that, "UL has exclusive rights and
possession to the contents of its files.  A UL Applicant has no
ownership or possessory rights to UL's files.  An Applicant has
no right to control the content(s) of UL's files."  (Rego Decl.
at ¶ 7.)  The parties' dispute over whether the UL numbers are
associated with Component or Trine owned filters or which party
paid the annual maintenance fees for a particular period of time
are therefore irrelevant.  Trine, accordingly, may continue to
manufacture and sell filters stamped with UL numbers R10173 and
R7283, subject to UL rules and policies.  We note that this
holding is moot as it refers to filters newly manufactured by
Trine, because as of April 2005, Trine stopped manufacturing new
filters stamped with R10173 and R7283.  Trine presently stamps
its newly manufactured filters with UL number R17114.  Component
also may continue to sell filters stamped with UL numbers R10173
and R7283, subject to the same UL rules and policies.

    3.   Parties' Right to Use the F-series Designations

Component also seeks to enjoin Trine from making and selling
T-series filters stamped with the designations T-30, T-35, T-50,

T-60 and T-70 ("T-series designations").  (Component Prop. Ord.)
Component so moves on the grounds that the T-series designations
"are synonymous and virtually identical to Component's F-30, F-
35, F-50, and F-60 trademarks and product names, and because such
Trine designations are likely to cause confusion or dilution in
the marketplace with respect to Component's F-30, F-35, F-50, and
F-60 trademarks and/or designations."  (Id.)  We reject this
argument.  Trine similarly cross-moves seeking an injunction
against Component prohibiting it from "[u]sing Trine's 'F-Series'
trademarks or any variation thereof."  (Trine Prop. Ord.)  We
find that neither party has proven a likelihood of success on
trademark infringement as to those parts numbers.

Component and Trine, as stated supra, in order to prove a
trademark infringement, must show: (1) there is a valid and
legally protectable mark; (2) the plaintiff owns the mark; (3) the
defendant's use of the mark is likely to cause confusion
concerning the origin of the goods or services.  Fisons, 30 F.3d
at 472.

An unregistered mark is entitled to the same protection as a
registered mark.  A.J. Canfield Co. v. Honickman, 808 F.2d 291,
296 (3d Cir. 1986).  The F-series designations, F-30, F-35, F-50,
and F-60 are not registered trademarks.[66]  Unregistered marks,

_____

[66]  Neither Component nor Trine presented evidence that the
F-series designations are registered trademarks.  The F-series
designations for grease filters are not listed as trademarks

however, are not entitled to a presumption of validity as are registered marks. See 15 U.S.C. § 1057 (b). The Court, therefore, in order to determine the validity of an unregistered mark must consider the nature of the mark that the parties seek to protect. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992).

"In order to be registered, a mark must be capable of distinguishing the applicant's goods from those of others." Id. Marks are classified into five categories: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. Id. Arbitrary and fanciful marks neither describe nor suggest anything about the product; suggestive marks require "customer imagination, thought or perception" to determine what the product is; descriptive marks describe the intended purpose, function, use, size, or the class of users of the goods; and generic marks "function as the common descriptive name of a product class." Checkpoint Sys., Inc. V. Check-point Software Techs., Inc., 269 F.3d 270, 282 (3d Cir. 2001) (citations omitted). Descriptive marks convey to the consumer an "immediate idea of the ingredients, qualities, or characteristics of" the product. Id. Suggestive, arbitrary, and fanciful marks are entitled to

---

registered to either Component or Trine on the United States Patent and Trademark Office website. See, www.uspto.gov., US Patent and Trademark Office Website, "Trademark Electronic Search System."

protection because they are inherently distinctive.  <u>Two Pesos</u>,
505 U.S. at 769.  Generic marks are not entitled to trademark
protection.  <u>Id.</u>

Grade designations, style designations, and part numbers are
descriptive marks.  <u>R&B, Inc. v. Needa Parts Mfg., Inc.</u>, 2002
U.S. App. LEXIS 17315, at *13, *19-*20 (3d Cir. 2002) (affirming
district court's denial of preliminary injunction and finding
district court properly found part numbers associated with
plaintiff's product did not have secondary meaning).
Unregistered descriptive marks qualify as valid trademarks where
there is a showing of inherent distinctiveness or the mark has
acquired distinctiveness through secondary meaning.  <u>Id.</u>; <u>Two
Pesos</u>, 505 U.S. at 769.  The plaintiff bears the burden of
showing that the descriptive mark has secondary meaning by
showing that consumers identify the product or service, and its
origin, by the mark.  <u>J&J Snack Foods, Corp. V. Nestle USA, Inc.</u>,
149 F.Supp.2d 136, 151-52 (D.N.J. 2001).  If the plaintiff fails
to show secondary meaning, the mark is not valid.  <u>R&B, Inc. v.
Needa Parts Mfg., Inc.</u>, 2001 U.S. Dist. LEXIS 17406, at *47 (E.D.
Pa. Aug. 13, 2001).

