**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| COMPONENT HARDWARE GROUP, INC.,<br><br>    Plaintiff/Counterclaim Defendant,<br><br>v.<br><br>TRINE ROLLED MOULDING CORP.,<br><br>    Defendant/Counterclaimant. | CIVIL ACTION NO. 05-cv-891 (MLC/TJB)<br><br><br>**FINAL PRETRIAL ORDER** |

This matter having come before the Court for a pretrial conference pursuant to Fed. R. Civ. P. 16; and Douglas Eakeley, Gavin J. Rooney, Monica N. Kamison and Kerstin Sundstrom of Lowenstein Sandler having appeared for plaintiff/counterclaim defendant, and Brendan Judge and Mitchell Taraschi from Connell Foley LLP and Lee Goldberg (admitted pro hac vice) having appeared for defendant/counterclaimant; the following Final Pretrial Order is hereby entered:

**1. JURISDICTION** (set forth specifically).

Jurisdiction of this action is conferred upon this Court by 28 U.S.C. §1332 as the matter in controversy is between citizens of different states and exceeds the sum or value of Seventy-Five Thousand (75,000.00) Dollars exclusive of interest and costs.  Jurisdiction is also conferred upon this Court by 28 U.S.C. §1331, as the matter involves a federal question.

**2. PENDING/CONTEMPLATED MOTIONS** (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar. Also, set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position).

**Component's Pending/Contemplated Motions**

1.    Component's motion *in limine* to exclude Trine's damages model and expert witness on the grounds that the damages that Trine seeks are not available as a matter of law and that the methodology is fatally flawed.

2.    Component's motion *in limine* to exclude all evidence by Trine regarding what constitutes commercially reasonable notice of termination of the Component/Trine relationship.

1

2195469-02

3.      Component's motion *in limine* to exclude all Trine testimony regarding the formation of the underlying Component/Trine relationship as hearsay.

4.      Component's motion *in limine* to exclude Trine's attempt to prove lost sales caused by Component's allegedly wrongful conduct by introducing purchase orders and invoices pre-dating and post-dating October 11, 2004.

5.      Component's motion *in limine* to preclude Trine from quoting or referring to the preliminary findings made by the Court in ruling on the parties' cross motions for preliminary injunction, the evidence admitted during the preliminary injunction hearing or the parties' cross motions for summary judgment.

**Trine's Pending/Contemplated Motions**

1.      Motion to exclude Component's expert's, Mr. Tindle's, opinions based upon the Federal Rules of Evidence and the <u>Daubert</u> standards.

2.      Motion to exclude Component's expert's, Mr. Karlitz's, opinions based upon the Federal Rules of Evidence and the <u>Daubert</u> standards.

3.      Motion to bar Mr. Tindle's "rebuttal" report due to untimeliness.

4.      Motion for an adverse inference regarding the terms of the 1997 agreement in which Component purchased Standard-Keil due to Component's failure to produce the agreement despite representing to the Court during the preliminary injunction hearing that such agreement was in counsel's possession or, in the alternative, to exclude any reference to that agreement.

5.      Motion seeking Order declaring that Component is estopped from claiming the Fire Fighter name and logo are not valid and protectable.

6.      Motion precluding Component from denying that the Fire Fighter product line was sold to Trine.

7.      Motion barring Component from referring to Trine as a "job shop" or "jobber".

8.      Motion barring Component from claiming ownership of the filter design by virtue of anything submitted to or received from Underwriters Laboratories, Inc.

9.      Motion for an Order precluding Component from asserting that the contractual relationship between the parties is unenforceable pursuant to the Statute of Frauds.

2

10.   Motion barring Tom Carr from testifying about the nature of the relationship between Component and Trine.

11.   Motion barring Tom Carr from referencing or discussing in any way and for any purpose a conversation he had with Al Klein in the presence of counsel in our about October 20004 due to Component's assertion of privilege.

12.   Motion barring Martin Burns from testifying about the nature of the relationship between Component and Trine.

13.   Motion barring Stuart Pachman from testifying as a witness.

14.   Motion to strike portions of Lee Goldberg's October 28, 2004 letter relating to a settlement demand.

15.   Motion barring Component from maintaining that it had a reasonable belief in the following as of the inception of this litigation:

    a.   That Component owned the design of the baffle grease filters manufactured by Trine since approximately 1982;

    b.   That Component had the right to purchase, market and sell filters other than those manufactured by Trine;

    c.   That Trine was illegally selling filters;

    d.   That Component owned the intellectual property rights associated with the baffle grease filters manufactured by Trine since approximately 1982;

    e.   That Component retained the Underwriter Laboratories, Inc. listing registrations for the baffle grease filters manufactured by Trine since approximately 1982;

    f.   That Component designed the baffle grease filters manufactured by Trine since approximately 1982;

    g.   That Component owned the Underwriters Laboratories, Inc.'s number placed on the baffle grease filters manufactured by Trine since approximately 1982; and

    h.   That Trine did not have the rights to the Underwriters Laboratories, Inc. numbers associated with the baffle grease filters manufactured by Trine since approximately 1982.

3

Return dates are not listed per the Court's instruction that a briefing schedule will be set at the parties' August 20, 2009 pretrial conference.

**3. STIPULATION OF FACTS** (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties).

No stipulations of fact.  Parties are granted leave to serve requests for admissions.

**4. PLAINTIFF'S CONTESTED FACTS** (State separately for each plaintiff. Proofs shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof).

A. Plaintiff intends to prove the following contested facts with regard to liability:

### COMPONENT'S EXECUTIVE SUMMARY RELATING TO LIABILITY

Prior to the formation of Component in 1981, its former principals (Alfred Klein, Eric Klein, Fred Weinmann, and Stephen Bohacik) were employed by Standard-Keil Hardware Manufacturing Co. ("Standard-Keil").  Standard-Keil is a designer and manufacturer of specialty hardware components.  Standard-Keil manufactured and sold baffle grease filters under the names "Fire Chief," "Fire Marshall," "Fire Guardian," and "Fire Fighter."  While at Standard-Keil, the Kleins, Weinmann and S. Bohacik learned how to both design and engineer these baffle-grease filters.  In 1981, they decided to form their own company.  Having learned that running a manufacturing facility and a sales organization simultaneously was too onerous, they decided Component would be a "virtual manufacturer," meaning Component wanted to design and control its products but that Component would hire a "job shop" to manufacture its products.

In 1982, Trine's Dave Wilson approached Component regarding the latter's search for a source of baffle-type grease filters for use in overhead commercial and residential kitchen exhaust fan systems.  Trine undertook to manufacture baffle-grease filters for Component.  Soon thereafter, Component provided Trine with Standard-Keil sample filters and Fred Weinmann's detailed construction drawings to facilitate their manufacturing process.  To move the process along, Component arranged for Rick Bohacik to assist Trine in its production of the grease filter.  Within months after Rick Bohacik's arrival, Trine finally produced a baffle-grease filter that Component could sell to its customers.  Once produced, Component secured the necessary Underwriter Laboratory ("UL") approvals.  Finally, in preparation for sale, each and every filter was stamped with Component's name and placed in Component's packaging during the course of the parties' relationship.

Starting in early 1983, Trine manufactured, and Component sold, baffle grease filters bearing Component's name and which were made of three kinds of alloys: F-30 for aluminum; F-35 for galvanized steel; and F-50 for stainless steel (the "F-

4

series filters"). Component also purchased tray slides from Trine for resale to its foodservice equipment customers. Component purchased well in excess of $500 worth of F-series filters and tray slides from Trine each year.

Component and Trine never had a written agreement detailing the rights and responsibilities associated with their business relationship and did not otherwise memorialize the terms of their relationship in a writing signed by the parties. Nor did the parties expressly agree on the duration of their relationship or what would happen in the event of termination. Throughout their relationship, Component and Trine operated separately from one another, with Trine maintaining its facility in the Bronx, New York and Component controlling and maintaining its own distribution and sales facility in Lakewood, New Jersey.

The parties developed a system involving three methods by which F-series filters were sold to customers in order to address increasing price competition in the grease filter market. The first method involved Component's direct purchase of F-series filters from Trine (the "direct purchase method"): Component would purchase the filters directly from Trine at a price based upon the costs incurred by Trine to manufacture the grease filters, plus a profit margin for Trine. Component, in turn, would then re-sell these filters to third-party purchasers in the marketplace at a price of its own choosing. Trine did not know the identity of the customers Component re-sold the filters to under the direct purchase method.

The second method involved what Trine characterizes as "commission sales": Component would set inventory levels for baffle-grease filters that Trine would be required to replenish. Component would then warehouse this inventory until it was purchased by a Component customer. Component would set the price at which such filters were sold to customers and ship the product and bill the customer directly. When Component sold such a filter, it would remit the purchase price to Trine, and Trine would then pay Component a "commission," which represented a percentage of the purchase price. Component guaranteed Trine payment under the so-called "commission sales" method in that Component was obligated to pay Trine in the event a customer defaulted on its payment obligations. As with the direct purchase method, Trine did not know the identity of the customers Component sold the filters to under the "commission sales" method.

In an effort to further cut shipping costs and save customers money, Component developed a third sales method. The third method involved Trine shipping filters to customers directly (the "direct ship method"): a customer would place an order with Trine directly, Trine would fill that order from its inventory, and ship the product and bill the customer directly. When this method was used, Trine would receive the purchase price from the customer and then pay Component a "commission," which again represented a percentage of the purchase price. As with the so-called "commission sales" method, Component guaranteed Trine payment in the event a customer failed to pay for the grease filters it had ordered. However, unlike the direct purchase and commission sales methods, Trine was

aware of the identity of the customers who purchased the filters under the direct ship method since it shipped to those customers directly.