A plaintiff establishes secondary meaning by showing "that
the mark is interpreted by the consuming public to be not only an
identification of the product or services, but also a
representation of the origin of the products or services."

Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 1990).  Secondary meaning generally "is established through extensive advertising [by the mark's owner,] which creates an association between the mark and the provider of services advertised under the mark." Id.  The factors that may be considered in assessing whether a product has acquired secondary meaning are, inter alia: (1) the extent of sales and advertising; (2) length of use; (3) exclusivity of use; (4) copying; (5) customer surveys; (6) customer testimony; (7) use in trade journals; (8) the company's size; (9) sales figures; (10) number of customers; and (11) actual confusion.  Id.

The Court finds that Component has failed to satisfy its burden of demonstrating that the descriptive F-series designations have acquired secondary meaning.  Component created a part numbering system that was essentially the same as the Standard-Keil system.  Filters stamped with Component's name and designations F-30, F-35, and F-50 were sold in the marketplace at the same time filters made by Standard-Keil were sold in the marketplace with similar part designations.  The F-series part numbering system, therefore, cannot have acquired secondary meaning such that it indicates source or origin of the F-series filters.  Trine, similarly, has also failed to satisfy its burden of proving that the F-series designations have acquired secondary meaning.

4.   <u>Parties' Rights to Sell to Former Customers</u>

Component seeks an injunction prohibiting Trine from selling T-series filters to "Component's customers without Component's express knowledge, information and consent."  (Component Prop. Ord.)  Component so moves on the grounds that its customer lists and customer information constitute protected trade secrets. (<u>Id.</u>)  Trine similarly seeks to enjoin Component from selling the Grease Guard to "any customer Trine has sold grease filters to since 1982 and all customers listed in the customer list Trine purchased from Component in 1997/1998."  (Trine Prop. Ord.)  We find that neither party has proven a likelihood of establishing such a claim on the merits.

Trade secrets include formulas, processes, devices, and compilations not generally known to the public or within the industry.  <u>Sun Dial Corp. v. Rideout</u>, 108 A.2d 442, 445 (N.J. 1954).  <u>See also</u> <u>Ingersoll-Rand Co. v. Ciavatta</u>, 542 A.2d 879, 893 (N.J. 1988).  Customer lists of service industries have been afforded trade secret protection in New Jersey.[67]  <u>Lamorte Burns & Co., Inc. v. Walters</u>, 770 A.2d 1158, 1166 (N.J. 2001); <u>see also</u> <u>AYR Composition, Inc. v. Rosenberg</u>, 619 A.2d 592, 597 (N.J. App. Div. 1993) ("Where a company's business is to provide services, information about customers is a property right of the

---

[67]   <u>See</u> <u>infra</u> note 67.

87

company."); Abalene Exterminating Co., Inc. v. Oser, 5 A.2d 738,
739 (N.J. Ch. 1939) (holding that service providers have a
proprietary interest in keeping customer lists confidential).
That same protection has not been extended to the customer lists
of manufacturers and wholesalers dealing with jobbers and
retailers, however.  Nat'l Tile Bd. Corp. v. Panelboard Mfg. Co.,
Inc., 99 A.2d 440, 442 (N.J. Ch. 1953) ("The plaintiff is a
manufacturer dealing with jobbers and retailers.  The knowledge
of the names of its customers is not a trade secret.").  The
general rule, rather, is that the names of customers are not a
trade secret if the plaintiff, or former employer, is a
manufacturer or wholesaler dealing with jobbers or retail
merchants because "everyone knows they buy from someone."  Haut
v. Rossbach, 15 A.2d 227, 228 (N.J. Ch. 1940).  That same rule
applies "where the complainant sells to members of a readily
ascertained class, even though some of the class do not buy like
services or articles from anybody."  Id.

    A trade secret requires a showing of six factors:

        (1) the extent to which the information is known
        outside of the business; (2) the extent to which it is
        known by employees and others involved in the business;
        (3) the extent of measures taken by the owner to guard
        the secrecy of the information; (4) the value of the
        information to the business and to its competitors; (5)
        the amount of effort or money expended in developing
        the information; and (6) the ease or difficulty with
        which the information could be properly acquired or
        duplicated by others.

<u>Ingersoll-Rand</u>, 542 A.2d at 893.  A plaintiff, in order to
establish that a customer list qualifies for protection as a
trade secret, must also show that the customer list in dispute is
in fact a secret.  <u>Subcarrier Commun., Inc. v. Day</u>, 691 A.2d 876,
880-82 (N.J. App. Div. 1997).  The information "may not be part
of the general knowledge or information of any industry or a
matter of public knowledge."  <u>Ingersoll-Rand</u>, 542 A.2d at 893.