At no point did Component ever undertake to represent Trine as a "commissioned sales agent." To the contrary, Trine made grease filters on behalf of Component. Component marketed those filters under its own name, and the filters and packaging made by Trine for Component all bore Component's name, not Trine's. Under all three sales methods outlined above, Component controlled all aspects of its grease filter sales. In particular, Component maintained and controlled its own sales force and warehouses at its own expense with no direction or oversight by Trine. Component also decided how the filters would be advertised and marketed, to whom it sold the filters and where it sold the filters -- with no input from Trine. In addition, Trine did not pre-approve orders or perform a credit check on the customers Component sold the filters to, and Component set its own sales targets with no obligation to report its filter sales revenues to Trine.

On or about August 29, 1997, Component purchased all of Standard-Keil's assets across all product lines, including its Fire Chief, Fire Marshall, Fire Guardian and Fire Fighter baffle-grease filter product lines, for a purchase price of $4,350,000. Component approached Trine in late 1997 and offered Trine an opportunity to purchase those assets associated with the former Standard-Keil baffle-grease filter product line, including machinery, equipment and tooling, as well as unsold Standard-Keil inventory. In December of 1997, Frank Rella, Trine's President, and James Lange on behalf of Trine and Stephen Bohacik on behalf of Component orally agreed that Trine would purchase the former Standard-Keil's grease filter's physical assets from Component for a total purchase price of $192,247.56 (the "December 1997 Asset Sale"). Approximately $112,000 of the $192,247.56 purchase price related to unsold Standard-Keil inventory.

Component retained the intellectual property rights associated with the Standard-Keil filters, including the Fire Fighter filter, following the sale. Neither of the documents memorializing the sale lists intellectual property such as good will or trademarks among the items transferred to Trine, and Bohacik advised Lange that "[t]he delivery of this tooling completes the transaction of your purchase of these items." Nor did Component agree to restrict its rights to develop new products. Trine's financial statements also do not reflect the acquisition of any good will as a result of the December 1997 Asset Sale.

While sales grew steadily through the 1980s and 1990s, the F-series filters faced increasing competition in the marketplace; they also became the subject of customer complaints. For example, Captive Aire Systems, Inc. ("Captive Aire"), a large manufacturer of commercial range hoods, complained frequently about the construction of the Trine-manufactured filter. In June of 1995, Captive Aire informed Component that, because of the less than satisfactory quality of the Trine-manufactured filters, it was seeking another vendor. Shortly thereafter, Component lost Captive Aire's grease filter business.

6

As a result of increasing competition, customer complaints and the loss of Captive Aire's business, Alfred Klein, Component's president, as well as other Component personnel, repeatedly requested that Trine develop a new and improved baffle-grease filter.   Component offered to help finance the development of a new filter, but Trine rejected Component's offers and instead advised Component that it would undertake efforts to develop a new filter on its own.   In 1999, Trine hired Special T Design & Manufacturing Co. of Reading, Pennsylvania ("Special T") to develop a stamped, two-piece filter on its behalf with the objective of reducing Trine's assembly line labor costs.

However, between October 1999 and August 21, 2003, Trine failed to provide Special T with any direction as to how to proceed and the project languished. Finally, apparently with input from Trine, Special T produced a prototype (designated the "T-70") in late 2003.   By its own calculations, Trine spent $93,056 in total for research and development costs over a nine year period to develop a prototype of the so-called T-70 filter.  The T-70 prototype then failed UL testing three times before it finally passed on March 3, 2004.  Trine never developed the T-70 beyond the prototype stage.

Meanwhile, concerned that Component would lose a significant amount of market share to its competitors due to price and product quality issues, and unsure if and when Trine would produce a satisfactory new filter, Klein prevailed upon Component's Richard Bohacik to develop a new and improved filter design. Unlike the design of Trine's T-70 prototype filter, which is a two-piece stamped filter secured by rivets, the filter designed by Bohacik was a three-piece filter sealed together with a "can seam" (similar to the seam on a can of soup).  On January 11, 2005, the U.S. Patent Office issued Patent No. 6,840,975 B2 to Bohacik for his new filter design and listed Bohacik as the inventor of the patent. Bohacik assigned the patent to Component, and this patented grease filter eventually became what is known today as the Grease Guard, Component's next generation baffle-grease filter.

Component subsequently invested in excess of $600,000 on tooling and specialized manufacturing equipment to develop a production-ready version of the Grease Guard at Shanghai New Tree Metals Co., Ltd. ("New Tree"), a manufacturing facility located in the People's Republic of China.  After New Tree manufactured the initial prototypes, Component openly displayed the Grease Guard at the September 2003 North American Association of Food Equipment Manufacturers (NAFEM) trade show along with the Trine-manufactured F-series filters.  Component also distributed Grease Guard prototypes to select customers during the same year to test market the new filter.  Component did not expressly advise Trine that it had decided to manufacture and market the Grease Guard filters, because it feared that Trine would retaliate and cut Component off. Component did not, however, engage in a concerted effort to "hide" the development of the Grease Guard from Trine.  To the contrary, the reality was that other than exchanging the "weekly manifest" purchase orders, the parties rarely communicated with one another.  Indeed, Rella never even bothered to

introduce himself to Component's new management team after Klein and the other founders sold Component in 2000.

Component's first commercial sale of the Grease Guard took place in early 2004. Component began reducing its orders of the F-series filters from Trine in the second week of September 2004.  Shortly thereafter, on October 11, 2004, Martin Burns, Component's Vice President of Operations, advised Lange that Trine could see a significant reduction in Component's orders for the F-series filters in the future because Component had a new filter that looked as if it was starting to be accepted in the marketplace.  By October 11, 2004, Component's total gross sales revenue from Grease Guard sales was approximately $119,292.

Eight days later, on October 19, 2004, Rella and Lange of Trine and Burns and Carr of Component met to discuss the reduction in Component's filter orders.  At the meeting, Carr told the Trine representatives that Component had a new filter that Component thought would be more acceptable in the marketplace, and that it intended to sell that filter in place of the Trine-manufactured filters in some cases, while going after lost business first.  As a consequence, he said Trine could expect a decline in its business.  Carr and Burns showed Rella and Lange the Grease Guard; the Trine representatives complimented Component on the design and said it looked very sturdy and was a well-made filter.  Carr advised that he expected the transition to take one to two years, and emphasized that it was Component's intent not to leave Trine with any unsold filters or raw material.  In order to work out a transition plan that would mitigate Trine's losses, Carr asked Rella and Lange to develop a list of raw materials, work-in-process and finished inventory on hand at Trine.  Rella said Trine would send Component an accounting the following week.

Instead of sending Component an accounting the following week, however, Trine sent a letter from its attorneys, accusing Component of illegal and wrongful acts, demanding payment and threatening to sue Component.   Trine also refused to ship grease filters to Component without being paid in cash in advance, and refused to process orders placed by Component for tray slides.

Sometime after the October 19, 2004 meeting, Trine entered the marketplace and began selling grease filters with Component's name stamped on them.  Upon advice of counsel to the effect that Component owned the intellectual property rights to the grease filters, Component filed suit against Trine and sought to enjoin Trine preliminarily from selling the grease filters.  Trine, in turn, counterclaimed, asserting that it owned the rights to the grease filters and seeking to enjoin Component preliminarily from selling them.  After a hearing, the court denied both parties' motions for preliminary injunction, and ruled in June 2005 that Component and Trine were each free to sell grease filters.

Trine now alleges that Component failed to provide Trine with commercially reasonable notice of termination.  However, neither Rella nor Lange could identify the amount of time Trine required for such notice.  Nevertheless, by the

8

time of the October 2004 meeting, Trine had enjoyed many years of substantial profits and had long since recouped its investment in the machinery and equipment used to manufacture the F-series filters.  In addition, Trine has since used and sold off all unused raw materials, work-in-progress or inventory in its possession at the time of the termination, and thus does not assert a damage claim related to such materials.

Trine also claims that Component attempted to win over two "direct ship" customers, Integrated Support Systems ("ISS") and Franklin Machine Products ("FMP"), by making false claims about Trine and the F-series filters.  But there is no evidence to suggest that Component's claims caused Trine to lose sales or customers.  Trine continued to sell the F-series filters to ISS at comparable levels and continues to do so today.  Trine also continued to sell the F-series filters to FMP at comparable levels for several months after Component first solicited FMP, and when FMP ceased purchasing the Trine-manufactured filter in April of 2005 and began purchasing the Grease Guard, it did so for reasons unrelated to Component's statements.  Moreover, Component's promotional efforts for the Grease Guard line were non-threatening and constituted typical sales negotiations.

Trine also claims that Component misappropriated the Fire Fighter trademark by marketing and selling a Chinese-made Fire Fighter.  While in 2005, New Tree did manufacture two shipments of Fire Fighter filters for Component and Component advertised the Chinese-made Fire Fighter for a limited period of time in its catalogue of products, Component possessed whatever good will, if any, was associated with the Fire Fighter mark.  The public identified Component as the company standing behind the Fire Fighter mark.  Component's name was stamped on each and every Fire Fighter filter sold during the course of the parties' relationship.  Customers testified that they took their complaints and issues regarding the baffle-grease filters to Component rather than Trine.  Trine only applied to the U.S. Patent and Trademark Office to register the Fire Fighter mark as a trademark on April 11, 2006, long after Component's use of the mark.