     The Court, upon a review of the relevant case law, found
that nearly all of the cases relating to customer lists
qualifying as trade secrets arise in an employer-employee
context.  <u>See</u> <u>Midland-Ross Corp. v. Yokana</u>, 185 F.Supp. 594, 604
(D.N.J. 1960), <u>aff'd</u> 293 F.2d 411 (3d Cir. 1961) (holding that a
former employee is obligated to return customer lists, but may
notify customers of an intention to leave an employer and it is
the customers' choice whether to move to the new company); <u>Nat'l
Tile Bd. Corp.</u>, 99 A.2d 440 at 443 ("[A]n employee is not
compelled to shut his eyes to what goes on in his place of
employment nor is he required to wipe his memory clear of those
matters which he learns during the course of his employment.  So
long as no contract express or implied prohibits him from
divulging the information learned during his employment, the
employee may use that information for his own benefit.").

     Component cited several cases relating to New Jersey trade
secret law and customer lists; however, it predominately cited

cases concerning employee-employer relationships.  (See Component Br. at 8-12.)  The only case Component cited involving a partnership involved an explicit non-competition agreement between the partners.  (See Component Br. at 9 (citing A.T. Hudson & Co., Inc. v. Donovan, 524 A.2d 412 (N.J. App. Div. 1987))).

We previously found in the Chronology of Events-Findings of Fact section of this memorandum opinion that the list Component provided to Trine in 1998 was not a "customer list" as Trine maintains.  It was, rather, a sales analysis that listed the names of former Standard-Keil customers.  Neither party has proprietary rights to that sales analysis.

Component sells and distributes products, many times on a wholesale basis, to OEMs and other retailers.  Component is not in a service industry.  The customers Trine and Component sell to are members of a relatively small ascertainable class of OEM and other purchasers who buy grease filters for the food service industry.  The identity of these customers, therefore, is generally known.  The customers that Component and Trine sold to from 1982 to 2004, therefore, are not "Component's customers" nor is the identity or knowledge of those customers a trade secret.

There is no contract or non-compete agreement between the parties that prohibits Trine from using its knowledge of customers' identities that it acquired during its relationship with Component.  The relationship between Component and Trine is

90

different than an employee-employer relationship.  Component and
Trine worked for 22 years in a "collective business."  Trine and
Component both simultaneously sold to the same customers per the
parties' sales arrangement.  The identity of those customers was
known by both parties.  Component provided Trine a weekly manifest
indicating exactly how many filters it sold and Trine provided to
Component a commissions statement detailing the identity of the
customers it sold to directly.  Trine and Component, therefore,
also knew the volume of sales to each customer.  The customers
Trine and Component sold to from 1982 to 2004, and continue to
sell to today, are mutual customers of both entities.

    The identities of — and other information pertaining to —
those customers, therefore, do not constitute a trade secret.
Neither party has rights over the other pertaining to customers
formerly sold to by both Trine and Component before October 2004.
The Court, accordingly, finds that neither Component nor Trine
has satisfied its burden of establishing a reasonable likelihood
of success on the merits of a trade secret claim pertaining to
customers that the parties sold to from 1982 to 2004.

    5.  <u>Breach of the Parties' Contractual Relationship</u>

    There is no question that Component and Trine had a
contractual relationship from 1982 to 2004.  (Component Br. at 7;
Trine Br. at 22.)  That relationship existed in the form of an
unwritten express and implied contract between Component and

Trine.  See St. Paul Fire & Marine Ins. Co. v. Indem. Ins. Co.,
158 A.2d 825, 828-29 (N.J. 1960); Comerata v. Chaumont, Inc., 145
A.2d 471, 475 (N.J. App. Div. 1958); N.J.S.A. §§ 12A:1-201(3), 2-
207(3), 2-208(1).  The contract involved the sale of goods for
more than $500 and was between merchants who deal in goods of the
kind involved in the transaction.  See N.J.S.A. § 12A:2-201.  The
provisions of the New Jersey Uniform Commercial Code ("UCC")
supplemented by New Jersey common-law principles therefore apply
to the parties' contract.[68]

The parties' contractual relationship involved two distinct
kinds of contract for the sale of goods: (1) direct sales where
Trine sold filters directly to Component, or through Component to
third parties; and (2) consignment sales where Trine supplied
Component F-series filters that Component held on consignment.
Each of these kinds of contract had aspects of a requirements
contract, in that Component and Trine agreed on the number of F-
series filters of each size Trine would make and ship to
Component.  Every week Component would inform Trine of the number
of filters it needed to replenish its inventory up to the agreed
upon inventory level.  Trine would then supply Component with
those filters.  The contract also had aspects of an exclusive
dealings arrangement in that Component acted as Trine's exclusive
sales agent in selling Trine-made filters in the marketplace.

---

[68]  Neither Component nor Trine contests the choice of law.
The Court, therefore, will apply the law of the forum.