B. Plaintiff intends to prove the following contested facts with regard to damages: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).

## <u>COMPONENT'S EXECUTIVE SUMMARY RELATING TO DAMAGES</u>

As will be explained in Component's motion *in limine* to exclude the damages model prepared by David J. Zaumeyer, Ph.D. of Marks, Paneth & Schron ("the Zaumeyer model"), the damages that Trine seeks here are not available as a matter of law.  Trine sues Component based upon two essential theories: contract and tort.  Under a contractual analysis, Component had the right to terminate the oral contract between the parties subject only to a requirement that it provide reasonable notice of its intent to terminate.  Damages for breach of that requirement would comprise Trine's lost profits for the notice period.  However,

the Zaumeyer model does not purport to estimate those damages.  Instead, the Zaumeyer model seeks to put Trine in the same position as if Component had never stopped doing business with it.  The model seeks lost profits for a thirty-nine month period (October 2004 to December 31, 2007), which is not claimed by Trine to represent a reasonable notice period.  Moreover, Trine also seeks an award of the supposed value that its business would have held as of December 31, 2007 but for the demise of its contractual relationship with Component.  Likewise, Trine's measure of damages for its tort claims are the lost profits arising from the loss of customer sales that it alleges resulted from the allegedly tortuous statements made by Component.  Again, the Zaumeyer model does not attempt to estimate such damages; instead, it seeks to estimate how Trine would have been better off had Component not chosen to stop doing business with it.  Given the lack of any fit between the damages model and the theories of liability, the model is irrelevant and should be excluded from trial.

Additionally, the Zaumeyer model also suffers from numerous defects, including the use of inappropriate and speculative assumptions and mathematical errors.  These defects are detailed in the report issued by Gary Karlitz and James Lynch of Citrin, Cooperman & Company, which is incorporated herein by reference.

**5. DEFENDANT'S CONTESTED FACTS** (State separately for each defendant. See instructions above).

A. Defendant intends to prove the following contested facts with regard to liability.

Pursuant to the directive of Judge Cooper, rather than submitting a detailed listing of every disputed fact Trine intends to prove at trial relating to liability and damages, Trine submits the following Executive Summary.

## TRINE'S EXECUTIVE SUMMARY RELATING TO LIABILITY AND DAMAGES

### A.    The Creation Of The Parties' Long-Term Exclusive Relationship

In 1981, Component was founded by three former employees of a company known as Standard-Keil Hardware Manufacturing Co. ("Standard-Keil"), which was a manufacturer and distributor of commercial food service products.  Standard-Keil had just fired the individuals, and they were stunned and hungry.  They had no products to sell and no manufacturing capability. Trine (a successful manufacturer, which had been in business since 1942), was one of the few companies that reached out to Component and offered it an opportunity.

Trine approached Component about the possibility of Component's selling grease filters for kitchen exhaust systems that Trine would manufacturer.  Because Trine had not previously manufactured such a filter, Component provided Trine with a sample Standard-Keil filter, which was available on the open market for $9, but which Component probably obtained for free.

At its sole cost, Trine legally, reverse engineered the filter, made certain design changes, designed and developed the tooling, and purchased the machinery necessary to mass manufacture the filter.

Trine went into production with its filter, known as the F-30 (aluminum), F-35 (galvanized) and F-50 (stainless steel) (collectively, the "F-series Filters") in or bout 1982.  At all times from approximately 1983/84 to October 11, 2004, Component led Trine to believe that Component was acting as Trine's exclusive commission sales agent for the sale of baffle grease filters.  During such same time period, Trine exclusively sold its baffle grease filters through the Component/Trine relationship, Trine even paid a commission to Component on sales Trine itself generated.

In order to be able to meet Component's requirements, Trine was required to maintain a certain manufacturing capability and roster of personnel on hand at all times.  By 1998 Trine had staffed its filter division to include twenty-two full-time employees involved in production in reliance on the parties' exclusive agency relationship.  In addition to those employees, Trine had nine employees in its roll forming division, plus another ten employees in administration, supervision, maintenance and other roles.  As of October 2004, the filter division comprised approximately two thirds of Trine's manufacturing facility

**B.    Trine's Purchase Of Standard-Keil's Filter Division From Component**

In 1997, Component purchased all the assets of Standard-Keil, including its four grease filter product lines: the Fire Chief, Fire Marshall and Fire Guardian and Fire Fighter (the "Standard-Keil Filter Division"). The Fire Chief, Fire Marshall and Fire Guardian were virtually identical to Trine's F-Series Filters.

In 1997/1998, Component sold to Trine the Standard-Keil filter division.  Trine purchased the Standard-Keil filter division from Component as a direct result of negotiating a guarantee that Component would not compete against Trine in the sale of Grease filters.[1]   After Component sold the Fire Fighter™ and other product lines to Trine, Component began marketing Trine's Fire Fighter™ using the same Fire Fighter name and logo that Standard-Keil had used since at least the 1980's.

---

[1] From at least 1999 through the inception of the litigation, all maintenance and inspection fees relating to Underwriter Laboratories, Inc.'s files R7283 (covering the Standard-Keil Fire Fighter filter) and R10173 (covering the filters Trine has manufactured since 1982) have been paid by Trine. Despite this fact, and despite the assignment of the Fire Fighter filter to Trine, after termination of the relationship Component and its counsel sought to block Trine from using R7283  and R10173.

11

### C.    Component's Encouragement To Develop A New Filter

During the 1990's, Component began encouraging Trine to develop a new filter to compete in the low cost market.   With Component's knowledge and encouragement, Trine spent approximately $100,000 developing a new filter, the prototype of which became known as the T-70.

### D.    Component Surreptitiously Developed, Marketed and Sold A Competing Grease Filter

Component was sold in early 2000, and the original management team began to be phased out.  At the same time, while Component was purporting to act as Trine's exclusive commission sales agent for grease filters, and encouraging Trine to develop a new filter, Component began secretly developing, marketing and ultimately selling a competing filter made in China. In 2000 Component (which was no longer stunned and hungry, but rather had become a Goliath in the food service hardware industry) sought a Chinese manufacturer to make a competing filter that ultimately became known as the Grease Guard.  The concept of using a can seam on a two piece filter was originally conveyed by Trine to Component in confidence.  Component then misappropriated that concept and applied it to a Trine filter to develope the Grease Guard.

Despite approaching several manufacturers located in the United States to inquire whether they would manufacture the Grease Guard, Component failed to approach Trine to make such an inquiry and even concealed from Trine its intent to develop this competing product.  Instead, Component engaged a "sourcing agent," Simmons International, Ltd. ("Simmons") to assist Component in locating a manufacturer for the Grease Guard in China.

Since at least 2000 when Component began developing its Chinese-manufactured Grease Guard, Component knew that once Component brought that product to market, Trine would become Component's competitor.   In 2002, Mr. Burns admitted it in writing, and has since admitted it in deposition.  Consequently, Component's Vice President, Martin Burns, devised a scheme to introduce all sizes of the Grease Guard to the market simultaneously - all the while hiding this plot from Trine.   Only after Component switched all orders for Trine's F-series Filters to the Grease Guard would Component advise Trine about the Grease Guard.  As Mr. Burns advised Simmons in December 2002:

> "our current supplier [Trine] will probably not supply us with product when we bring the New Grease Guard filter to market.  He will become our **competitor**.  Therefore we will have to tool all of the additional sizes at the same time and rather quickly in order to introduce all sizes at the same time and to continue supplying our customers."

Despite advising this Court during the injunction proceedings in 2005 that it planned to slowly wean Trine from Component's filter orders, Mr. Burns has since admitted that, in fact, Component never had a plan to gradually introduce its Grease Guard, and it never had a plan to gradually reduce its orders to Trine.  And Component had no plan to gradually wean Trine from its filter orders.

At least as early as March 15, 2002, Component began secretly marketing the Grease Guard in the United States by attempting to generate interest in that product at Captive Air, which is the largest purchaser of grease filters in the United States.  Despite being Trine's exclusive commission sales agent for grease filters at the time, Component made no effort to generate interest at Captive Air in Trine's F-series Filters.

In 2003, Component continued to market the Grease Guard to Captive Air and other customers and potential customers.  Component secretly distributed free samples of the Grease Guard throughout the industry, and marketed the Grease Guard at the most important tradeshow, the NAFEM tradeshow, in September 2003, while purportedly being Trine's exclusive commission sales agent.  While Component had prominently displayed the Trine filter at prior NAFEM tradeshows, Component did not display the Trine filter at the 2003 NAFEM show, electing to display only the Grease Guard.  Trine was never informed of this action.  As Component's new President and CEO, Tom Carr, explained: Component was representing its own interests at that show.

**E.     Component's Secret Sales Of The Grease Guard**

Component began secretly selling the Grease Guard in February 2004. Component failed to provide any advance notice to Trine that it was marketing and selling the Grease Guard. Component's sales management and Mr. Carr were encouraging its sales force to "do more in the form of selling Grease Guard."  The sales force was instructed to "get sales—get more sales going."  At the same time, Component's sales management and Mr. Carr were not directing the sales force to make more (or any) sales of the Trine F-series Filters.

**F.     The One-sided Race Is On In September 2004**

As of September 2004, Component had never advised Trine that it was developing the Grease Guard, that it had been marketing the Grease Guard to Trine's customers since at least 2002, or that it had been selling the Grease Guard to Trine's customers since February 2004.  By September 2004, Component had all of its Priority 1 sizes in stock and was in position to "change over" all orders for Trine's filters to the Grease Guard.