92

Chapter Two of the Uniform Commercial Code ("UCC"), as adopted by New Jersey in N.J.S.A. § 12A:1-201 et seq., applies to the direct sales and requirements contract aspects of the parties' contractual relationship. See N.J.S.A. § 12:2-106 (1) (defining sale of goods as "passing of title from the seller to the buyer for a price"); § 2-306(1) (defining requirements contract).

Chapter 9 of the UCC applies to the consignment aspect of the parties' contract. The term consignee is defined in Chapter 9 as "a merchant to which goods are delivered in a consignment." N.J.S.A. § 12A:9-102(19). A consignor is "a person that delivers goods to a consignee in a consignment." Id. at § 9-102(21). Consignment is defined as a:

> transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
>
>> (A) the merchant:
>>
>>> (i) deals in goods of that kind under a name other than the name of the person making delivery;
>>>
>>> (ii) is not an auctioneer; and
>>> (iii) is not generally known by its creditors to be substantially engaged in selling the goods of others;
>>
>> (B) with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;
>>
>> (C) the goods are not consumer goods immediately before delivery; and
>>
>> (D) the transaction does not create a security interest that secures an obligation.

N.J.S.A. § 12A:9-102(20). Aspects of the parties' contract satisfies this definition. The consignment aspect of the

contract did not change the parties' contractual relationship; rather, it merely changed how each party was compensated for the sale of filters to third party purchasers.

Section 1-203 imposes upon every contract governed by the UCC a general "obligation of good faith in its performance or enforcement."  Id. at § 12A:1-203; Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997).  Good faith is defined as "honesty in fact in the conduct or transaction concerned."  N.J.S.A. § 12A:1-201(19).  Good faith in the context of merchants is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."  Id. at § 12A:2-103(1)(b).

An exclusive dealing contract imposes certain specific obligations on the parties.  Section 2-306(2) states:

> A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

Comment 5 to this section states:

> Subsection (2), on exclusive dealing, makes explicit the commercial rule embodied in this Act under which the parties to such contracts are held to have impliedly, even when not expressly, bound themselves to use reasonable diligence as well as good faith in their performance of the contract. Under such contracts the exclusive agent is required, although no express commitment has been made, to use reasonable effort and due diligence in the expansion of the market or the promotion of the product, as the case may be. The principal is expected under such a contract to refrain from supplying any other dealer or agent within the

94

> exclusive territory. An exclusive dealing agreement
> brings into play all of the good faith aspects of the
> output and requirement problems of subsection (1).

Id. at § 12A:2-306(2) cmt. 5.

The New Jersey Supreme Court, in Sons of Thunder, Inc. v. Borden, Inc., stated:

> [E]very contract in New Jersey contains an implied
> covenant of good faith and fair dealing . . . This Court
> has stated that in every contract there is an implied
> covenant that neither party shall do anything which will
> have the effect of destroying or injuring the right of
> the other party to receive the fruits of the contract;
> in other words, in every contract there exists an
> implied covenant of good faith and fair dealing.

690 A.2d at 587 (citations and quotations omitted).

A written contract did not exist between the parties. Nor did the parties expressly agree on the duration of the contract or what would happen in the event of termination. There is no evidence that a confidentiality agreement or non-compete agreement existed between the parties pertaining to post-termination conduct. The parties' contract, therefore, was capable of being terminated at will by either party without cause. Bak-A-Lum Corp. Of Am. v. Alcoa Bldg. Prods., Inc., 351 A.2d 349, 351-52 (N.J. 1976). N.J.S.A. § 12A:2-309(2) provides that: "Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party." Comment 7 of that section states:

> Subsection (2) applies a commercially reasonable view
> to resolve the conflict which has arisen in the cases
> as to contracts of indefinite duration. The "reasonable
> time" of duration appropriate to a given arrangement is
> limited by the circumstances. When the arrangement has
> been carried on by the parties over the years, the
> "reasonable time" can continue indefinitely and the
> contract will not terminate until notice.

N.J.S.A. § 12A:309(2) cmt. 7. Termination "occurs when either

party pursuant to a power created by agreement or law puts an end

to the contract otherwise than for its breach.  On 'termination'

all obligations which are still executory on both sides are

discharged but any right based on prior breach or performance

survives."  Id. at § 12A:2-106(3).

   But a party to a contract must provide the non-terminating

party with reasonable notice of termination.  N.J.S.A. § 12A:2-

309(3); Bak-A-Lum, 351 A.2d at 351; Sons of Thunder, 690 A.2d at

587-89; Jo-Ann, Inc. v. Alfin Frags., Inc., 731 F.Supp. 149, 160

(D.N.J. 1989).  UCC Section 2-309(3) provides: "Termination of a

contract by one party except on the happening of an agreed event

requires that reasonable notification be received by the other

party and an agreement dispensing with notification is invalid if

its operation would be unconscionable."  Comment 8 of that section

states in pertinent part: "Subsection (3) recognizes that the

application of principles of good faith and sound commercial

practice normally call for such notification of the termination

of a going contract relationship as will give the other party

96

reasonable time to seek a substitute arrangement."  N.J.S.A. §

12A:2-309(3) cmt. 8.