By e-mail dated September 10, 2004, Tom Carr advised Component's top sales management that "[t]he starting gate has been rolled out and the race is on."  At the time, the Component sales force "was trying to sell our new Grease Guard filter to your customers in place of the Trine-manufactured filter and others."

13

Component considered itself to be in a "race" with Trine.

But as of September 2004, no one at Component had ever informed any one at Trine that Trine was in a "race" with Component. Trine, unaware that it was in a competitive "race" with its exclusive sales agent, Component, was simply relying on its agent (Component) to sell its filters.

Some time prior to September 24, 2004, the Component sales force was instructed to switch over to all customers to the Grease Guard when they took orders. On September 24, 2004, Component's A.J. Kraft sent the entire Component sales force a "Grease Guard Change Over" e-mail reminding them to switch all orders for Trine's filters over to Grease Guard:

> Hello all, I just wanted to send an e-mail out to everyone to remind you all to switch **ALL** filters over to *Grease Guard* when you take orders. The first thing we should all do when we have an order for filters is to check stock and if we have them we need to change them over to *Grease Guard*. The only reason not to change someone over is if they have told us they do not want the new filters!

As Mr. Burns admitted, the September 24, 2004 Grease Guard Change Over e-mail reflects the execution of the plan that Mr. Burns had set forth in his December 19, 2002 e-mail to Simmons, in which Mr. Burns explained that it was Component's plan to introduce all sizes at the same time to continue supplying the customers.

## G.    Trine's Inquiries

As a result of the execution of this long-standing scheme, in September 2004, Component dramatically decreased its orders for the Trine filters. When Trine's Jim Lange called Component to inquire about the dramatic decrease, Component's John Foran lied to Mr. Lange about the real reason for the decrease in orders (Component's long-planned, abrupt change-over plan), and misrepresented the actual reason for the decrease by "begg[ing] off due to slow sales." But the reason for the drop in sales that Trine observed had nothing to do with any sales slowdown at Component.

It was not until after Component "saw some acceptance" of the Grease Guard in the market in September 2004 that Mr. Burns and Mr. Carr even had any discussion with regard to contacting Trine. And it was not until Jim Lange called Component inquiring about the decrease in orders that Component decided to tell Trine anything.

Sometime after October 1, 2004, Mr. Burns and Mr. Carr had a conversation in which Mr. Carr stated that Component "should call Jim Lang[e] and Trine and tell him that we had a new filter." At that point, Component had been developing its

14

own Chinese-made filter, the Grease Guard, since 2000, marketing the Grease Guard since 2002, and selling the Grease Guard in the industry since at least February 19, 2004.   Also at that point, Component had determined that the Grease Guard was rapidly becoming accepted by more and more customers.

## H.   The First Notice Given On October 11, 2004

By October 11, 2004, Component had sold at least several thousand Grease Guards while still purportedly acting as Trine's exclusive commission sales agent. But Component had yet to contact Trine.  Trine received the weekly manifest on October 11, 2004, which reflected inventory orders much lower than usual—the orders for F-30 20x20 filters went from 1,500 to 96. The F-30 aluminum filters were the biggest selling type of filter, accounting for approximately 71% of Trine's overall filter sales, and the filter product line was over 56% of Trine's overall business as of October 2004.  The total reduction of the F-30 filters was significant; it represented approximately an 84% reduction in F-30 orders.

Over the course of its 22-year relationship with Component, Trine had sold approximately 3.5 to 4 million baffle filters and paid Component approximately $3.5 million in commissions over the course of its 22-year relationship with Component.   This included payment of commissions from Trine's in-house sales not even generated by Component.

But that apparently meant nothing to Component's Martin Burns when he called Trine's James Lange for the first time on October 11, 2004, to discuss the decline in weekly manifest orders for the F-30.  Mr. Burns advised Trine that "we now have a new grease filter being manufactured elsewhere and is rapidly becoming accepted by more and more customers."[2]

Thus, as a matter of undisputed fact, Component failed to contact Trine at all with regard to its development, marketing or sales of the Grease Guard until after Component had switched-over all orders for the Trine filters to the Grease Guard, had sold thousands of Grease Guards and had determined that the market was rapidly accepting the Grease Guard as a result of its surreptitious "switch over" scheme implemented by Component's senior management.

Adding insult to injury, at the same time Component terminated the parties' decades-long relationship without notice, as part of Component's scheme to put Trine out of business, Component abruptly stopped purchasing other products from Trine in October 2004, without providing any notice to Trine in a further effort to destroy Trine.  From 1998 through October 2004, Component purchased more than $1,000,000 of channels and tray slides from Trine.  Since mid-October

---

[2] Of course the Grease Guard was gaining acceptance--Component under the guise of its exclusives sales agency was switching customers to its Chinese made filter. Additionally, Component was telling customers the Trine filters were obsoleted, would no longer be available and that Trine was selling the filters illegally.

2004, Trine's dedicated tray slide production mill has sat dormant, despite Trine's efforts to obtain replacement customers for stainless steel tray slides.

**I.      Component's Misrepresentations At The October 19th Meeting**

Stunned that Component would do such a thing, Trine's President, Frank Rella, contacted Component to ask about the situation and request that the parties meet. Rella and Lange of Trine and Carr and Burns of Component met on October 19, 2004 (the "October meeting").

According to Mr. Burns, Component stated to Trine at the October meeting that Component was "gradually attempting to reduce the manufacture of the antiquated grease filters, and consequently, the purchase orders and inventory relating to them."   Component's Tom Carr testified that he told Trine's representatives that he anticipated that Component would continue to buy Trine-made filters for approximately 1 to 2 years, but he was unsure how long that phase-out period would be because he did not know how the Grease Guard would be accepted in the market.   Mr. Carr further testified that he stated: "My best guess was that we were talking one, one and a half to two year transition period to—in which we would be selling his filter concurrent with ours."

But, in reality, the switch-over of all filter orders from Trine's filters to the Grease Guard had already occurred well prior to October 19, 2004.  Component was not "gradually attempting to reduce the manufacture" of the Trine filters, and consequently, the purchase orders and inventory relating to them.  As of October 19, 2004, Component had <u>no plan</u> to gradually reduce its orders of the Trine-manufactured filters.  And Component had <u>no plan</u> to gradually wean Trine from the filters sales.  And as of October 19, 2004, Component had <u>no plan</u> to help Trine reduce its inventory.[3]  On the contrary, Component did have a plan.  The plan was to destroy Trine as a competitor in the grease filter business.  It was the plan that was conceived prior to December 2002 and executed in 2004 - to simultaneously switch over all customer orders for Trine filters to the Grease Guard.

**J.      Component's Theft of Fire Fighter And Its Infringement of The Fire Fighter™ Trademark**

Trine purchased the Fire Fighter™ product line and other Standard-Keil assets from Component in order to guarantee that Component would not compete against Trine in the production and sale of grease filters.  After Component sold the Fire Fighter™ product line to Trine in 1998 along with the other Standard-Keil filter product lines, Component, acting as Trine's exclusive sales agent,

---

[3] Notwithstanding the foregoing, on March 7, 2005, Mr. Burns certified to this Court that "[t]he purpose of the meeting in October 2004 was to help Trine understand that we would not be selling our older grease filters in the future and to attempt to help them gradually wean themselves off manufacturing our grease filter."

began marketing the Fire Fighter using the same Fire Fighter name and logo that Standard-Keil had used going back at least as early as the 1980's.

Notwithstanding that guarantee not to compete, at some point after Mr. Burns joined Component in July 2001, Component decided to compete against Trine by finding a source in China for the heavy duty, welded stainless steel filter and to call it the "Fire Fighter." Component made that decision to "cover [itself] in case Trine became a competitor and to obtain a lower price." Mr. Burns directed his purchasing department to send to Shanghai New Tree a Trine Fire Fighter™ for the purpose of having New Tree manufacture that product.

Pursuant to Component's request, in or about 2004 New Tree began manufacturing a heavy duty, welded, stainless steel filter. Component concealed from Trine its efforts to have New Tree manufacture a Fire Fighter. In February 2005, Component received the first of two orders it placed to New Tree for the New Tree-manufactured Fire Fighter. Immediately upon its receipt of those New Tree-manufactured Fire Fighters, Component began selling them.

Significantly, the New Tree-manufactured Fire Fighter is identical in both design and construction to the Trine Fire Fighter™. The New Tree-manufactured Fire Fighter™ filters were all stamped with the name "Fire Fighter" on them. At the time it was receiving and selling the New Tree-manufactured Fire Fighter filters, Component did not want Trine to know that New Tree was approved as a manufacturer for the Fire Fighter™, and undertook to hide that approval from Trine (and, apparently, from the Court).

Component was palming off a counterfeit New Tree-manufactured Fire Fighter. That is, Component brazenly advertised the New Tree-manufactured Fire Fighter in its catalogues using the same name and logo that Standard Keil used dating back at least as early as the 1980's, and which Component had used to advertise the Trine Fire Fighter™. Component advertised the New Tree Fire Fighter using the name and logo that Component had sold to Trine.

## K.    Component's Defamatory Statements To Customers

After Trine objected to Component's plan to continue selling Grease Guards, Component engaged in a campaign to disparage Trine in the industry. Component Hardware "apprised its customers" that Component "retains the UL and NSF registrations for all of its products illegally distributed by Trine."

Indeed, Component contacted customers and advised them that Trine had no right to manufacture or sell the F-Series filters. FMP's Michael Conte testified that Component told Conte in December 2004 that Component owned the UL rights to the F-series filters, Trine had no right to sell the F-series filters, and Trine was selling directly to Component's customers. During the meeting with Mr. Conte, Component alluded to Trine's lack of stability going forward.