     "What is a reasonable time for taking any action depends on

the nature, purpose, and circumstances of such action."  N.J.S.A.

§ 12A:1-204(2).  Notice requires one to have actual knowledge of

a fact or have received notice or notification or that the person

has reason to know of the existence of a fact "from all the facts

and circumstances known to the person at the time in question."

N.J.S.A. § 12A:1-201(25).  "A person 'knows' or has 'knowledge'

of a fact when the person has actual knowledge of it. 'Discover'

or 'learn' or a word or phrase of similar import refers to

knowledge rather than to reason to know."  Id.  "A person

'notifies' or 'gives' a notice or notification to another by

taking such steps as may be reasonably required to inform the

other in ordinary course whether or not the other actually comes

to know of it."  Id. at § 1-201(26).  A person "receives" notice

or notification when it comes to his or her attention or notice

is "delivered at the place of business through which the contract

was made or at any other place held out by the person as the

place for receipt of such communications."  Id.

     Component terminated the parties' contract when it began

ordering substantially fewer grease filters from Trine than was

usual in the parties' course of dealings and course of

performance.  Component terminated the parties' contract at the

same time that it provided notice of termination.  Component, therefore, failed to give Trine advance notice of its intention to terminate the parties' contract.  Component terminated the parties' long-term contract without advance notice to Trine despite knowing that: (a) Component and Trine had an exclusive dealings arrangement whereby Component would apprise Trine every week of its requirements and Trine would fill those requirements; (b) Component's requirements for F-series filters manufactured by Trine remained substantially the same for many years, (see 4-7-05 Tr., Burns Test., at 176-77); (c) Trine, in order to meet those requirements, ordered a significant amount of inventory and raw materials several months to one year in advance of its anticipated use, (see 4-6-05 Tr., Richard Bohacik Test., at 320); (d) F-30 filters manufactured by Trine comprised the largest portion of Trine's overall filter production, (see 4-7-05 Tr., Burns Test., at 167); and (e) Trine employed a manufacturing and assembly work force strictly for the purpose of manufacturing grease filters sold by Component.[69]

Component effectively stopped business as usual and immediately ceased doing business with Trine as it had for more

---

[69]  Another fact that the trier of fact could consider in assessing Component's conduct relating to the termination and subsequent breach of the parties' contract is that while Component was encouraging Trine to invest in developing a new product that Component would sell, Component itself was surreptitiously developing, marketing, and selling its own competing grease filter.

than 22 years.  Component instead expressed its intention to

continue to order from Trine but only as it suited Component's

needs and only for a limited time.  Component expressed its

intention to market the Grease Guard as aggressively as possible

all the while competing with Trine, its former exclusive

manufacturer.  Component also expressed its intention to help

sell off Trine's inventory.  This offer to "pare down" Trine's

inventory, however, was legally insufficient.  Component, rather,

was obligated to give Trine reasonable notice of its intention to

terminate the contract.  Component was obligated to give Trine

enough notice so that Trine could make alternative arrangements

for the sale of its grease filters and continue to operate as it

had before Component's termination of the parties' contract, or

so that Trine could wind-down its operations.  See Bak-A-Lum, 351

A.2d at 352 (reasonable period of notice of termination was 20

months, the time it would take distributor to make alternate

arrangements to make ultimate utilization of its expanded

warehouse); Jo-Ann, 731 F.Supp. at 159-60 (notice of termination

of exclusive distributorship was not reasonable where notice of

termination and termination occurred simultaneously, leaving

distributor "no chance to make alternate arrangements or close

its affairs in an economically proper manner in the interim").[70]

---

[70]  One example of a commercially reasonable wind-down is the
termination of the relationship between Trine and Electrolux.
Trine produced air conditioning parts for Electrolux, a company

Component, in failing to provide such reasonable notice,
unilaterally terminated the parties' contract and failed to
satisfy its duty of good faith and fair dealing as expressed in
the UCC and its implied duty of good faith and fair dealing as
expressed in New Jersey common-law.  See Sons of Thunder, 690
A.2d at 589 (holding that whether purchaser which had contract to
buy clams from supplier breached its obligation to perform its
duties in good faith was question for jury, where evidence
indicated that purchaser: (a) knew that supplier depended on
income from contract to pay loans on boats, (b) continuously
breached contract by not buying required amount of clams from