17

Component's Ron Braham wrote Mr. Conte a letter on December 9, 2004, which reiterated Component's party-line that Component owned both the former Standard-Keil product lines and the F-Series filters, which Component claimed it actually designed:

> When I met with you on December 2, you mentioned that a representative of [Trine] was going to meet with you regarding grease filters.  In any discussion with Trine, you should be aware that grease filters made by Trine are manufactured by it as a job shop for [Component].  Prior to 1997, Trine made grease filters designed by [Component].  When [Component] acquired assets and intellectual property rights from Standard-Keil, including those to the grease filters commonly known as Fire Chief, Fire Marshall, Fire Guardian, and Fire Fighter, Trine began to make those products as a job shop for [Component]. [Component] has retained all of the intellectual property rights to the former Standard-Keil products as well as the UL listing registrations for the grease filter designed by [Component] and those formerly made by Standard-Keil.

Mr. Burns informed another customer who had been purchasing Trine's filters for years, ISS, that if Trine was still stamping filters with Component's name and UL number R10173 that its conduct may possibly be illegal.  Component's Tom Carr, in an e-mail to Marty Kelly of ISS, sent December 10, 2004, stated in pertinent part:

> I need to know what might be happening between ISS and [Component].  As you may be aware, Component Hardware has developed a new (and infinitely more robust) grease filter, Grease Guard.  The industry is rapidly flipping their filter away from our old design to this new one. We thought that ISS was switching over to this design; but I'm now hearing that you may not.
>
> Our old design will be obsolete at some point next year; however we will retain the IP rights and UL listing for it.  We don't think, however, that many customers will want the old design once thy have seen and tried the Grease Guard style.[4]

In contacting ISS and FMP Component was attempting to discourage those customers from buying from Trine so those entities would be in a position to buy from Component. Component was also claiming rights that it had sold to Trine, and was deceiving customers by claiming that the Trine filter was Component's and that Component was somehow retiring this product. None of which is factually true or correct.

---

[4] Mr. Carr was referring to the Trine-made F-series filters when he wrote "our old design."

### L.      Litigation Conduct

Component sought to put Trine out of business not only through unfair competition and theft of Trine's intellectual property, but also by seeking to destroy a financially weaker adversary through oppressive litigation tactics.  On January 25, 2005, Component filed its Complaint in this matter along with an application for a preliminary injunction.  The injunction that Component sought from this Court would have prevented Trine from competing against Component. That is, the injunction would have prohibited Trine from manufacturing and selling the grease filters that Trine had been manufacturing and selling since 1983.  Had the injunction been entered, it would have destroyed any competition from Trine, and in the process, immediately destroyed Trine itself.

The action for an injunction was part of an illicit and surreptitious plan conceived by Component and its counsel to destroy Trine as a competitor and to allow Component to convert Trine's business to that of its own.  Amazingly, discovery of Component's own files has revealed that for years prior to filing the Complaint and its preliminary injunction application Component knew that Trine had every right to sell its filters and would do so to compete against Component once Component brought to market a new Chinese-manufactured filter, the Grease Guard.  Component filed its Complaint and injunction application anyway in a malicious attempt to destroy Trine and in utter bad faith.  Both Component and its counsel were aware of the true facts at the time Component's injunction application, Complaint and Answers to Trine's Counterclaims were filed, during the preliminary injunction hearing which planned three months, and during the more that four years that this litigation has continued.  Even worse than using this Court to improperly destroy competition (and a potential competitor), Component and its prior counsel did so with the full knowledge that its entire position was based upon a lie.

Below is a list of the conduct that forms the basis of Trine's claim that Component engaged in frivolous and vexatious litigation in an attempt to destroy Trine:

- Component filed frivolous pleadings, certifications and briefs that had no legal or factual basis.
- Component's witnesses and executives submitted false certifications and proffered perjured testimony.
- Component's witnesses and executives failed to conduct any investigation into the facts upon which they certified and testified.
- Component's witnesses and executives submitted certifications and testimony on topics about which they had no personal knowledge.
- Component used the litigation and discovery process to outspend and outlast a financially weaker opponent, Trine, knowing at all times that its positions were factually and legally meritless.

19

- Component intentionally concealed relevant documents and facts that were within their possession both before and during the preliminary injunction hearing in an intentional effort to mislead the Court and destroy Trine.

**M.     Damages**

Trine's business has been destroyed by Component's wrongful conduct both prior to and during this litigation.  Various categories of Trine's damages have been itemized and detailed in a report authored by Trine's experts, David Zaumeyer and Paul Marquez.  The following is a list of certain of the categories of damages sought by Trine:

- Grease Filter Orders Terminated
- Lost Roll Forming Sales
- Fire Fighter Infringement
- Previous Rutzler Filter Sales
- Grease Guard Filters Sold Prior To 10/11/04
- T-70 Development Costs
- Working Capital Contributions
- Unpaid Component Invoices
- Unpaid Rent
- Destruction of Business
- Royalties for the Theft of the Grease Guard Design
- Prejudgment Interest
- Attorney and Expert Fees
- Costs
- Treble Damages
- Punitive Damages

All told, Trine's damages claim is in excess of $10,000,000, excluding treble and punitive damages.

B. Defendant intends to prove the following contested facts with regard to damages. (This statement must include the factual basis for each defense against plaintiff's claims for damages).

See Trine's Executive Summary, above.

**6. PLAINTIFF'S WITNESSES** (Aside from those called for impeachment purposes, only those witnesses whose names and addresses are listed below will be permitted to testify at trial).

A. On liability, plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

1.   Richard Bohacik (102 Penbrook Road, Forked River, NJ 08731-5824): Knowledge of (a) Standard-Keil from 1972 to 1982, (b) the formation and business of Component, (c) Trine's manufacturing processes, (d) the Component/Trine relationship from 1982 to 1983 and from 1987 to 2003, (e) the engineering of baffle-grease filters, (f) setting and maintaining inventory levels (weekly manifests), (g) the Standard-Keil asset purchase, (h) the grease filter sales from 2000 to 2003, (i) the T-70 development and prototype, (j) the F-series designation, (k) the Grease Guard development, and (l) the Captive Aire relationship/termination.

2.   Steven Bohacik (221 Oval Road, Manasquan, NJ 08736):  Knowledge of (a) Standard-Keil from 1972 to 1982, (b) the formation and business of Component, (c) the Component/Trine relationship from 1983 to 2000, (d) the Component relationship with Frank Rella, Sr., David Wilson and Matt Berardi from 1983 to 2000, (e) setting and maintaining inventory levels (weekly manifests), (f) Component's pricing matrix, (g) the Standard-Keil asset purchase, and (h) the T-70 development and prototype.

3.   Alfred Klein (923 County Route 64, Shushan, NY 12873): Knowledge of (a) Standard-Keil from 1972 to 1982, (b) the formation and business of Component, (c) the Component/Trine relationship from 1983 to 2001, (d) the Component relationship with Frank Rella, Sr., David Wilson and Matt Berardi from 1983 to 2001, (e) the F-series designation, (f) Component's pricing matrix, (g) the Standard-Keil asset purchase, (h) the four sales methods utilized by Component and Trine, (i) the Captive Aire relationship/termination, (j) the T-70 development and prototype, and (k) Franklin Machine Products.

4.   Martin Burns (29 Penn Place, Forked River, NJ 08731): Knowledge of (a) the Component/Trine relationship from 2003 to 2009, (b) Component's pricing matrix, (c) the marketing of the baffle grease filters, (d) the development of the Grease Guard, (e) letters sent to customers, (f) the termination of Component/Trine relationship, (g) Component's relationship with Shanghai New Tree Metals, (h) Component's efforts to market the Grease Guard, and (i) the instant litigation.

5.   Thomas Carr (15 Pawnee Road, East Brunswick, NJ 08816): Knowledge of (a) the Component/Trine relationship from 2003 to 2009, (b) Component's pricing matrix, (b) the marketing of the grease filter, (c) the development of the Grease Guard, (d) letters sent to customers, (e) the termination of Component/Trine relationship, and (f) the instant litigation.

6.   Alan J. Kraft (305 Chelsea Street, Forked River, NJ 08731): Knowledge of (a) Component's grease filter sales, (b) the marketing of the baffle grease filter, (c) the development of the Grease Guard, (d) the grease filter industry generally, (e) Component's pricing matrix, (f) customer

complaints regarding the Trine-manufactured grease filter, (g) the Captive Aire relationship and termination, (h) Component's efforts to market the Grease Guard, (i) Component's loss of grease filter market shares, and (j) Component's F-60 sales.

7. Keith Raymond (704 Princeton Road, Lanoka Harbor, NJ 08734): Knowledge of (a) Component's grease filter sales, (b) the marketing of the grease filter, (c) the development of the Grease Guard, (d) Rutzler sales, (e) Component's pricing matrix, (f) the pricing of the Grease Guard, (g) the NAFEM 2003 conference, (h) Component's efforts to market the Grease Guard, and (i) Trine competing in the marketplace.

8. David Burke (1735 Forge Pond Road, Brick, NJ 08724): Knowledge of (a) Component's development and design of the Grease Guard, (b) communications with Underwriter Laboratory, and (c) Component's F-60 sales, approvals, manufacturing and production.