---

that made air conditioning units, for approximately 12 years.
(5-31-05 Tr., Rella Test., at 45.)  Electrolux terminated the
parties' relationship in 2003 because it moved its manufacturing
facilities to China.  (Id.)  Electrolux's business, depending on
the weather of the summer season, represented between 18% to 25%
of Trine's total business.  (Id. at 46-47.)  Electrolux informed
Trine of its intention to stop purchasing air conditioning parts
from Trine three years in advance of the contract's termination.
(4-27-05 Tr., Lange Test., at 41-45.)  Electrolux held periodic
meetings throughout that time period for the purpose of winding
down Trine's production of air conditioning parts.  (Id. at 42-
44.)  Electrolux, in August 2002, told Trine that it was ceasing
operations as of August 2003.  (Id.)  Electrolux then worked with
Trine to wind-down production and to purchase all of Trine's
inventory.  (Id.)  When Trine ceased production of Electrolux
parts, Electrolux purchased the remaining excess inventory.  (Id.
at 44.)  Trine did not have to lay off any employees as a result
of losing Electrolux's business.  (Id. at 45.)
     Another example of a commercially reasonable wind-down is
the termination of Component's relationship with Rutzler.
Rutzler produced filters for Component from 1982 to 1983.  (4-6-
05 Tr., Klein Test., at 160.) Klein testified that Component
"wean[ed]" itself off of buying products from Rutzler over the
course of six months to 1 year because, inter alia, Component
"had to be fair to everybody."  (Id. at 160-61.)

supplier, and (c) knew supplier guaranteed loans of another clam supplier operation); Bak-A-Lum, 351 A.2d at 351-52 (manufacturer breached implied covenant of good faith and fair dealing when secretly decided to terminate exclusive distributorship by adding distributors, knowing that distributor was making significant investments in expanding its warehouse).

Component also breached the parties' contract when it began marketing and promoting its own Grease Guard to the detriment of Trine's products.  Component, as a seller and consignee of Trine's products in the context of the parties' exclusive dealing arrangement, owed Trine a duty of good faith and fair dealing and a duty to use its best efforts to promote the sale of Trine's goods.  See N.J.S.A. §§ 12A:1-203, 2-306(2).  Component violated that duty.  Component, in surreptitiously marketing and selling the Grease Guard, also breached its implied duty of good faith and fair dealing.  See Bak-A-Lum, 351 A.2d at 352 ("[D]efendant's selfish withholding from plaintiff of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation constituted a breach of the implied covenant of dealing in good faith.").

Trine, as a result of Component's unilateral termination of the parties' contract, was legally permitted to repudiate the parties' contract and to cover its damages.  Section 2-610 of the UCC provides for anticipatory repudiation stating:

> When either party repudiates the contract with respect
> to a performance not yet due the loss of which will
> substantially impair the value of the contract to the
> other, the aggrieved party may . . . suspend his own
> performance or proceed in accordance with the
> provisions of this Chapter on the seller's right to
> identify goods to the contract notwithstanding breach
> or to salvage unfinished goods (12A:2-704).

N.J.S.A. § 12A:2-620.

Section 2-703 pertains to a seller's remedies where a buyer breaches a whole contract.  Id. at § 12:2-703.  The aggrieved seller is entitled, with respect to any goods directly affected or with respect to the whole undelivered balance, to "(a) withhold the delivery of goods; . . . (c) proceed [under 12A: 2-704] respecting goods still unidentified to the contract; (d) resell and recover damages as [provided in 12:2-706]; (e) recover damages for non-acceptance (12A: 2-708) or in a proper case the price (12A:2-709) ; or (f) cancel." Id.

Section 2-704 of the UCC pertains to the seller's right to identify goods to the contract or to salvage unfinished goods. N.J.S.A. § 12A:2-704.  That section provides:

> (1) An aggrieved seller under the preceding section may
>
> > (a) identify to the contract conforming goods not
> > already identified if at the time he learned of
> > the breach they are in his possession or control;
> > (b) treat as the subject of resale goods which
> > have demonstrably been intended for the particular
> > contract even though those goods are unfinished.
>
> (2) Where the goods are unfinished an aggrieved seller
> may in the exercise of reasonable commercial judgment
> for the purposes of avoiding loss and of effective
> realization either complete the manufacture and wholly

identify the goods to the contract or cease manufacture and resell for scrap or salvage value or proceed in any other reasonable manner.

Id. at § 12A:2-704.

          Section 2-706 of the UCC relates to a seller's rights to resell goods that were the subject of the contract.  Id. at § 12A:2-706.  That section provides in pertinent part:

(1) Under the conditions stated in 2-703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Chapter (2-710), but less expenses saved in consequence of the buyer's breach.

(2) Except as otherwise provided in subsection (3) or unless otherwise agreed resale may be at public or private sale including sale by way of one or more contracts to sell or of identification to an existing contract of the seller. Sale may be as a unit or in parcels and at any time and place and on any terms but every aspect of the sale including the method, manner, time, place and terms must be commercially reasonable. The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach.

(3) Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell.