9. Ronald Braham (International Sales Representative, CHG, 11 Harwood Road, Marlton, NJ 08053: Knowledge of (a) Component's sales to major distributors, including FMP, (b) customer complaints regarding the Trine-manufactured filters, (c) Component's pricing matrix, (d) the 2003 NAFEM show, (e) Component's efforts to market the Grease Guard, (f) Trine competing in the marketplace, and (g) Component's F-60 sales.

B. On damages plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

1. Joe Grato (President, Franklin Machine Products, 101 Mt. Holly By-Pass, Lumberton, NJ 08048): Knowledge of (a) purchases of Trine-manufactured grease filters from Trine from 1986 to date, and (b) Component's solicitation of FMP.

2. Albert Rodriguez (Purchasing Representative, Custom Mobile Food Equipment, 275 South 2nd Road, Hammonton, NJ): Knowledge of (a) purchases of Trine-manufactured grease filters from Trine, (b) Component's solicitation of Custom, (c) Component's marketing of the Grease Guard, (d) Custom's purchase of the Grease Guard, and (e) Custom's purchases from Kason.

C. Defendant objects to the following witnesses for the reasons stated:

Trine has no objections to Component's list of proposed witnesses.

**7. DEFENDANT'S WITNESSES** (See instructions above).

A. On liability, defendant intends to call the following witnesses who will testify in accordance with the following summaries:

1.      George Backenstoes
        Superior Metalworks, Inc.
        1416 Trindle Rd.
        Carlisle, Pennsylvania
        Mr. Backenstoes has knowledge of Component's advising customers that
        it was discontinuing the Trine style filter and that such filter would no
        longer be available.  He also has knowledge of Trine's efforts to mitigate
        its damages.  He also has knowledge of customer satisfaction with the
        Trine filter and dissatisfaction with the Grease Guard.

2.      Diane Baumeister
        Rutzler Manufacturing Co., Inc.
        12 Grove Street
        Plainfield, New Jersey 07060
        Ms. Baumeister has knowledge of Component's breach of the exclusive
        commission sales agency agreement in the 1980s and early 1990s.

3.      Richard Bohacik
        102 Penbrook Road
        Forked River, New Jersey
        Mr. Bohacik has knowledge of such topics as his work for Trine to enable
        Trine to mass produce the Trine filters; the relationship between Trine and
        Component, Component's breach of the exclusive commission sales
        agency agreement, the development of the T-70 and the development of
        the Grease Guard.

4.      Stephen Bohacik
        415 Osprey Point Drive
        Breille, New Jersey 08730
        Mr. Bohacik has knowledge of such topics as the relationship between
        Trine and Component and Trine's purchase of the former Standard-Keil
        filter product lines.

5.      Ronald Braham
        Component Hardware Group, Inc.
        1890 Swarthmore Avenue
        Lakewood, New Jersey 08701-4530
        Mr. Braham has knowledge of Component's filter sales efforts, including
        but not limited to the switch-over to the Grease Guard and
        communications with customers.  Mr. Braham has knowledge of Trine's
        efforts to mitigate damages.

6.      David Burke
        Component Hardware Group, Inc.
        1890 Swarthmore Avenue

23

Lakewood, New Jersey 08701-4530
Mr. Burke has knowledge of Component's development and approvals of
the Grease Guard and the knock-off Chinese manufactured Fire Fighter.
Mr. Burke has knowledge of Component's dealings with UL.

7.  Martin Burns
    Component Hardware Group, Inc.
    1890 Swarthmore Avenue
    Lakewood, New Jersey 08701-4530
    Due to his involvement in Component's plan to develop alternative
    manufacturing sources for the baffle grease filters, switch-over all filter
    orders to the Grease Guard, knock-off the Fire Fighter filter, and file suit
    and seek an injunction against Trine, Mr. Burns claims to have knowledge
    of all topics relating to Component's claims and defenses asserted in this
    lawsuit.

8.  Thomas E. Carr
    Component Hardware Group, Inc.
    1890 Swarthmore Avenue
    Lakewood, New Jersey 08701-4530
    As CEO of Component during the time of Component's wrongful
    conduct, Mr. Carr claims to have knowledge of all topics relating to
    Component's claims and defenses asserted in this lawsuit.

9.  Blanca Cintron
    Trine Rolled Moulding Corporation
    1421 Ferris Place
    Bronx, NY  10461
    Ms. Cintron has knowledge of the quality of the Trine filter.  She also has
    knowledge of customer reactions to Component's statements that Trine
    did not have the authority to sell its filters.  She also has knowledge that
    CHG was Trine's exclusive filter distributor.  She also has knowledge of
    the damage suffered by Trine and Trine's efforts to mitigate its damages.

10. Michael Conti
    Franklin Machine Products
    101 Mt. Holly By-Pass
    Lumberton, New Jersey  08048
    Mr. Conte has information regarding the parties' outward manifestation of
    their relationship; quality of Trine's filters; Franklin Machine Products'
    ("FMP's") purchase of Trine's filters; private labeling in the industry;
    Component's marketing of the Grease Guard; communications between
    FMP and Trine and between FMP and Component; and FMP's subsequent
    purchase of the Grease Guard and other filters from Component.

11. Custodian of Records

24

2195469-02

Component Hardware Group, Inc.
1890 Swarthmore Avenue
Lakewood, New Jersey 08701-4530

12.    Berl Finkelstein
       Kason Industries, Inc.
       57 Amlajack Blvd.
       Shenandoah, GA 30265
       Mr. Finkelstein has knowledge relating to the grease filter industry and the
       quality of the Trine filters and the Grease Guard.

13.    John Foran
       503 Adolphus Street
       Forked River, NJ 08731
       Mr. Foran has knowledge of Component's efforts to develop the Grease
       Guard and Chinese manufactured Fire Fighter™, its efforts to sell filters,
       its surreptitious conduct; certain communications with Trine; tray slides;
       Trine's efforts to mitigate its damages. Component's lack of
       communications with Trine.

14.    Joseph Grato
       Franklin Machine Products
       101 Mt. Holly By-Pass
       Lumberton, New Jersey 08048
       Mr. Grato has knowledge of Franklin Machine Products' sales of the Trine
       filters; the outward manifestation of the parties' relationship, the Trine
       filter; the lack of customer complaints regarding the Trine filers; and
       Component's efforts to market the Grease Guard.

15.    Alfred Klein
       Component Hardware Group, Inc.
       1890 Swarthmore Avenue
       Lakewood, New Jersey 08701-4530
       Mr. Klein has knowledge of such topics as the relationship between Trine
       and Component, the development of the Trine-manufactured filters and
       Trine's purchase of the former Standard-Keil filter product lines.

16.    Craig Knabb
       Specialty Design & Manufacturing Co., Inc.
       2000 Friedensburg Rd.
       Reading, Pennsylvania
       Mr. Knabb has knowledge of Trine's efforts and costs to develop the T-70
       filter.

25

17. Alan "A.J." Kraft
Component Hardware Group, Inc.
1890 Swarthmore Avenue
Lakewood, New Jersey 08701-4530
Mr. Kraft has knowledge of Component's development of the Grease Guard and Chinese Fire Fighter™; its efforts to sell filters, tray slides and glass capping; Component's misappropriation of Trine's trade secrets; lack of communications with Trine; Trine's efforts to mitigate its damages.

18. James Lange
Trine Rolled Moulding Corporation
1421 Ferris Place
Bronx, NY 10461
Mr. Lange has knowledge of all topics relating to Trine's defenses and counterclaims, including Trine's efforts to mitigate its damages and the industry's response to the Grease Guard.

19. Keith Raymond
704 Princeton Road,
Lanoka Harbor, NJ
Mr. Raymond has knowledge of Component's efforts to develop and market the Grease Guard and Fire Fighter™; Component's theft of Trine's trade secrets; certain Component communications with Trine and with Franklin Machine Products; and Trine's efforts to mitigate its damages.

20. Richard A. Reed
Lewis Braff & Company LLP
60 East 42nd Street
New York, NY 10165
Mr. Reed has knowledge of Trine's finances and damages suffered by Trine.

21. Charles Rego
Senior Corporate Counsel of Underwriters Laboratories Inc. ("UL")
333 Pfingsten Road
Northbrook, IL 60062-2096
Mr. Rego has knowledge of UL's policies and procedures, Component's dealings with UL.

22. Michele Rella
Trine Rolled Moulding Corporation
1421 Ferris Place
Bronx, NY 10461

26

Ms. Rella has information regarding Trine's efforts to mitigate its damages, the industry's response to the Grease Guard, and Component's communications with customers.

23.    Frank Rella
        Trine Rolled Moulding Corporation
        1421 Ferris Place
        Bronx, NY 10461
        Mr. Rella has knowledge of all topics relating to Trine's defenses and counterclaims, including Trine's efforts to mitigate its damages and the industry's response to the Grease Guard.

24.    Albert Rodriguez
        Custom Sales and Service
        275 South 2nd Road
        Hammonton, NJ 08037
        Mr. Rodriguez has information relating to Component's switching orders for the Trine filter to the Grease Guard without customer notice or consent.  He also has knowledge relating to Component's advising customers that the Trine filter was either no longer available or no longer being manufactured.  He also has knowledge about Trine's efforts to mitigate its damages.

25.    Jeffrey Tindle
        c/o PDI
        3128 Nifda Boulevard
        Smyrna, GA 30080
        Mr. Tindle has knowledge of the quality of Trine's filters, customer satisfaction with the Trine filters, and Trine's knowledge of customer identities.

26.    Lester Wykowski
        Trine Rolled Moulding Corporation
        1421 Ferris Place
        Bronx, NY 10461
        Mr. Wykowski has knowledge of the design and development of the Trine manufactured filters.