(4) Where the resale is at public sale

(a) only identified goods can be sold except where there is a recognized market for a public sale of futures in goods of the kind; and

(b) it must be made at a usual place or market for public sale if one is reasonably available and except in the case of goods which are perishable or threaten to decline in value speedily the

> seller must give the buyer reasonable notice of
> the time and place of the resale; and
>
> (c) if the goods are not to be within the view of
> those attending the sale the notification of sale
> must state the place where the goods are located
> and provide for their reasonable inspection by
> prospective bidders; and
>
> (d) the seller may buy.
>
> . . .
>
> (6) The seller is not accountable to the buyer for any
> profit made on any resale.

N.J.S.A. § 12A:2-706.

The Court finds Trine's actions in selling the remaining F-series filters stamped with Component's name and UL numbers R10173 and R7283 to customers of both Trine and Component is commercially reasonable under the circumstances.[71]  We acknowledge that Component's name is entitled to trademark protection.  The goods stamped with Component's name that are currently being sold by Trine in the marketplace were stamped prior to the termination of the parties' contract.  The goods, therefore, were identified to the contract.  Trine has the right under the UCC to sell those finished goods identified to the contract and to finish manufacturing unfinished goods so that the finished products may be identified to the contract.  We find that Trine has sold F-series filters stamped with Component's name as cover and has done so in a commercially reasonable fashion.

---

[71]  See supra I.A.4. for a discussion of Trine's right to sell to customers that were customers of Trine and Component prior to the termination of the parties' contract.

104

Trine, under N.J.S.A. § 12A:2-706 was required to give Component reasonable notice of its private sale of goods associated with the Component-Trine contract.  The Court finds that Trine provided Component with such notice and made full disclosure of its sales efforts in the course of this litigation. We will not enjoin Trine from taking commercially reasonable steps to deal with the situation it found itself in upon Component's breach of the parties' contract.  The Court, therefore, will deny Component's request that Trine be enjoined from selling F-series filters stamped with Component's name.

### B.   Irreparable Injury

Neither Component nor Trine has established the existence of irreparable injury supporting the entry of injunctive relief. Generally, a party seeking a preliminary injunction must make "a clear showing of immediate irreparable injury."  Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989).

Trine asserts it will be irreparably harmed and forced to go out of business if it is enjoined from manufacturing and selling F-series and T-series filters.  This argument of irreparable harm is moot because we hold in Trine's favor as to those sales.  Trine can freely sell F-series and T-series filters in the marketplace, whether directly or through new sales agent(s)/consignees.  Trine is currently selling filters in the marketplace bearing its own name and UL number R17114, under which it is listed as applicant.

Trine is free to do so in the marketplace without Component's interference.  Trine is also now selling its remaining stocks of filters bearing Component's name and UL number R10173 and R7283 and Trine is free to sell those filters without Component's interference.

Likewise, Component is currently offering its Grease Guard, bearing its name and UL number R10173, Volume III, under which it is listed as applicant and Shanghai is listed as manufacturer, for sale in the marketplace.  Component is free to continue to do so.  As to the sale by Component of any Trine-made products held on consignment, bearing the UL number R10173, that is beyond the scope of this memorandum opinion.[72]

Trine also asserts that it is being irreparably harmed by Component's selling the Grease Guard in competition with Trine-made filters.  Trine contends that Component has a "head start"

---

[72]  It appears that neither party has requested injunctive relief, in this proceeding, relating to the inventory of filters consigned by Trine to Component that now remains in Component's possession.  That category of goods may be subject to the provisions of UCC Chapter 9, pertaining to secured transactions.

As discussed above, we have made a preliminary finding that to the degree that products manufactured by Trine were shipped to Component under a consignment arrangement, that arrangement fits the UCC definition of "consignment" under N.J.S.A. § 12A:9-102(a)(20).  If so, under Sections 9-102(a)(28) and (a)(72), Trine is a secured party and has certain rights against Component in the consignment relationship, under the applicable provisions of Chapter 9.  See generally UCC Chap. 9, Subchap. 6, N.J.S.A. § 12A:9-601 et seq.  However, we expressly make no further findings on this topic here, and leave the parties to sort out that aspect of their former business relationship in the first instance.

in the marketplace as a result of its selling the Grease Guard. (6-3-05 Trine's Closing Arg.)  We find that there has been no showing by Trine that it will be forced out of business merely as a result of Component's selling the Grease Guard in competition with Trine's product.  This is properly a damages claim, but the evidence does not support injunctive relief to offset the "head start" that the Grease Guard may have received in the market. Once Trine is free to sell its product, the effect of the Grease Guard competing with Trine's product is speculative at best.