B. On damages defendant intends to call the following witnesses who will testify in accordance with the following summaries:

In addition to the above witnesses, many of whom will testify relating to Trine's damages, Trine also intends to call the following witnesses:

1.    David J. Zaumeyer, Ph.D., CPA - Marks Paneth & Shron, LLP - Expert with knowledge of the damages suffered by Trine.

27

2. Paul G. Marquez, JD, CPA/ABV ASA CBA CFE - Marks Paneth & Shron, LLP - Expert with knowledge of the damages suffered by Trine.

3. Richard Reed - Lewis Braff and Company, LLP - Witness with knowledge of damages suffered by Trine.

C. Plaintiff objects to the following witnesses for the reasons stated:

1. Component objects to Trine calling expert witnesses Zaumeyer and Marquez on the grounds that their methodology is fatally flawed and their testimony is irrelevant

2. Component objects to any Trine witnesses testifying regarding the formation of the underlying Component/Trine relationship.

**8. EXPERT WITNESSES** (No opposing counsel shall be permitted to question the expert's qualifications unless the basis of an objection is set forth herein).

A. Plaintiff's expert witnesses are:

1. Gary Karlitz will be called to rebut Trine's damages expert. He will testify in accordance with his expert rebuttal report.

2. Jeff Tindle will be called as an industry expert to rebut Trine's damages expert. He will testify in accordance with his expert rebuttal report.

3. Mr. Tindle will also be called to give an opinion on whether Trine took reasonable steps to mitigate its alleged damages. He will testify in accordance with his expert report.

B. Defendant's objections to the qualifications of plaintiff's expert are:

Trine objects to the qualifications of Mr. Karlitz with regard to portions of his opinion that constitute legal argument.

C. Defendant's expert witnesses are:

1. David J. Zaumeyer, Ph.D., CPA - Marks Paneth & Shron, LLP

2. Paul G. Marquez, JD, CPA/ABV ASA CBA CFE - Marks Paneth & Shron, LLP

D. Plaintiff's objections to the qualifications of defendant's experts are:

28

**9. PLAINTIFF'S EXHIBITS** (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made).

A. Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

> Plaintiff's proposed exhibit list was submitted to the Court on August 14, 2009.

B. Defendant objects to the introduction of plaintiff's exhibits (set forth number of an exhibit and grounds for objection):

1. Trine objects to the admission of Plaintiff Exhibit 73 (the T-70 sample filter marked as P-11 at the preliminary injunction hearing) that Component used during the preliminary injunction hearing because the sample filter had been damaged while in the possession or control of Component or its previous counsel prior to the hearing by some unidentified person at some unspecified time by unspecified means. As such, the spoliation of this object while in the care, custody, or control of Component or its previous counsel makes it an unrepresentative example of any item delivered to Component by Trine.

2. Trine objects to the admission of Plaintiff Exhibits 11 - 13 and 19. All of these exhibits relate to Component's agreement to purchase Standard-Keil assets. Despite repeated requests, such agreement was never produced in complete form.

3. Trine objects to the admission of Plaintiff Exhibit 37 for any reason other than the limited purpose of representing Component's position at the time - and not for the truth of the matter asserted in the document.

4. Trine objects to the admission of Plaintiff Exhibits 51 and 76, as they were already rejected by the Court during the preliminary injunction hearing.

5. Trine objects to the admission of Plaintiff Exhibits 67 and 69 (Mr. Karlitz' expert reports) because much, if not all, of Mr. Karlitz' opinion is inadmissible.

6. Trine objects to the admission of Plaintiff Exhibit 80, Mr. Karlitz' curriculum vitae.

7.     Trine objects to the admission of Plaintiff Exhibits 65 and 68 (Mr. Tindle's expert reports) because much, if not all, of Mr.  Tindle's opinion is inadmissible.

8.     Trine further reserves the right to object to any exhibit on relevancy grounds.

**10. DEFENDANT'S EXHIBITS** (See instructions above).

A. Defendant intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

Defendant's proposed exhibit list was submitted to the Court on August 14, 2009, with a revised exhibit list submitted on August 19, 2009.

B. Plaintiff objects to the introduction of defendant's exhibits (set forth number of exhibit and grounds for objection):

1.     Per FRE 602, Component objects to the following exhibits because there is no competent witness with personal knowledge as to the contents of said documents: 1a-c; 8; 8a; 9; 9a; 45-47; 55; 65-66; 70; 76; 89; 90-92; 102; 104; 106; 108; 132; 133; 139-39; 160; 261 and 436.

2.     Per FRE 901 and 902, Component objects to the following exhibits because they are not authentic: 8a; 9; 9a; 55; 65-66; 73; 89-91; 102; 104; 106; 108; 117-21; 132-33; 138-41; 144; 163; 170; 175-77; 197-98; 221; 232; 284; 311; 436; 452; 465; 475; 515; 518; 527 and 538.

3.     Per FRE 801-803, Component objects to the following exhibits because they contain inadmissible hearsay: 26; 67; 80; 93-97; 104; 107-10; 115; 142; 149-51; 160; 164-65; 168; 171-74; 178; 181; 194; 200; 204; 208; 213-14; 223; 231; 248; 251; 258; 261; 274-77; 290; 308; 310; 327-28; 338-46; 449; 459; 462; 489; 490; 497-98; 526; 528-29; 552; 562; 564-66; 568-69; 571; 587; 590-91; 593; 596-97; 611; 622 and 634.

4.     Per FRE 401-403, Component objects to the following exhibits because they are irrelevant, immaterial, and will likely cause jury confusion: 89; 100-01; 184; 188; 325; 397; 457; 468; 482; 491; 504; 508; 510; 532; 575-76; 578 and 639.

5.     Per FRE 403, Component objects to the following exhibits because the prejudicial nature of these documents far outweighs any probative value they may have:  89; 100-01; 184; 188; 325; 397; 457; 468; 482; 491; 504; 508; 510; 532; 575-76; 578 and 639.

6.      Per FRE 702, 703 and 705, Component objects to the following exhibits because much, if not all, of Mr. Zaumeyer's expert opinion is inadmissible: 400-01; 433-34; 410-16; 630 and 633.

7.      Per FRE 702, 703 and 705, Component objects to the following exhibits because much, if not all, of Mr. Marquez's expert opinion is inadmissible: 400-02; 410-16; 630; 632 and 633.

8.      Component objects to the use of preliminary hearing testimony as documentary evidence. (*See* exhibits D553-561 and 563.)

9.      Component objects to the use of pleadings, briefs and orders as documentary evidence. (*See* exhibits 382, 396, 541, 548, 550, 624, and 635.)

(Copies of exhibits are to be made for opposing counsel, and a bench book of exhibits is to be delivered to the Judge at the start of trial. If counsel desires to display exhibits to the jury, sufficient copies should be available to provide each juror with a copy; alternatively, enlarged photographic or projected copies may be used).

## 11. PLAINTIFF'S LEGAL ISSUES

1.      The UCC statute of frauds bars enforcement of the alleged oral grease filter and tray slide contracts.

2.      Covenants of good faith and fair dealing and confidentiality may not be implied in the absence of an enforceable contract.

3.      Component did not breach the covenant of good faith and fair dealing implied in the alleged contract.

4.      Component did not breach the express terms of the alleged contract.

5.      Component provided Trine with adequate notice of termination.

6.      Component was not Trine's agent or fiduciary.

7.      Trine cannot prove the required elements for tortious interference.

8.      Component was within its rights to develop, market and sell the Grease Guard to advance its own competitive interests.

9.      Trine cannot prove that it had a reasonable expectation that it would have sold the Trine-manufactured filter to the customers who purchased Rutzler filters between 1985 and 1995 and it claims is otherwise barred by the applicable statute of limitations.

10.    Trine's alleged covenant not to compete does not protect any legitimate proprietary interests.

11.    Trine's alleged restrictive covenant lacks reasonable temporal, geographic and subject matter limitations.

12.    None of the items allegedly misappropriated by Component -- the filter design, customers, pricing information and the Firefighter name and logo -- constitute a trade secret.

13.    Trine cannot prove that Component's employees made defamatory statements of fact concerning Trine which were false.  Trine also cannot prove that Component made false defamatory statements with the requisite level of fault and/or actual malice.

14.    Trine cannot establish that the Fire Fighter mark was a valid and protectable trademark during the relevant time period.  The Fire Fighter mark is not inherently distinctive.  The Fire Fighter mark has not acquired secondary meaning.  Trine did not own the Fire Fighter mark during the relevant time period.  The Fire Fighter mark also is a contestable mark, since a mark does not become incontestable until it has been in continuous use for five consecutive years subsequent to registration, or until October 9, 2012.

15.    Trine cannot prove the required elements of fraud with respect to the T-70 filter or the baffle-grease filters.

16.    Trine cannot prove the required elements of conversion.

17.    Trine cannot prove the required elements of unjust enrichment.

18.    Trine cannot prove the required elements of constructive trust.

19.    Trine cannot establish causation between the alleged contractual breaches and its claimed future lost profits and destroyed business value damages.

20.    The alleged fiduciary breaches were not the proximate cause of Trine's alleged lost future profits and destroyed business value.

21.    Trine cannot prove that it suffered damages as a result of the allegedly defamatory statements.

22.    Trine cannot prove that the alleged misappropriation of trade secrets was the proximate cause of Trine's alleged lost future profits and business value.