Trine further contends that it is sustaining irreparable harm as a consequence of Component disparaging Trine or its product to its customers and/or potential customers.  Trine seeks injunctive relief directing Component to correct statements Component made to customers regarding Trine's right to manufacture the T-series filters.  We hardly think it necessary to order these two sophisticated business entities to notify customers of the outcome of this proceeding.  The Court need not intervene in this matter.  We expect that each party will notify customers in good faith, that as a result of this proceeding, at this juncture, each entity is free to sell and each customer is free to buy products offered for sale by Component and Trine. This ruling should be communicated and observed in the marketplace by both parties.  Trine and Component may engage in marketing efforts to communicate accurate information to the

107

industry.  Both parties are required to communicate honestly and accurately in the marketplace in light of judicial rulings.  Any violation of that duty by either party could occasion a further injunctive application.[73]

Component asserts it is being irreparably harmed as a result of Trine's trademark and trade dress infringement.  Normally irreparable harm exists where infringement is found.  We find here that Component has not demonstrated a likelihood of success as to its trademark and trade dress claims.  No irreparable harm, therefore, exists as to Component's trademark rights.

Component also asserts that Trine's use of UL numbers R10173 and R7283, for which Component is listed as applicant, has caused it irreparable harm.  We hold, however, that Component has no trademark protected interest in the exclusive use of those UL numbers.  Trine, moreover, is no longer stamping newly made filters with UL numbers R10173 and R7283.  We, therefore, find that injunctive relief is not necessary because the present situation does not require it.

Component further claims that it is suffering irreparable harm as a consequence of Trine's contacting its customers and that such conduct constitutes unfair competition and illegal use

---

[73] Cf. Louis W. Epstein Family Partn. v. Kmart Corp., 13 F.3d 762, 771 (3d Cir. 1994) (recognizing that a court should not grant injunctive relief that "merely enjoins a party to obey the law or comply with an agreement").

of its trade secrets.  We find however that, as between Component and Trine, there are no trade secrets regarding the identity of customers.  Component, therefore, has failed to prove a likelihood of success as to that claim; therefore, its claim of irreparable harm is not applicable.

## CONCLUSION

Component seeks a preliminary injunction enjoining Trine from, inter alia: (1) manufacturing, marketing, or selling baffle filters imprinted with Component's name, UL numbers R10173 and R7283, or name designations F-30, F-35, F-50, or F-60; (2) manufacturing, marketing, or selling baffle filters whose design is based on the former Standard-Keil Fire-series filter design and that are designated as T-30, T-35, T-50, and T-60; and (3) marketing and selling baffle filters to any customers that Component has sold to since 1982.  (Component Prop. Ord.)  Trine cross-moves seeking a preliminary injunction enjoining Component from, inter alia: (1) selling filters to any customers Trine has sold to since 1982; (2) selling the Grease Guard, a competing filter; (3) selling filters imprinted with UL numbers R10173 and R7283; (4) disparaging Trine or its products; and (5) representing to Trine's customers that Trine has no right to sell its grease filters.  (Trine Prop. Ord.)

The Court has made the following preliminary findings and conclusions as to the rights of Component and Trine (hereinafter

referred to as the parties), based on the evidence presented to date in this case.

1) Neither party has a protected right to the design of the baffle filters originally designated as F-30, F-35, F-50 and F-60.  Each party is free to make and sell filters of that design.

2) Neither party has a protected right to the parts numbers F-30, F-35, F-50 or F-60.  Each party is free to make and sell filters with those parts numbers.

3) Each party is free to make and sell filters with parts numbers similar to the F-series designations.  Therefore, Component is free to use FG-series parts numbers, and Trine is free to use T-series parts numbers.

4) Neither party has a protected right to the design of the baffle filters originally designated as Standard-Keil filters Fire Chief, Fire Guardian, Fire Marshall, and Fire Fighter.  Each party is free to make and sell filters of that design.

5) Trine owns the product names Fire Chief, Fire Guardian, Fire Marshall, and Fire Fighter.

6) Component owns the product name Grease Guard, and is the current holder of the patent for the design of that filter. Component is currently free to market and sell the Grease Guard line of filters.  Any dispute between the parties

110

concerning the rights to the Grease Guard patent has not yet been adjudicated.

7)   Neither party has proprietary rights to any UL numbers. Each party must deal with UL concerning the use of UL numbers on UL-approved products.

8)   Each party is free to market and sell to all former, current and prospective customers of either party, without restriction.

9)   Each party is free to deal with any manufacturers, sales agents, or other sources and intermediaries, in the making and selling of filters.

10)   Notwithstanding the foregoing rulings, Trine is free to sell the existing inventory of Trine-made filters currently in the possession of Trine, whether or not such filters are stamped with Component's name and/or UL numbers R7283 or R17114, consistent with the N.J.S.A. § 12A:2-706 and relevant provisions.

11)   This ruling does not determine how the parties should deal with the existing inventory of Trine-made filters currently in the possession of Component on consignment.

12)   All claims and defenses of each party, and all claims for damages and other relief, are preserved for future adjudication in the course of this litigation.

The Court, for the reasons stated <u>supra</u>, will deny Component's motion for preliminary injunction and also will deny Trine's cross motion for preliminary injunction.  The Court will issue an appropriate order.


       <u>   s/ Mary L. Cooper     </u>
**MARY L. COOPER**
United States District Judge