## 12. DEFENDANT'S LEGAL ISSUES

1.   Whether a contractual relationship for the sale of baffle grease filters existed between Trine and Component.

2.   Whether the contractual relationship between Component and Trine was exclusive.

3.   Whether an agency relationship exited between Trine and Component.

4.   Whether a fiduciary relationship existed between Trine and Component.

5.   Whether Component acted as Trine's exclusive commission sales agent for the sale of baffle grease filters.

6.   Whether Component's conduct violated common-law, statutory law and the terms of the relationship with Trine concerning the sale of baffle grease filters.

7.   Whether Component's conduct violated the implied covenant of good faith and fair dealing with Trine concerning the sale of baffle grease filters.

8.   Whether Component's litigation conduct violated the Lanham Act, New Jersey's Unfair Competition Act and common law unfair competition.

9.   Whether Component acted as Trine's exclusive representative for the sale of tray slides.

10.  Whether Component's conduct violated common-law, statutory law and the terms of the agreement with Trine by failing to provide commercially reasonable notice of Component's intention not to purchase tray slides.

11.  Whether Component's conduct violated the implied covenant of good faith and fair dealing with Trine by failing to provide commercially reasonable notice of Component's intention not to purchase tray slides.

12.  Whether Component misappropriated Trine's trade secrets, including Trine's filter design, Trine's customers, Trine's pricing information and Trine's rights to the Fire Fighter™ name and logo.

13.  Whether Component was Trine's agent for the sale of baffle grease filters.

14.  Whether Component owed fiduciary duties to Trine relating to the sale of baffle grease filters.

15.     Whether Component's conduct breached its agency and fiduciary duties to Trine.

16.     Whether Component interfered with Trine's economic expectancy.

17.     Whether Component is liable for injurious falsehood and slander of Trine.

18.     Whether Component is liable for trade libel of Trine.

19.     Whether Component is liable for conversion of Trine property.

20.     Whether Component is liable for violations of common law unfair competition law.

21.     Whether Component is liable for violations of New Jersey's Unfair Competition Act.

22.     Whether Component is liable for unfair competition in violation of the Lanham Act

23.     Whether Component is liable for trademark infringement, false designation of origin and false description or representation in violation of the Lanham Act.

24.     Whether Trine purchased the former Standard-Keil grease filter product lines, Fire Chief™, Fire Marshall™, Fire Guardian™ and Fire Fighter™ including all intellectual property, from Component.

25.     Whether Trine purchased the former Standard-Keil grease filter product line, Fire Fighter™, including all intellectual property, from Component.

26.     Whether the Fire Fighter name and logo is valid and protectable.

27.     Whether Component committed a fraud by encouraging Trine to incur all costs relating to the development of a new style filter when Component had no intention of ever selling that filter but, rather, intended to sell a Chinese-manufactured filter.

28.     Whether Component committed a fraud by leading Trine to believe Component would continue to sell the Trine-manufactured filters.

29.     Whether Trine and Component's agreement, pursuant to which Component sold to Trine the former Standard-Keil product lines, Fire Chief™, Fire Marshall™, Fire Guardian™ and Fire Fighter™, contained a restrictive covenant pursuant to which Component agreed not to compete against Trine in the sale of grease filters.

34

30. Whether Component violated the covenant not to compete in the sale of grease filters.

31. Whether Trine and Component's agreement, pursuant to which Component sold to Trine the former Standard-Keil product lines, Fire Chief[TM], Fire Marshall[TM], Fire Guardian[TM] and Fire Fighter[TM], contained an implied restrictive covenant pursuant to which Component agreed not to compete against Trine in the sale of grease filters.

32. Whether Component violated the implied covenant not to compete in the sale of grease filters.

## 13. CHOICE OF LAW:

Neither party disputes the applicability of New Jersey law.

## 14. MISCELLANEOUS (Set forth any other matters which require action by, or should be brought to the attention of the Court).

1. Trine and Component may use Power Point presentations of exhibits and testimony to assist the Court and the jury.

2. Trine intends to rely upon the documentary and testimonial evidence previously received by this Court as evidence during the preliminary injunction hearing. Component objects. Court directs parties to review preliminary injunction hearing ("PI") exhibits and testimony in evidence and provide itemized objections. Otherwise, all PI evidence not subject to objection and ruling is deemed admissible at trial. See Rule 65(a)(2).

3. Trine and Component intend to read excerpts of deposition transcripts into the record for the jury. Parties to exhange proposed deposition designations and counter-designations and/or objections.

4. Trine does not intend to pursue any portion of any claim based upon either party's use of the F-Series designations. Component has confirmed Trine's position.

5. The parties reserve any rights to apply for an award of attorneys' fees pursuant to 15 U.S.C. 1117(a); Fed.R.Civ.P. 11 and 28 U.S.C. 1927 will be addressed, if at all, on post-trial motions pursuant to Fed.R.Civ.P. 54(d)(2).

6. Trine asserts that its application for an award of treble damages pursuant to 15 U.S.C. 1117 should be addressed, if at all, on post-trial motions.

7.      Trine intends to present evidence of Component's value for purposes of an award of punitive damages.

8.      Pursuant to Federal Rules of Evidence 703 and 705, Trine does not intend to offer into evidence all of the thousands of pages of documents and other material produced by Trine during discovery that was reviewed and/or relied upon by Trine's experts.   Rather, pursuant to Federal Rule of Evidence 1006, Trine intends to present that evidence in summary form as set forth in the expert report of Marks, Paneth & Shron LLP dated February 14, 2008, as well as the errata sheets marked during deposition. Trine is willing to reproduce the Marks, Paneth & Shron LLP file in its current form (predominantly electronic) in Court during trial if the Court requests.   Trine reserves the right to seek to introduce at trial any document reviewed or relied upon by its experts that may be necessary to clarify its experts' testimony.

Component reserves its right to object to Trine's "summary" exhibits, errata sheets and documents reviewed by Trine's experts.

Parties also to consider demonstrative evidence admissibility.

9.      Trine needs the last known address and current employment for Tom Carr as well as updated contact information for Component employees and former employees, if different from the above.

Component provided certain recent addresses in its proposed pretrial order.

10.     Trine does not intend to pursue its unjust enrichment claim.   Component has confirmed Trine's position.

11.     Court will conduct Trial Management Conference covering jury selection and other trial procedure matters.

12.     Trine would like to confirm that Your Honor does not permit jurors to submit questions to be posed to witnesses.  Confirmed.

13.     Trine would like to confirm that the Court has retained the original exhibits admitted into evidence during the 2005 preliminary injunction hearing, with the exception of the filters.   Court makes those exhibits available to both parties.

14.     Pursuant to Federal Rule of Evidence 611(c), Trine seeks leave to treat as hostile the following witnesses as each is hostile, an executive of Component or identified with Component: Richard Bohacik, Stephen Bohacik, Ronald Braham, David Burke, Martin Burns, Thomas Carr, John

Foran, Alfred Klein, Alan Kraft, Keith Raymond and Jeffrey Tindle. Component objects.

**15. JURY TRIALS** – Not later than the Trial Management Conference.

A. Counsel for each party shall submit to the Judge, with a copy to opposing counsel, written requests for instructions to the jury. Supplemental requests for instructions may be submitted at any time prior to argument to the jury. All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations of supporting authorities, if any, and shall designate the party submitting same. In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper.

B. Proposed verdict forms/special interrogatories are to be submitted to the trial judge.

**16. NON-JURY TRIALS** – Not Applicable.

**17. TRIAL COUNSEL** (List the names of trial counsel for all parties).

For Component - Douglas Eakeley, Gavin J. Rooney, Kerstin Sundstrom and Monica Kamison of Lowenstein Sandler

For Trine - Brendan Judge and Mitchell Taraschi of Connell Foley LLP and Lee Goldberg (admitted pro hac vice)

**18. BIFURCATION** (Where appropriate, the issues relating to liability shall be severed and tried to verdict. Thereafter, all issues relating to damages will be tried).

The issues of liability and damages SHALL NOT be tried separately but the amount, if any, of punitive damages will be bifurcated for jury determination immediately after trial verdict.

Trine consents to the bifurcation of the patent claims, Counts XX (Declaration of Inventorship) and XXI (Unenforceability), as suggested by the Court during the June 2, 2009 hearing.  Trine furthermore does not object to removal from this trial its demands for the following relief: entering an order declaring the '975 Patent invalid and/or unenforceable and/or that the '975 Patent be assigned to Trine.

Trine consents to the foregoing bifurcation so long as it does not limit Trine's ability to introduce documentary and testimonial evidence germain to both the bifurcated claims and the claims contained in Count III (Theft of Trade Secrets), Count IV (Breach of Fiduciary Duties), Count IX (Conversion), Count X (Common Law Unfair Competition), Count XI (New Jersey's Unfair Competition Act) and Count XII (Lanham Act) as all are based on the parties' decades-long relationship and Component's pattern of conduct that included, at least in part, the misappropriation of Trine's filter design.

**19. ESTIMATED LENGTH OF TRIAL**

20 DAYS FOR LIABILITY
and
5 DAYS FOR DAMAGES.

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED
UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD
RESULT IF THE AMENDMENT IS DISALLOWED.


_____ /s/ Douglas Easkeley
Douglas Eakeley
Lowenstein Sandler
Attorneys for Component Hardware Group, Inc.


_____ /s/ Brendan Judge
Brendan Judge
Connell Foley LLP
Attorneys for Trine Rolled Moulding Corp.


_____ s/ MARY L. COOPER _____
UNITED STATES MAGISTRATE JUDGE


DATED:  September10, 2009_____

38

2195469-02